UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

AMERICAN LECITHIN COMPANY,
LIPOID GmbH,
LIPOID, LLC, and
PHOSPHOLIPID GmbH,                          Case No. 12-cv-0929 (RA)

                        Plaintiffs,

-against-

                                            AFFIDAVIT OF CARSTEN
CARSTEN MATTHIAS REBMANN,                   MATTHIAS REBMANN

                        Defendant.
------------------------------------------------------------------x

CARSTEN MATTHIAS REBMANN, being duly sworn, declares and says:

     1.     I am the defendant in this action and make this Affidavit (A) in support of my motion for leave to file a proposed amended answer, counterclaims and third-party claims ("PAA") in this action and (B) in reply to the papers filed by Plaintiffs in opposition to my motion. I make this affidavit on personal knowledge, except as otherwise indicated. I will attempt to limit this Affidavit to facts relevant to the current motion.

*Background*

     2.     My father, Herbert Rebmann ("Herbert") terminated my employment as CEO of Lipoid LLC and American Lecithin Company ("ALC") in August 2011. Lipoid LLC and ALC are the United States members of the worldwide conglomerate that my father runs, known as the "Lipoid Group." I had worked for my father and the Lipoid Group intermittently since 1979, when I was seven years old, and received a 10% equity interest in the Lipoid Group early on. In 2004, I moved to New York to run the Lipoid Group's American operations.

     3.     My father always acted with absolute authority in running both the Lipoid Group and his family. I believe the event that triggered my firing was that I had refused to file certain

tax returns on behalf of Lipoid LLC that I was advised and understood would violate U.S. law.   I tried to heal the rift between us both before and after this termination, but to no avail.

4.      I was trying to negotiate a settlement with Herbert when he started this lawsuit in the Southern District of New York, claiming, in part, that while I was CEO of Lipoid LLC and ALC, I had wrongfully registered certain domain names belonging to these companies and others in the Lipoid Group in my own name (Complaint (Dkt. 1), ¶ 13) and that I had breached my fiduciary duties (Complaint, ¶ 37).

5.      Herbert caused the Complaint to be filed by Lipoid LLC and ALC, as well as two of Herbert's German Lipoid Group companies, Lipoid GmbH and Phospholipid GmbH.

6.      My father was well aware of my limited financial resources and the problems that this would pose in defending this suit.  As an owner of the Lipoid Group I had fixed my own compensation as CEO of Lipoid LLC and ALC and out of a sense of ownership and loyalty, had kept my compensation relatively low – less than at least one of Lipoid LLC's other employees who reported to me. My income was sufficient to cover my living expenses, but not much more. Accordingly, I did not have the resources to fight my father in Court.

7.      When this lawsuit began, I was still hoping to find a way to repair my relationship with my father.  I retained counsel to help me defend this lawsuit. The law firm I retained agreed to defend me, but due to my limited resources, not to bring counterclaims. I made an offer of judgment in an effort to end the litigation, but this was rejected.

8.      Ultimately, as my father continued to reject all of my overtures at reconciliation, I was forced by financial constraints, to relieve counsel and act as my own attorney.

9.      Herbert took my deposition on July 19, 2012.  I served Notices of Deposition on Herbert and Plaintiffs on August 9, 2012.   These depositions were to be taken before the

discovery deadline of August 27, 2012. When Herbert refused to appear for his deposition, I moved the Court for an order compelling his appearance.

10.     On September 21, 2012, this Court ordered my father to have his deposition taken at his attorneys' offices in Manhattan (Dkt. 34). On November 28 2012, I moved for sanctions (Dkt. 41). A hearing was scheduled for December 18, 2012.

11.     Herbert had been claiming that medical conditions prevented him from traveling to New York. On December 11, 2012, this Court ordered Herbert to produce by December 18, 2012, a doctors' note detailing when he would be able to travel to New York and a copy of his international travel itinerary for the prior six months (Dkt. 43). My father did not comply with this Order either.

12.     Instead, on December 18, 2012, the very same day that we were in front of this Court on my motion for sanctions, he served me with notice of a shareholders meeting of another one of the Lipoid Group companies, Lipoid Grundstuecks GmbH ("Lipoid G") to be held on December 25, 2012 in his living room in Neustadt-Gimmeldingen, Germany. The purpose of the meeting was to consider taking away my shares in Lipoid G. A copy of this notice, and its English translation, is annexed hereto as Exhibit A. Through a series of corporate restructurings and other maneuvers by Herbert, that I had been given scant information on, my 10% interest in the Lipoid Group had devolved into a 10% interest in Lipoid G.

13.     At the December 18, 2012 hearing, Herbert's attorneys requested permission to withdraw this lawsuit, but insisted that this be *without prejudice*.

14.     On January 1, 2013, Herbert sent me an email (Exhibit B hereto) stating that I was in default on a $490,000 note held by Lipoid Verwaltungs AG ("LVAG"). I can only assume that this email was referring to a note that I had signed to Complector AG (which Herbert states

in his Declaration, had its name changed to LVAG) in the amount of $700,000, but this note was not payable until 2017 and in any event, was to be paid out of Lipoid Group funds earned by me or otherwise. A copy of this note is annexed as Exhibit C.

15.     The date of the Lipoid G shareholders meeting was moved by Herbert to January 9, 2013. On January 25, 2013, I received an envelope from Herbert sent to my apartment in Manhattan that contained a copy of the minutes of a January 9, 2013 shareholders' meeting of Lipoid G (a copy of this is annexed as Exhibit D) and nothing more. The minutes reflected that at this meeting, at which only he and his second wife were present, they voted to take my 10% share ownership in Lipoid G "for cause." The procedures whereby my shares were taken were both procedurally and substantively defective. One of the "for cause" reasons given in the resolution was that I had taken domain names from "the Lipoid Group." Another was that I had failed to file tax returns in the United States on behalf of Lipoid LLC and ALC.

16.     As noted previously, the taking of my Lipoid G shares actually constituted the taking of my shares in the entire Lipoid Group. My father had always treated the Lipoid Group as a single solitary entity, but over time, had set up a complex corporate structure for tax and liability reasons. I had a 10% ownership interest in his original company, Lipoid KG, which included the entire Lipoid enterprise and later became known as Lipoid G. Over time, as Herbert continued to establish and expand his corporate tax structure, assets were moved out of Lipoid KG, a/k/a Lipoid G, into other entities. These asset shifts were never intended to affect my ownership interest in the entire Lipoid Group. Until my relationship with my father began to fray, I had always placed the greatest trust in him to look out for my interests and to assure that despite all of these corporate restructurings, I would retain my 10% in the entire Group. My father always assured me that I was an equity owner in the entire Group and should act

4

accordingly.  This is exactly what I did.  Until my termination, I had always been treated by my father as an equity owner in the entire Group and I had always acted, with his full encouragement and support, as an equity owner in the entire Lipoid Group.

17.     When Herbert took my shares, I realized that the breach was not likely to be reversed, and on January 30, 2013, acting *pro se,* I moved for permission to submit an amended answer and counterclaims. (Dkt. 49).  Herbert objected on the basis that I did not submit a copy of my proposed pleading. I realized that I would have to retain counsel to assist me with the preparation of an amended pleading.

18.     In the interim a *pro bono* counsel was appointed to help me try to settle the issues with my father and to prepare for mediation before Magistrate Judge Kevin Fox.

19.     On March 25, 2013, the parties engaged in mediation before Magistrate Fox, but were unable to reach agreement. The next day, after the Court was notified that the mediation had been unsuccessful, this Court ordered that the deposition of Herbert take place within one month of the Court's ruling on this motion to amend (Dkt. 50).

20.     In May 2013, I retained new counsel and on June 21, 2013, my new counsel filed my proposed amended answer, counterclaims and third-party claims (Dkt. 56).

*No Undue Delay or Prejudice*

21.     To the extent that there has been delay in this case, this can largely be attributed to Herbert's refusal to participate in the discovery process in an action that he commenced and our various efforts to resolve the case through negotiation.  I have been trying to take Herbert's deposition since August 2012, without success. Herbert is presently in violation of this Court's Order dated September 21, 2012, (Dkt. 34), directing him to appear in New York City for deposition and this Court's December 11, 2012 Order directing him to provide proof of his

inability to travel (Dkt. 43).  These facts are conspicuously absent from his opposition papers, in which he claims, as a reason that my motion should be denied, that discovery was complete.  In point of fact, discovery against Plaintiffs has not even begun.

***Complete Diversity Exists***

22.     As the Complaint in this action indicates, I am a resident of New York City and the companies suing me are all domiciled outside of New York.  Lipoid LLC is domiciled in New Jersey, American Lecithin Company is domiciled in Connecticut and Lipoid GmbH and Phospholipid GmbH are domiciled in Germany.

23.     All of the proposed third-party defendants are also domiciled outside of New York.  Herbert is citizen and resident of Germany.  Lipoid Grundstuecks GmbH ("Lipoid G") and Lipoid Verwaltungs GmbH ("Lipoid V") are organized and have their principal offices in Germany.  Complector AG is organized and has its principal office in Switzerland. According to Herbert's Declaration filed with Plaintiffs' opposition papers, Complector is now LVAG, and I will amend my proposed amended answer, counterclaims and third-party claims (the "PAA") to reflect this.

24.     As the PAA indicates, the amount in controversy exceeds $75,000.   If leave to amend is granted, I will make sure that this Court's diversity jurisdiction is clearly stated.

***Claims all Factually Related***

25.     Deciding Herbert's claims of wrongful acts while I was employed at Lipoid LLC and ALC and of breach of my fiduciary duties will require that this Court hear and consider the same facts as it will be required to hear in resolving the issues raised in the PAA.  All of the claims are factually related.  They involve the facts relating to my employment by Lipoid LLC and ALC, its termination by my father and the reasons leading up to this.  The "dispute" over

domain names and computer software cannot be separated from the other issues that were in contention between us, and all of this ultimately relates to the breakdown of my relationship with my father. This can be seen in the following brief summary.

26.     In 2007, Herbert caused several of the Lipoid Group companies to finance the acquisition of an apartment in New York for the benefit of the Lipoid Group and me. I believe, but am not certain that the funds came from Lipoid G and from Lipoid AG.  At some point, Herbert had me sign an acknowledgment of the funds I had received from Lipoid G (Exhibit E hereto). The acknowledgment stated that I will repay this amount when it was convenient. Months, perhaps a year, later, Herbert had me sign a note in favor of Complector for $700,000 (see Exhibit C). I was told that this was for tax reasons. The note was not due until 2017 and was to be paid out of my earnings or otherwise through Lipoid Group funds.

27.     In 2009, when I received a small inheritance from my mother, Herbert's first wife, Herbert took the money and on information and belief, put it into the Lipoid Group.  I do not know if this money was used to pay down these "loans" or had been "invested" in the Lipoid Group. In any event, when I objected to this act, this exacerbated our relationship and Herbert intensified his efforts to assert his will on me.

28.     I had acted with considerable autonomy in running the Lipoid Group's American operations and had had considerable success in growing our U.S. business.  However, as our relationship grew contentious, Herbert began taking steps to make my job more difficult. He also insisted that I file certain tax returns for Lipoid LLC that I did not want to because I had been informed by our tax advisors that they were not in compliance with U.S. law.  This led to additional friction between us as he sought to impose his will on me.  In August 2011, as retaliation for my unwillingness to file these illegal tax returns in accordance with his wishes,

Herbert notified me that all of my positions with the Lipoid Group, including my positions as CEO of Lipoid LLC and ALC had been terminated. My efforts at reconciliation were to no avail, as were my efforts to settle our differences over the termination and its consequences. When I refused to drop my claims altogether, Herbert seized upon an inconsequential non-issue relating to the domain names to sue me in New York.

29.     When I continued to press for his deposition to establish the facts needed to defend against his claims, he seized my shares in retaliation. This occurred in direct response to my actions and this Court's Orders in this case.

***Personal Jurisdiction Exists***

30.     Contrary to his assertions in his Declaration (Dkt. 67-1), Herbert has conducted and continues to conduct business in New York, and he has committed tortious acts in New York that are the subject of my claims against him.   I believe that I am able to provide enough facts in this affidavit to establish this point beyond a doubt. But, to the extent that any further proof is necessary, then I request that a decision on the jurisdiction issue be delayed until I am able to obtain discovery from Herbert and take Herbert's deposition in aid of jurisdiction.

31.     The wrongful termination of my employment took place in New York, New York. Annexed hereto as Exhibit F is a copy of Herbert's termination letter to me, dated August 25, 2011, which was sent by fax and mail to my residence in Manhattan.

32.     This letter, in addition to showing that the termination took place in New York, illustrates that Herbert ignored corporate structures and formalities and used the members of the Lipoid Group to carry out his personal wishes. Note that Herbert acted unilaterally and by personal fiat to terminate my employment with "Lipoid LLC (the "Company) [and] any and all other positions you have held with the Company's affiliates and with American Lecithin

Company."  Note that he is acting on behalf of all of the members of the Lipoid Group, which would include all of the Plaintiffs and proposed corporate third-party defendants.  Note that he did not articulate what my positions were with the other Group companies or what his position was with any of them.  In any event, these were fungible commodities. He could assume whatever position he wanted or bestow upon me and others whatever position he chose in order to meet his needs of the moment.  No formal elections were necessary and positions with the Lipoid Group companies could change at his whim from one moment to the next.

33.    Note that he wrote the letter on Lipoid LLC letterhead without any indication as to what his title or authority was to send this letter.  To my knowledge, Herbert had no formal position with Lipoid LLC.  This is consistent with the way he acted throughout in that he didn't need any titles and had complete personal authority over all of the Lipoid Group companies. He ruled by decree and his power was absolute. These companies and Herbert were one and the same.

34.    Note that Herbert wrote this letter unilaterally and not on behalf of any board, or other governing body of any of the Lipoid Group companies that ostensibly fired me.   This is consistent with the way he and all of the Lipoid Group companies worked – no formal resolutions or votes were necessary - personal decree by Herbert was sufficient.

35.    Note that the reason that Herbert gave for terminating my employment was my "unwillingness to work with the parent company and others within our group."  This is his way of saying that I refused to work with him, which was not true. He is *de facto* the parent company and the group.  While employed by Lipoid LLC and ALC, I did not report to a board or any other group of individuals; the only person I reported to was Herbert.

9

36.     Note that "parent company" is left undefined as there is more than one (one in Switzerland and another in Germany) and at any given time, this term could mean something else. The corporate structure of the Group is not always clear and it is often changed by Herbert to achieve various personal and business objectives.  Even when I was CEO of Lipoid LLC and ALC, Herbert changed the ownership structure of these companies without telling me.

37.     Moreover, the procedures followed by Herbert in taking my shares were legally deficient and ineffective. Further, the reason given was not true.  The issues relating to this unlawful taking – which was in direct response to me seeking discovery sanctions against him - should be decided by this Court, as should the issues relating to Herbert's other retaliatory and wrongful acts against me.

38.     This lawsuit, which was initiated by Herbert in New York using four members of the Lipoid Group as his proxies, is being pursued by Herbert in New York.  The taking of my shares took place in Germany, but this was in direct response to events that took place in this Court in New York.

39.     Other tortious acts directly relevant to this litigation were committed by Herbert and the Lipoid Group in New York.  Herbert tried to cause me to file improper tax returns with the IRS during telephone calls in which he called me in New York (and Connecticut).  Herbert took improper steps to impede my ability to set up a lecithin and phospholipids supply business in New York and to keep me from competing with the Lipoid Group in New York by predatory pricing strategies and attempts to monopolize the market through exclusive long-term supply agreements. Many of these acts took place, or had impact, in New York.  Herbert retaliated against me by dramatically lowering the prices for several key products below his own costs and selling these products to customers in New York.

40.     Not only did Herbert commit tortious and wrongful acts in New York that are the basis for this lawsuit, he has regularly conducted business in New York.

41.     While I was the CEO of Lipoid LLC and ALC, Herbert visited the United States, including New York, on a fairly regular basis for the purpose of conducting business in the United States, as well as personally visiting me.  Herbert stayed in my apartment in New York, New York on at least three occasions. During these visits, he frequently conducted business on behalf of the Lipoid Group both from the apartment and from other locations in New York.  He met with business associates while in New York, including lawyers performing services for him and the Lipoid Group and the landlord of Lipoid LLC.

42.     In the months after I was terminated (in the latter part of 2011), Herbert was, upon information and belief, present in New York City on a number of occasions for business reasons and he personally conducted business meetings in Manhattan.

43.     I am aware, for example, that he met with Dr. Richard Deckelbaum in September or October 2011 at Columbia University's Medical Campus in Washington Heights for the purpose of commissioning phospholipid research that might be useful to the Lipoid Group. I had introduced him to Dr. Deckelbaum earlier that year.

44.     I am aware that Herbert hosted a Christmas party for the employees of Lipoid LLC in New York City in December 2011.

45.     I am aware that after I was terminated, Herbert cut his prices to customers located in New York, including Estee Lauder, below cost in order to interfere with and prevent me from completing deals that I was working on to sell products to them.

46.     Plaintiffs Lipoid GmbH and Phospholipid GmbH and proposed third-party defendants LVAG (according to Herbert, f/k/a Complector) regularly ship goods into New York,

directly or through affiliated intermediaries. These goods are sometimes shipped on to Lipoid LLC and ALC and sometimes shipped directly to customers in New York on their behalf.

47.     Herbert caused Lipoid G and upon information and belief, Lipoid AG[1], companies he states do no business in New York, to finance the acquisition of a cooperative apartment in New York City for the benefit of the Lipoid Group and me. As noted, this apartment – while technically not an office – served as a place from which Herbert conducted business on behalf of the Lipoid Group.

48.     I was instructed by him to sign a $700,000 note in favor of Complector, a different member of the Lipoid Group in relation to the financing of the apartment. Apparently, this note was paid down to $490,000. I recollect making some payments towards the principal of the note out of my Lipoid LLC earnings, but far less than $210,000. It is possible that Herbert applied the money I had received from my mother's estate to pay down this note (and perhaps the Lipoid G funds used to buy the apartment). Also, upon information and belief, the interest on this note was at least in some years charged as an intra-company transaction, to ALC and/or Lipoid LLC, and/or other members of the Lipoid Group. All of this illustrates the interchangeable nature of the Lipoid Group companies.

49.     As illustrated by the termination notice Herbert sent me, all of the Lipoid Group Companies act as Herbert's alter ego and corporate titles and formalities are routinely ignored. He exercises complete dominion over them and acts as if he and the Lipoid Group companies are one and the same.

50.     This is also illustrated by an October 11, 2011 letter he wrote to Kurt-Hartwig Richter, a German attorney that he learned I had consulted about the funds he had taken that I

---

[1] I state, upon information and belief that Lipoid AG provided the funds, but I do not know this for sure as I was never told precisely which Lipoid Group entities the funds came from.

had received from my mother's estate (see Exhibit G hereto).  In this letter, he states (translated

from the German):

> Your client owes me approx. $400,000 and approx. 140,000 Euro to the company
> Lipoid Grundstucks GmbH, that I represent.  Both amounts have been past due
> for months.
>
> Furthermore, as leader of our company in the U.S.A., he failed unfortunately to
> submit balance sheets and to report foreign accounts.
>
> There, according to our consultant we have to expect penalties up to or even more
> than $5 million that we will charge to your client, respectively send the court after
> him.
>
> Both proceedings [sic!] have criminal content, and if we don't undertake very big
> efforts, your client might be in American prison by the end of this criminal
> investigation. And I really don't see a reason why we should make an effort to
> interfere with this.
>
> Therefore, I have to advise you that you collect in advance; because afterwards
> not much will be left

51.     Herbert treats the Lipoid Group companies as a single entity and the various

members of the Lipoid Group are used interchangeably by Herbert to pursue his business and

personal affairs.  This is illustrated by his August 25, 2011 termination letter and his January 9,

2013 taking of my shares in Lipoid G purportedly for things I did relating to domain names

belonging to the four Plaintiffs, but not Lipoid G.

52.     Lipoid Group companies' formal ownership and management structures are

variable, as Herbert unilaterally changes these as and when he wishes.  This is illustrated by the

fact that in his Declaration, Herbert states that he is the President of Lipoid LLC. Yet, in

LinkedIn, the President is listed as Bruce Baretz (see Exhibit H annexed hereto).

53.     Herbert pays no regard to the separate identities of the various Lipoid Group

companies.  To illustrate this, I am aware that at Herbert's instruction, a tax refund check written

by the IRS and payable to Lipoid LLC was deposited to bank account of Lipoid GmbH in Germany. I am not sure what the purpose of this maneuver was.

54.     As CEO and board member of ALC, I reported to Herbert, and not to a board, shareholders or LLC members.  Corporate formalities and structures were ignored and Herbert ruled by fiat and decree – bypassing me when he wanted to, even though I was CEO, and going directly to other employees of these companies.   ALC did not have regular board or shareholders' meetings.  To the best of my information and belief, all of the companies in the Lipoid Group operated in the same way, with Herbert doing as he pleased and with corporate structures and formalities ignored if he deemed this expedient.

55.     As noted above, Herbert caused multiple Lipoid Group Companies to finance the acquisition of the coop apartment in New York.  I was instructed by him to sign a note in favor of Complector, which to the best of my knowledge had not provided the financing.  Upon information and belief, the interest on this note was at least in some years charged as an intra-company transaction, to ALC and/or Lipoid LLC, and/or other members of the Lipoid Group.

*Tortious Interference and Defamation*

56.     Upon my termination from Lipoid LLC, I was contacted by long-standing customers of the Lipoid Group that sought to source lecithin and phospholipids from me.  I decided to establish and operate my own lecithin and phospholipid sale and distribution business in New York.  Based on my years of experience and previous success in the industry, I had developed a network of industry contacts that I readily expected to leverage in his efforts to establish this business.  However, Herbert, individually and through the Lipoid Group entities, intentionally and wrongfully interfered with my efforts to enter the lecithin and phospholipids business.  Herbert took a number of wrongful and anti-competitive acts to prevent me from

establishing my own phospholipid business and from completing specific transactions with prospective customers. When he found out that I was in the process of concluding deals with several customers, including Estee Lauder, Maxhealth and Hospira, he immediately lowered his prices below cost so I could not complete these transactions.

57.     Herbert made representations to a number of customers and industry professionals, including Jarrow, that I was subject to a non-compete and confidentiality agreement so they would not do business with me. I did not have a non-compete, but persons who were told by him that I did were afraid to do business with me.

58.     Herbert terminated my membership in the Phospholipid Research Center, an industry group I had helped found.  He also he had me barred from this industry group to impede my ability to establish myself in the phospholipid business.

59.     Herbert also slandered me to my former coworkers and upon information and belief, other in the industry, by falsely alleging that I was fired for not sending company reports.

60.     Herbert defamed me to a lawyer I had consulted in Germany by sending him an email accusing me of professional incompetence and "criminal behavior" and threatening that I would be "imprisoned."  As a direct result of this intimidation, the lawyer stated that he could not represent me.

61.     All of these steps by Herbert further illustrate why it is critical that all of the issues between me and my father be resolved in one action in this Court – a forum he selected.

Carsten Matthias Rebmann

Sworn to before me this
18th day of October, 2013

Notary Public

15

MORRIS K. MITRANI
Notary Public, State of New York
No. 02MI6086152
Qualified in New York County
Commission Expires October 8, 2013

## <u>CERTIFICATE OF SERVICE</u>

I am an attorney at Samuel Goldman & Associates, counsel for Defendant, in the above-captioned proceeding. I hereby certify that on October 18, 2013, I caused the foregoing Affidavit of Carsten Matthias Rebmann to be served electronically via the United States District Court, Southern District of New York Court's ECF system upon those parties entitled to receive electronica notice.


<u>*/s/ Samuel Goldman*</u>
Samuel Goldman

# Exhibit A

Lipoid Grundstücks GmbH
Frigenstr.4
67065 Ludwigshafen


Herrn Carsten Matthias Rebmann
331 W 84 th Street,Unit 2
New York,NY 10024


**Betreff: Außerordentliche Gesellschafterversammlung der Lipoid Grundstücks GmbH, HRB 3812 des Handelsregisters beim Amtsgericht Ludwigshafen**


Sehr geehrter Herr Rebmann,

als Geschäftsführer der Lipoid Grundstücks GmbH lade ich Sie zur außerordentlichen Gesellschafterversammlung

am 25.Dezember 2012, 9:00 Uhr
im Fürstenweg 13,67435 Neustadt
Deutschland

ein. Folgende Tagesordnungspunkte sind vorgesehen:

1.  Beschluss über die Ausschließung von Herrn Carsten Matthias Rebmann als Gesellschafter aus wichtigem Grund.
2.  Beschluss über die Einziehung des Geschäftsanteils von Herrn Carsten Matthias Rebmann gegen Zahlung einer Abfindung gem. § 11 Abs. 2 Satz 2 i. V. m. § 13 des Gesellschaftsvertrages.

**Herr C. Rebmann hat bei der Beschlussfassung kein Stimmrecht.**

Ludwigshafen, 18. Dezember 2012


Dr. Herbert Rebmann

[translation of invitation to Ausserordentliche Gesellschafterversammlung Lipoid Grundstucks GmbH 25 Dec 2012]

Lipoid Grundstucks GmbH
Frigenstrasse 4
67065 Ludwigshafen

Mr. Carsten Matthias Rebmann
331 W 84th Street, Unit 2
New York, NY 10024

Regarding: Special Shareholder Meeting of Lipoid Grundstuecks GmbH, registry no. 3812 at the commercial registry of the municipal court Ludwigshafen

Dear Mr. Rebmann,

As Managing Director of Lipoid Grundstucks GmbH I invite you to the special shareholder meeting

On December 25th, 2012, 9:00AM
at Furstenweg 13, 67435 Neustadt
Germany.

This is the agenda:

1) Decision to remove Mr. Carsten Matthias Rebmann as share holder for important reason.

2) Decision to retract the shares of Mr. Carsten Matthias Rebmann against payment of compensation according to article 11, paragraph 2 in connection with article 13 of the shareholder agreement.

**Mr. C. Rebmann has no vote in these decisions.**

Ludwigshafen, 18th December 2012

[illegible signature]
Dr. Herbert Rebmann

# Exhibit B

## Matthias Rebmann

**From:**     Dr. Herbert Rebmann [dr.rebmann@lipoid.com]
**Sent:**     Tuesday, January 01, 2013 6:45 AM
**To:**       Matthias Rebmann
**Subject:**  AW: außerordentliche Gesellschafterversammlung am 9.1.2013

Was Du Geschäftsordnung nennst ist wohl die Satzung.Diese hast Du vorliegen seit Bestehen der Firma.

Die außerordentliche Gesellschafterversammlung wurde,wie Dir mitgeteilt ,vom 25.12. auf den 9.1.2013 verlegt.

Im Rahmen der endgültigen Abrechnung Deines Anteils,die hoffentlich in 6 Monaten vorliegen wird,werden Dir,soweit Du dies anforderst, auch  die Ergebnisse der letzten Jahre mitgeteilt werden.

Ich erinnere daran,dass Dein Kredit bei der Lipoid Verwaltungs AG in Höhe von ca 490.000 $ seit mehr als 12 Monaten fällig gestellt ist.Ich erwarte von Dir einen konkreten Vorschlag wie und wann Du ihn zurückzahlen wirst.

H.Rebmann

Diese E-Mail kann vertrauliche Informationen enthalten. Der Inhalt ist nur für den Empfänger bestimmt. Wenn Sie nicht der richtige Empfänger sind, informieren Sie bitte umgehend den Absender und vernichten die Nachricht. Das unerlaubte Kopieren und unbefugte Weiterleitung ist nicht gestattet. Der Austausch von Nachrichten per E-Mail dient ausschließlich Informationszwecken. Rechtsverbindliche Aussagen dürfen über diesen Weg nicht ausgetauscht werden, da Verfälschungen des Inhaltes bei der Datenübertragung nicht ausgeschlossen werden können.

This e-mail may contain confidential information. The content is intended solely for the addressee. If you are not the intended recipient, please inform immediately the sender and destroy this e-mail. Any unauthorised copying and disclosing of the content is forbidden. Correspondence via e-mail is only for information purposes. It is not allowed to use e-mail for legally binding communications, because of the possible falsification of the original content.

**Von:** Matthias Rebmann [mailto:rebmann@perimondo.com]
**Gesendet:** Freitag, 28. Dezember 2012 22:31
**An:** Dr. Herbert Rebmann; Birgit Rebmann; Balder Rebmann; 'Helge Rebmann'
**Betreff:** RE: außerordentliche Gesellschafterversammlung am 9.1.2013

Dear Madam, Sirs!

I bestaetige den Eingang dieser E-mail vom 27. Dezember 2012.  (translation: I confirm receipt of your email dated Dec 27, 2012.)

Bevor ich inhaltlich Stellung nehmen kann, wiederhole ich das dringliche Gesuch, dass mir die (1) Geschaeftsordnung, (2) saemtliche Jahresberichte der Gesellschaft und das (3) Protokoll der Sitzung vom 25. Dezember 2012 via E-mail oder Telefax bis zum 31. Dezember 2012 zugesandt werden.
(translation: Before reviewing the content of this e-mail, I repeat my urgent request that the (1) by-laws, (2) all annual reports since the conception of the company, and (3) the minutes of the meeting on December 25th 2012 are sent to me via e-mail or facsimile by December 31, 2012.)

Mit freundlichen Gruessen!  (translation: Best regards,)
C Matthias Rebmann

**From:** Dr. Herbert Rebmann [mailto:dr.rebmann@lipoid.com]
**Sent:** Friday, December 28, 2012 10:32 AM
**To:** Birgit Rebmann; Balder Rebmann; Helge Rebmann; rebmann@perimondo.com
**Subject:** außerordentliche Gesellschafterversammlung am 9.1.2013

Liebe Mitgesellschafter,

zur Vorbereitung des Treffens noch folgende Klarstellungen :

1

Anträge müssen schriftlich erfolgen mit Begründung

Vertreten lassen kann sich ein Gesellschafter bei Beschlüssen der Gesellschafter aufgrund schriftlicher Vollmacht durch eine anderen Gesellschafter  oder  seinen Ehegatten oder durch einen zur beruflichen Verschwiegenheit verpflichteten Dritten.

Alle Eingaben oder Anträge sind in schriftlicher Form, in deutscher Sprache und per Einschreiben oder per Fax an alle Gesellschafter  im Voraus einzureichen.

Die Teilnahme muss vor der Versammlung schriftlich bestätigt werden.

Mit freundlichen Grüßen
H.Rebmann

Diese E-Mail kann vertrauliche Informationen enthalten. Der Inhalt ist nur für den Empfänger bestimmt. Wenn Sie nicht der richtige Empfänger sind, informieren Sie bitte umgehend den Absender und vernichten die Nachricht. Das unerlaubte Kopieren und unbefugte Weiterleitung ist nicht gestattet. Der Austausch von Nachrichten per E-Mail dient ausschließlich Informationszwecken. Rechtsverbindliche Aussagen dürfen über diesen Weg nicht ausgetauscht werden, da Verfälschungen des Inhaltes bei der Datenübertragung nicht ausgeschlossen werden können.

This e-mail may contain confidential information. The content is intended solely for the addressee. If you are not the intended recipient, please inform immediately the sender and destroy this e-mail. Any unauthorised copying and disclosing of the content is forbidden. Correspondence via e-mail is only for information purposes. It is not allowed to use e-mail for legally binding communications, because of the possible falsification of the original content.

[translations emails ausserordentliche Gesellschafterversammlung]

**From:** Dr. Herbert Rebmann [mailto:dr.rebmann@lipoid.com]
**Sent:** Tuesday, January 01, 2013 6:45 AM
**To:** Matthias Rebmann
**Subject:** AW: außerordentliche Gesellschafterversammlung am 9.1.2013

What you call the rules of procedure are presumably the by-laws.  You have these since the formation of the company.

The special shareholder meeting has been, as communicated to you, moved from December 25th to January 9th 2013.

In the context of a final evaluation of the values of your share, that hopefully will be available within six months, you will, if you request it, learn about the business results from the recent years.

I remind that your loan with Lipoid Verwaltungs AG that amounts to approximately $490,000 has been past due for more than 12 months. I expect the precise proposal from you how and when you will repay these it.

H.Rebmann

Diese E-Mail kann vertrauliche Informationen enthalten. Der Inhalt ist nur für den Empfänger bestimmt. Wenn Sie nicht der richtige Empfänger sind, informieren Sie bitte umgehend den Absender und vernichten die Nachricht. Das unerlaubte Kopieren und unbefugte Weiterleitung ist nicht gestattet. Der Austausch von Nachrichten per E-Mail dient ausschließlich Informationszwecken. Rechtsverbindliche Aussagen dürfen über diesen Weg nicht ausgetauscht werden, da Verfälschungen des Inhaltes bei der Datenübertragung nicht ausgeschlossen werden können.

This e-mail may contain confidential information. The content is intended solely for the addressee. If you are not the intended recipient, please inform immediately the sender and destroy this e-mail. Any unauthorised copying and disclosing of the content is forbidden. Correspondence via e-mail is only for information purposes. It is not allowed to use e-mail for legally binding communications, because of the possible falsification of the original content.

**Von:** Matthias Rebmann [mailto:rebmann@perimondo.com]
**Gesendet:** Freitag, 28. Dezember 2012 22:31
**An:** Dr. Herbert Rebmann; Birgit Rebmann; Balder Rebmann; 'Helge Rebmann'
**Betreff:** RE: außerordentliche Gesellschafterversammlung am 9.1.2013

Dear Madam, Sirs!

I bestaetige den Eingang dieser E-mail vom 27. Dezember 2012.  (translation: I confirm receipt of your email dated Dec 27, 2012.)

Bevor ich inhaltlich Stellung nehmen kann, wiederhole ich das dringliche Gesuch, dass mir die (1) Geschaeftsordnung, (2) saemtliche Jahresberichte der Gesellschaft und das (3) Protokoll der Sitzung vom 25. Dezember 2012 via E-mail oder Telefax bis zum 31. Dezember 2012 zugesandt werden.

(translation: Before reviewing the content of this e-mail, I repeat my urgent request that the (1) by-laws, (2) all annual reports since the conception of the company, and (3) the minutes of the meeting on December 25th 2012 are sent to me via e-mail or facsimile by December 31, 2012.)


Mit freundlichen Gruessen!  (translation: Best regards,)

C Matthias Rebmann


**From:** Dr. Herbert Rebmann [mailto:dr.rebmann@lipoid.com]
**Sent:** Friday, December 28, 2012 10:32 AM
**To:** Birgit Rebmann; Balder Rebmann; Helge Rebmann; rebmann@perimondo.com
**Subject:** außerordentliche Gesellschafterversammlung am 9.1.2013


Dear co-shareholders,

in preparation of our meeting the following clarifications:

motions have to be made in writing with reasons

A shareholder can be represented by another shareholder or by his spouse or by a third-person that is obligated to secrecy due to his or her profession in shareholder decisions based on a written authorization.

All petitions or motions have to be made in writing, in German language, and via registered mail or via facsimile to all shareholders in advance.

The participation has to me confirmed in writing before the meeting.


Best regards,

H.Rebmann


Diese E-Mail kann vertrauliche Informationen enthalten. Der Inhalt ist nur für den Empfänger bestimmt. Wenn Sie nicht der richtige Empfänger sind, informieren Sie bitte umgehend den Absender und vernichten die Nachricht. Das unerlaubte Kopieren und unbefugte Weiterleitung ist nicht gestattet. Der Austausch von Nachrichten per E-Mail dient ausschließlich Informationszwecken. Rechtsverbindliche Aussagen dürfen über diesen Weg nicht ausgetauscht werden, da Verfälschungen des Inhaltes bei der Datenübertragung nicht ausgeschlossen werden können.

This e-mail may contain confidential information. The content is intended solely for the addressee. If you are not the intended recipient, please inform immediately the sender and destroy this e-mail. Any unauthorised copying and disclosing of the content is forbidden. Correspondence via e-mail is only for information purposes. It is not allowed to use e-mail for legally binding communications, because of the possible falsification of the original content.

# Exhibit C

**Promissory Installment Note (w/Balloon Payment)**

Date:                          _June 7, 2007_____

Borrower:                     _C. Matthias Rebmann _____

Borrower's Address:           _331 W 84th St, Apt. 2, New York, NY_

                              _____

Payee:                        _Complector AG   _____

Place for Payment:            _____

                              _____

Principal Amount:             $_700,000.00_____

Term:                         _120_____  (months)

Monthly Interest              $ 3'208.32_____
Payments:

**INTEREST RATE.** Annual interest rate on matured, unpaid amounts shall be 5.5%. The interest rate shall be re-negotiated as at January 1 of each year to ensure adjustment to market conditions.

**PAYMENT TERMS.** This Note is due and payable as follows, to-wit:
_____0____ (zero) *[insert number of payments]* equal monthly payments of $ 0.00 principal *[insert monthly payment amount]*. The first such payment due and payable on the 1st day of July, 2007, and a like installment shall be due and payable on the same day of each succeeding month thereafter until the total principal of $ 700,000 principal *[insert total principal amount]* is paid in full. If each payment is not paid on time, the remaining balance will be subject to the maximum amount of interest permitted by the Laws of the State of New York.

**BALLOON PAYMENT.** Borrower promises to make a single, final payment for the entire balance owed to the Payee on or before June 20, 2017.

**BORROWER'S PRE-PAYMENT RIGHT.** Borrower reserves the right to prepay this Note in whole or in part, prior to maturity, without penalty.

**PLACE FOR PAYMENT.** Borrower promises to pay to the order of Payee at the place for payment and according to the terms for payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by the final scheduled payment date.

gives Borrower notice of the default and the time within which it must be cured, as may be required by law or written agreement, then Payee may declare the unpaid principal balance and earned interest on this Note immediately due. Borrower and each surety, endorser, and guarantor waive all demands for payment, presentation for payment, notices of intentions to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

**INTEREST ON PAST DUE INSTALLMENTS AND CHARGES.** All past due installments of principal and/or interest and/or all other past-due incurred charges shall bear interest after maturity at the maximum amount of interest permitted by the Laws of the State of New York until paid. Failure by Borrower to remit any payment by the 15th day following the date that such payment is due entitles the Payee hereof to declare the entire principal and accrued interest immediately due and payable. Payee's forbearance in enforcing a right or remedy as set forth herein shall not be deemed a waiver of said right or remedy for a subsequent cause, breach or default of the Borrower's obligations herein.

**INTEREST.** Interest on this debt evidenced by this Note shall not exceed the maximum amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of the maximum shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this instrument (and any other instruments) concerning this debt.

**FORM OF PAYMENT.** Any check, draft, Money Order, or other instrument given in payment of all or any portion hereof may be accepted by the holder and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the holder hereof except to the extent that actual cash proceeds of such instruments are unconditionally received by the payee and applied to this indebtedness in the manner elsewhere herein provided.

**ATTORNEY'S FEES.** If this Note is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Borrower shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs in addition to other amounts due.

**SEVERABILITY.** If any provision of this Note or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Note nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

**BINDING EFFECT.**  The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

**DESCRIPTIVE HEADINGS.**  The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations under this Note.

**CONSTRUCTION.**  The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

**GOVERNING LAW.**  This Note shall be governed, construed and interpreted by, through and under the Laws of the State of New York.

Borrower is responsible for all obligations represented by this Note.

EXECUTED this 20th day of June, 2007.

*[Borrower's Signature:]*

*[Borrower's Printed or Typed Name]:*

C. Matthias Rebmann

# Exhibit D

**Niederschrift**

der außerordentlichen Gesellschafterversammlung der

**Lipoid Grundstücks-GmbH**

HRB 3812, Amtsgericht Ludwigshafen

am 9.1.2013 um 8 Uhr

in 67435 Neustadt Fürstenweg 13

**A.   Beteiligungsverhältnisse**

Das Stammkapital der Gesellschaft beträgt DM 300.000,00 und ist voll eingezahlt. An der Gesellschaft sind die Gesellschafter wie folgt beteiligt:

| | |
|---|---|
| Dr. Herbert Rebmann | DM 120.000,00 |
| Birgit Rebmann | DM 90.000,00 |
| Carsten Rebmann | DM 30.000,00 |
| Helge Rebmann | DM 30.000,00 |
| Balder Rebmann | DM 30.000,00 |
| **Gesamt:** | **DM 300.000,00** |

**B.   Teilnehmer**

Dr. Herbert Rebmann

Birgit Rebmann

Helge Rebmann vertreten durch Frau Birgit Rebmann

Balder Rebmann vertreten druch Herrn Dr.Herbert Rebmann

Nicht erschienen: Carsten Rebmann

Hinzu tritt, dass Herr Carsten Rebmann die Internetdomain für kommerzielle Zwecke aktiv nutzt. Kunden und Geschäftspartner sind irritiert und erreichen ihre gewünschten Gesprächspartner nicht.

Durch die Treuepflichtverletzungen von Herrn Carsten Rebmann steht zu befürchten, dass der gesamten Lipoid-Gruppe ein erheblicher materieller und immaterieller Schaden zugefügt wird. Das gilt letztlich auch für die Lipoid Grundstücks-GmbH, deren wirtschaftliche Interessen integraler Bestandteil der Lipoid-Gruppe sind und damit von den treuwidrigen Aktivitäten von Herrn Carsten Rebmann mittelbar verletzt werden.

Den übrigen Gesellschaftern sei daher eine Fortsetzung der Gesellschaft mit Herrn Carsten Rebmann nicht mehr zuzumuten.

§ 11 der Satzung bestimmt: Ein Gesellschafter kann durch Gesellschafterbeschluss aus der Gesellschaft ausgeschlossen werden, wenn in seiner Person ein wichtiger Grund vorliegt, so dass den übrigen Gesellschaftern die Fortsetzung der Gesellschaft mit dem in Frage stehenden Mitgesellschafter in Folge seines Verhaltens oder seiner Persönlichkeit nicht mehr zuzumuten ist.

Die anwesenden Gesellschafter beschlossen sodann einstimmig:

Herr Carsten Matthias Rebmann wird gem. § 11 Abs. 1 Satz 1 aus der Gesellschaft ausgeschlossen.


**2.   Beschluss über die Einziehung des Geschäftsanteils von Herrn Carsten Matthias Rebmann gegen Zahlung einer Abfindung gem. § 11 Abs. 2 Satz 2 i. V. m. § 13 des Gesellschaftsvertrages**


Die anwesenden Gesellschafter beschlossen einstimmig:

1.   Der Geschäftsanteil von Herrn Carsten Rebmann im Nennbetrag von DM 30.000,00 wird gemäß § 11 Abs. 2 Satz 2 des Gesellschaftsvertrages eingezogen.

2.   Der Geschäftsführer Dr. Herbert Rebmann wird beauftragt, Herrn Carsten Rebmann gegenüber die Einziehung seines Geschäftsanteils schriftlich zu erklären.

3.   Der Geschäftsführer Dr. Herbert Rebmann wird ferner beauftragt, den Betrag der gem. § 11 Abs. 3 i.V.m § 13 zu zahlenden Abfindungssumme zu ermitteln und diese – nach Verrechnung mit allen Gegenansprüchen, die der Gesellschaft zustehen – an Herrn Carsten Rebmann auszuzahlen.



4.    Anstelle des eingezogenen Geschäftsanteils wird ein neuer Geschäftsanteil im Nennbetrag von DM 30.000,00 gebildet, der der Gesellschaft als eigener zusteht und von ihr übernommen wird.


Der Versammlungsleiter verkündete das Ergebnis aller gefassten Beschlüsse und stellte die Beschlüsse damit fest.

Der Versammlungsleiter schloss die Gesellschafterversammlung um 8.30 Uhr.


Neustadt, 9.1.2013



Dr. Herbert Rebmann

Anwesenheitsliste

Außerordentliche Gesellschafterversammlung der Lipoid Grundstücks GmbH

912-671-000

**Deutsche Post** ✆

R

☐ EINSCHREIBEN
EINWURF

☒ EINSCHREIBEN
(Recommandé)

☐ EIGENHÄNDIG
(A remettre en
main propre à)

☐ INT. NACHNAHME
(Remboursement)

☐ RÜCKSCHEIN
(Avis de réception)

RK 62 436 538 1DE

C.M. Rebomore
331 W 8yth Street 2
10024 New York

MSA

Jan 25, 2013



bzpen el Jandstich bltt Fürtnn weg 18

D 6835 Nennhadt

Translation of Niederschrift Lipoid Grundstücks GmbH 20130109

Minutes of the extraordinary shareholder meeting of Lipoid Grundstücks-GmbH HRB 3812, local court Ludwigshafen, on 9th January 2013 at 8:00 a.m. in 67435 Neustadt Fürstenweg 13

A. Ownership relations
The common stock of the company amounts to DM 300,000.00 and has been fully paid. The shareholders have the following stake in the company:

| | |
|---|---|
| Dr. Herbert Rebmann | DM 120,000.00 |
| Birgit Rebmann | DM 90,000.00 |
| Carsten Rebmann | DM 30,000.00 |
| Helge Rebmann | DM 30,000.00 |
| Balder Rebmann | DM 30,000.00 |
| Total | DM 300,000.00 |

B. Participants
Dr. Herbert Rebmann
Birgit Rebmann
Helge Rebmann represented by Ms. Birgit Rebmann
Balder Rebmann represented by Dr. Herbert Rebmann
not appeared: Carsten Rebmann

[...]

1. Decision on the exclusion of Mr. Carsten Matthias Rebmann as shareholder for important cause

The present shareholders justified the exclusion of Mr. Carsten Rebmann with his violation of the general fiduciary duty towards the society and towards the co-shareholders (BGHZ 65, 15f, 17, 18).

The content of the fiduciary duty is to protect the interests of the GmbH as its shareholder; especially not to impair it through a damaging conduct and accordingly to consider the common interests of the co-shareholders and of affiliated companies.  Mr.. Carsten Rebmann has violated his fiduciary duty in multiple respects.

For instance, he has not fulfilled his duties as Managing Director during his time as Managing Director of the affiliated companies American Lecithin Company and Lipoid LLC; he has not prepared and submitted balance sheets and tax returns despite repeated requests. Thereby, he has damaged the reputation of the group.

Mr Carsten Rebmann registered internet domains in his own name and after his exit as managing director he blocked all correspondence through the domain names registered by him [awkward in German as well]. Employees of the Lipoid Group have no longer access to their former accounts and to the incoming personal and business-related messages.  He directs the user of the homepage of ALC to a page that is only accessible to him and claims on top of this that this is the only official page of the company.  Thereby he naturally directly damaged the company.

Additionally, Mr. Carsten Rebmann uses the internet domains actively for commercial purposes. Customers and business partners are confused and don't reach their desired correspondents.

It is to be feared that the entire Lipoid Group will suffer substantial material and immaterial damages due to Mr Carsten Rebmann's violations of fiduciary duty.  This applies finally to Lipoid Grundstücks GmbH as well; its economic interests are an integral part of the Lipoid Group and are damaged indirectly by the acts of bad faith of Mr Carsten Rebmann.

Therefore, it can no longer be expected of the other shareholders that they continue the company with Mr. Carsten Rebmann.

Paragraph 11 of the bylaws stipulates: A shareholder can be excluded from the company through decision of the shareholders, if there is an important reason in this person [sic! awkward and unclear in German], so that the other shareholders can no longer be expected to continue the company with the questionable co-shareholder as a result of his conduct or his personality [points rather to character flaws than to actions].

The present shareholder decided thereafter unanimously:
Mr. Carsten Matthias Rebmann is excluded from the company according to paragraph 11 section 1 sentence 1.

2. Decision on the forfeiture of the share of Mr. Carsten Matthias Rebmann against payment of a compensation according to paragraph 11 section 2 sentence 2 in connection with paragraph 13 of the shareholder contract.

The present shareholders decide unanimously:
1. The Shares of Mr. Carsten Rebmann that nominally amount to DM 30,000.00 is forfeit according to paragraph 11 section 2 sentence 2 of the shareholder contract.

2. The managing director Dr. Herbert Rebmann is commissioned to declare the forfeiture of his share to Mr. Carsten Rebmann in writing [has not happend, I only received the minutes].

3. The managing director Dr. Herbert Rebmann is further commissioned to assess the payable amount of the compensation according to paragraph 11 section 3 in connection with paragraph 13 and to pay this amount to Mr Carsten Rebmann, after all counter-claims that the company owns have been deducted.

4. In lieu of the forfeit shares a new block of shares if created with the nominal value of DM 30,000.00 that are owned by the company and taken over by her.

The leader of the meeting anounced the result of all decisions made and thereby determined the decisions.

The leader of the meeting closed the shareholder meeting at 8:30am.

Neustadt, 9th January 2013

[signed] Dr. Herbert Rebmann

[on bottom of page: abbreviated signature] Birgit Rebmann

# Exhibit E

# LIPOID
# Grundstücks
# GmbH
**Frigenstraße 4**
**67065 Ludwigshafen**

Lipoid Grundstücks GmbH, Frigenstraße 4, 67065 Ludwigshafen

## Kreditvertrag

Die Firma Lipoid Grundstücks GmbH gewährt Herrn Carsten Matthias Rebmann einen Kredit über 110.000,00 € (einhundertzehntausend)

Der Kredit wird nicht verzinst.

Die Auszahlung erfolgt zu 100 % auf das Konto der SpardaBank Frankfurt.
Eine Rückzahlung erfolgt z.Z. nicht, ist aber jederzeit möglich. Wird eine Rückzahlung vereinbart, so wird dieser Vertrag schriftlich ergänzt.
Es gilt ausschließlich deutsches Recht und der Gerichtsstand ist Ludwigshafen.

Ludwigshafen, den

Lipoid Grundstücks GmbH

C.M. Rebmann

[translation of Kreditvertrag Lipoid Grundstucks GmbH]

Lipoid Grundstucks GmbH
Frigenstrasse 4
67065 Ludwigshafen

**Loan agreement**

The company Lipoid Grundstucks GmbH grants Mr Carsten Matthias Rebmann a credit of 110,000.00 Euro (one hundred ten thousand) .

The loan amount earns no interest.

100% of the loan amount are paid to the bank account at SpardaBank Frankfurt.  Repayment is not made at this time, but is possible at any time.  If the repayment is agreed to, this contract is amended in writing.  German laws apply and the place of jurisdiction is Ludwigshafen.

Ludwigshafen, the [no date]

[no signature]                                              [signature]
Lipoid Grunstucks GmbH                          C.M. Rebmann

# Exhibit F

# Lipoid

Lipoid LLC
The National Newark Building
744 Broad Street, Suite 1801
Newark, NJ 07102-3802

phone 973 735 2692
fax 973 735 2698

e-mail office@lipoidllc.com
http://www.lipoidllc.com

August 25, 2011

Via Fax and mail
Carsten Matthias Rebmann
**331 84th Street**
**New York, 10024**

Re:     Termination of your employment

Dear Carsten:

As was indicated to you on August 11, 2011, please allow this letter to serve as formal confirmation that your employment with Lipoid LLC (the "Company") is terminated effective immediately. This letter also terminates any and all other positions you have held with the Company's affiliates and with American Lecithin Company. While I regret this decision, it is based on your unwillingness to work with the parent company and others within our group.

On August 31, 2011 you will receive your final pay check , which represents all monies due and owing to you from the Company. This amount includes your earned salary to date, unused and accrued vacation time, and any expenses for which you are entitled to reimbursement.

Please be advised that you are no longer authorized to act in any manner on behalf of the Company. This includes but is not limited to continued use of the Company's computer systems, credit cards and mobile phones. With respect to the Company website, please turn over all information necessary to ensure that the Company can actively maintain its website and minimize any disruption related to your departure.

If you have not already done so, please return all property provided to you by the Company and/or belonging to the Company by August 31, 2011. Should you have any questions, please contact me.

Sincerely,

Dr. Herbert Rebmann

# Exhibit G

**From:** Dr. Herbert Rebmann
**To:** Kurt-Hartwig.Richter@t-online.de
**Sent:** Tuesday, October 25, 2011 11:07 PM
**Subject:** WG: Ihr Schreiben vom 7.10.2011

---

**Von:** Dr. Herbert Rebmann
**Gesendet:** Dienstag, 25. Oktober 2011 23:02
**An:** 'Kurt-Haartwig.richter@t-online.de'
**Betreff:** Ihr schreiben vom 7.10.2011

Sehr geehrter Herr Richter,

mir liegt Ihr o.g.Schreiben vor.

Ihr Auftraggeber schuldet mir ca 400.000 $ und ca 140.000 Euro der Firma Lipoid Grundstücks GmbH,die ich vertrete.Beide Beträge sind seit Monaten fällig gestellt.

Weiter hat er als Leiter unserer Firma in den USA leider versäumt seit 2006 Bilanzen einzureichen und ausländische Konten zu melden.

Dort müssen wir nach Angaben unseres Beraters mit Strafen bis zu und sogar mehr als 5 Millionen $ rechnen,die wir Ihrem Auftraggeber in Rechnung stellen werden bzw.ihn vom Gericht direkt belangen lassen werden.

Beide Vorgänge sind strafrechtlich relevant,und wenn wir uns nicht sehr große Mühe geben,wird Ihr Auftraggeber das Prozessende evtl.in einem amerikanischen Gefängnis erleben.Und eigentlich sehe ich keinen Grund weshalb wir versuchen sollen dies zu verhindern.

Ihnen muss ich also raten, Vorkasse zu machen,denn viel wird danach nicht mehr zu holen sein.

Mit freundlicher Empfehlung


Dr.Herbert Rebmann

[translation Email Herbert Rebmann to attorney Richter]

----- Original Message ----**From:**
Dr. Herbert Rebmann
**To:** Kurt-Hartwig.Richter@t-online.de
**Sent:** Tuesday, October 25, 2011 11:07 PM
**Subject:** RE: Your letter dated October 7th 2011

**Von:** Dr. Herbert Rebmann
**Sent:** Tuesday, October 25, 2011 23:02
**To:** 'Kurt-Haartwig.richter@t-online.de'
**Subject:** Your letter dated October 7th 2011

Dear Mr. Richter,

I have your above mentioned letter in front of me.

Your client owes me approx. $400,000 and approx. 140,000 Euro to the company Lipoid Grundstucks GmbH, that I represent.  Both amounts have been past due for months.

Furthermore, as leader of our company in the U.S.A., he failed unfortunately to submit balance sheets and to report foreign accounts.

There, according to our consultant we have to expect penalties up to or even more than $5 million that we will charge to your client, respectively send the court after him.

Both proceedings [sic!] have criminal content, and if we don't undertake very big efforts, your client might be in American prison by the end of this criminal investigation. And I really don't see a reason why we should make an effort to interfere with this.

Therefore, I have to advise you that you collect in advance; because afterwards not much will be left.

With friendly recommendation
Dr. Herbert Rebmann

# Exhibit H

Drug Discovery

R&D

**People Similar to Bruce**

**Donald Kirsch**  3rd
CSO at Cambria Biosciences & Biopharma...
**Connect**

### Education

**Columbia University in the City of New York**
Doctor of Philosophy (Ph.D.), Chemistry, 3.6
1979 – 1983

Connections                                   Shared (4)

**Frank Schubert**  1st
Director Global Sales bei Lipoid AG

**Thomas Tarara**  1st
director at Novartis

**Abdel Omri**  1st
Professor

**Christian Wettre**  1st
President at W-Systems Corp.

Groups

**Invitrogen Alumni**
Join

**LED Lighting Professi...**
Join

**Nicholas Turro Group...**
Join

**Pharmaceutical Busi...**
Member

Following

**Pharmaceuticals**
138,594 followers
Following

**Allergan**
Pharmaceuticals
Follow

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account
LinkedIn Corporation © 2013 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

⌄  Search for people, jobs, companies, and more...           [ ]  Advanced

Home     Profile     Network     Jobs     Interests                                          Premium Solutions     Upgrade

CEO: Better Mfg Reporting - All Your Data—Sales, Finance, Mktg, etc—In One CEO Dashboard. Get A Demo! | Read More »

# Bruce Baretz                                                                          2nd

President at Lipoid LLC

Greater New York City Area | Pharmaceuticals

Previous      Lipoid LLC, Invitrogen, Keen Solutions, Inc.
Education     Columbia University in the City of New York

| Connect | Send InMail ⌄ |

**110**
connections

Background

## Experience

**President**
Lipoid LLC
February 2012 – Present (1 year 8 months) | Newark, NJ

**Director**
Lipoid LLC
June 2006 – February 2012 (5 years 9 months)

**Director**
Invitrogen
January 2005 – December 2006 (2 years) | Frederick, MD

*life* technologies

Global Programs and Portfolio Management for BioReliance, BioDefense and BioInformatics Businesses of Invitrogen.

**President**
Keen Solutions, Inc.
January 1993 – December 2004 (12 years) | West Milford, NJ

Technology and Business Development Consultancy which developed the White Light LED Technology (U.S. Patent 6,600,175)

**Director, Sales**
American Cyanamid Company
1983 – 1993 (10 years) | Wayne, NJ

Chemical Group.

## Skills & Expertise

9  Biotechnology
7  Commercialization
6  Technology Transfer
5  Lifesciences
4  Patents

**People Similar to Bruce**

**Donald Kirsch** 3rd
CSO at Cambria Biosciences & Biopharma...
Connect

ADS YOU MAY BE INTERESTED IN

**Are You A CEO?**
Apply to Worldwide Who's Who
and expand your online networking.                                    ›

**6 Tips for E-Tailers**
Free Whitepaper: 6 Strategies for
Winning the E-Commerce War.
Download Now.                                                         ›

**LC/MS Equip. on a Budget**
Thermo     Refurbished/Demo Mass
Spectrometry Instruments.Special
Offer (NA Only)                                                       ›

**How You're Connected**

You

Frank Schubert

Abdel Omri

Christian Wettre

and 1 more connection in
common
Get introduced ›

Bruce Baretz

**In Common with Bruce**

◯ You     ◯ Bruce