UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

AMERICAN LECITHIN COMPANY,
LIPOID GmbH,
LIPOID, LLC, and
PHOSPHOLIPID GmbH,                            Case No. 12-cv-0929 (RA)

                          Plaintiffs,

-against-

                                             AFFIDAVIT OF CARSTEN
CARSTEN MATTHIAS REBMANN,                     MATTHIAS REBMANN

                          Defendant.
-------------------------------------------------------------------x

CARSTEN MATTHIAS REBMANN, being duly sworn, declares and says:

1.    I am the defendant in this action and make this Affidavit (A) in support of my
motion for leave to file a proposed amended answer, counterclaims and third-party claims
("PAA") in this action and (B) in reply to the papers filed by Plaintiffs in opposition to my
motion. I make this affidavit on personal knowledge, except as otherwise indicated. I will
attempt to limit this Affidavit to facts relevant to the current motion.

*Background*

2.    My father, Herbert Rebmann ("Herbert") terminated my employment as CEO of
Lipoid LLC and American Lecithin Company ("ALC") in August 2011. Lipoid LLC and ALC
are the United States members of the worldwide conglomerate that my father runs, known as the
"Lipoid Group." I had worked for my father and the Lipoid Group intermittently since 1979,
when I was seven years old, and received a 10% equity interest in the Lipoid Group early on. In
2004, I moved to New York to run the Lipoid Group's American operations.

3.    My father always acted with absolute authority in running both the Lipoid Group
and his family. I believe the event that triggered my firing was that I had refused to file certain

tax returns on behalf of Lipoid LLC that I was advised and understood would violate U.S. law.   I tried to heal the rift between us both before and after this termination, but to no avail.

4.      I was trying to negotiate a settlement with Herbert when he started this lawsuit in the Southern District of New York, claiming, in part, that while I was CEO of Lipoid LLC and ALC, I had wrongfully registered certain domain names belonging to these companies and others in the Lipoid Group in my own name (Complaint (Dkt. 1), ¶ 13) and that I had breached my fiduciary duties (Complaint, ¶ 37).

5.      Herbert caused the Complaint to be filed by Lipoid LLC and ALC, as well as two of Herbert's German Lipoid Group companies, Lipoid GmbH and Phospholipid GmbH.

6.      My father was well aware of my limited financial resources and the problems that this would pose in defending this suit.  As an owner of the Lipoid Group I had fixed my own compensation as CEO of Lipoid LLC and ALC and out of a sense of ownership and loyalty, had kept my compensation relatively low – less than at least one of Lipoid LLC's other employees who reported to me. My income was sufficient to cover my living expenses, but not much more. Accordingly, I did not have the resources to fight my father in Court.

7.      When this lawsuit began, I was still hoping to find a way to repair my relationship with my father.  I retained counsel to help me defend this lawsuit. The law firm I retained agreed to defend me, but due to my limited resources, not to bring counterclaims. I made an offer of judgment in an effort to end the litigation, but this was rejected.

8.      Ultimately, as my father continued to reject all of my overtures at reconciliation, I was forced by financial constraints, to relieve counsel and act as my own attorney.

9.      Herbert took my deposition on July 19, 2012.  I served Notices of Deposition on Herbert and Plaintiffs on August 9, 2012.  These depositions were to be taken before the

discovery deadline of August 27, 2012.  When Herbert refused to appear for his deposition, I moved the Court for an order compelling his appearance.

10.     On September 21, 2012, this Court ordered my father to have his deposition taken at his attorneys' offices in Manhattan (Dkt. 34). On November 28 2012, I moved for sanctions (Dkt. 41). A hearing was scheduled for December 18, 2012.

11.     Herbert had been claiming that medical conditions prevented him from traveling to New York. On December 11, 2012, this Court ordered Herbert to produce by December 18, 2012, a doctors' note detailing when he would be able to travel to New York and a copy of his international travel itinerary for the prior six months (Dkt. 43). My father did not comply with this Order either.

12.     Instead, on December 18, 2012, the very same day that we were in front of this Court on my motion for sanctions, he served me with notice of a shareholders meeting of another one of the Lipoid Group companies, Lipoid Grundstuecks GmbH ("Lipoid G") to be held on December 25, 2012 in his living room in Neustadt-Gimmeldingen, Germany. The purpose of the meeting was to consider taking away my shares in Lipoid G. A copy of this notice, and its English translation, is annexed hereto as Exhibit A. Through a series of corporate restructurings and other maneuvers by Herbert, that I had been given scant information on, my 10% interest in the Lipoid Group had devolved into a 10% interest in Lipoid G.

13.     At the December 18, 2012 hearing, Herbert's attorneys requested permission to withdraw this lawsuit, but insisted that this be *without prejudice*.

14.     On January 1, 2013, Herbert sent me an email (Exhibit B hereto) stating that I was in default on a $490,000 note held by Lipoid Verwaltungs AG ("LVAG").  I can only assume that this email was referring to a note that I had signed to Complector AG (which Herbert states

in his Declaration, had its name changed to LVAG) in the amount of $700,000, but this note was not payable until 2017 and in any event, was to be paid out of Lipoid Group funds earned by me or otherwise. A copy of this note is annexed as Exhibit C.

15.     The date of the Lipoid G shareholders meeting was moved by Herbert to January 9, 2013. On January 25, 2013, I received an envelope from Herbert sent to my apartment in Manhattan that contained a copy of the minutes of a January 9, 2013 shareholders' meeting of Lipoid G (a copy of this is annexed as Exhibit D) and nothing more. The minutes reflected that at this meeting, at which only he and his second wife were present, they voted to take my 10% share ownership in Lipoid G "for cause." The procedures whereby my shares were taken were both procedurally and substantively defective. One of the "for cause" reasons given in the resolution was that I had taken domain names from "the Lipoid Group." Another was that I had failed to file tax returns in the United States on behalf of Lipoid LLC and ALC.

16.     As noted previously, the taking of my Lipoid G shares actually constituted the taking of my shares in the entire Lipoid Group. My father had always treated the Lipoid Group as a single solitary entity, but over time, had set up a complex corporate structure for tax and liability reasons. I had a 10% ownership interest in his original company, Lipoid KG, which included the entire Lipoid enterprise and later became known as Lipoid G. Over time, as Herbert continued to establish and expand his corporate tax structure, assets were moved out of Lipoid KG, a/k/a Lipoid G, into other entities. These asset shifts were never intended to affect my ownership interest in the entire Lipoid Group. Until my relationship with my father began to fray, I had always placed the greatest trust in him to look out for my interests and to assure that despite all of these corporate restructurings, I would retain my 10% in the entire Group. My father always assured me that I was an equity owner in the entire Group and should act

4

accordingly.  This is exactly what I did.  Until my termination, I had always been treated by my father as an equity owner in the entire Group and I had always acted, with his full encouragement and support, as an equity owner in the entire Lipoid Group.

17.     When Herbert took my shares, I realized that the breach was not likely to be reversed, and on January 30, 2013, acting *pro se,* I moved for permission to submit an amended answer and counterclaims. (Dkt. 49).  Herbert objected on the basis that I did not submit a copy of my proposed pleading. I realized that I would have to retain counsel to assist me with the preparation of an amended pleading.

18.     In the interim a *pro bono* counsel was appointed to help me try to settle the issues with my father and to prepare for mediation before Magistrate Judge Kevin Fox.

19.     On March 25, 2013, the parties engaged in mediation before Magistrate Fox, but were unable to reach agreement. The next day, after the Court was notified that the mediation had been unsuccessful, this Court ordered that the deposition of Herbert take place within one month of the Court's ruling on this motion to amend (Dkt. 50).

20.     In May 2013, I retained new counsel and on June 21, 2013, my new counsel filed my proposed amended answer, counterclaims and third-party claims (Dkt. 56).

*No Undue Delay or Prejudice*

21.     To the extent that there has been delay in this case, this can largely be attributed to Herbert's refusal to participate in the discovery process in an action that he commenced and our various efforts to resolve the case through negotiation.  I have been trying to take Herbert's deposition since August 2012, without success. Herbert is presently in violation of this Court's Order dated September 21, 2012, (Dkt. 34), directing him to appear in New York City for deposition and this Court's December 11, 2012 Order directing him to provide proof of his

inability to travel (Dkt. 43). These facts are conspicuously absent from his opposition papers, in which he claims, as a reason that my motion should be denied, that discovery was complete. In point of fact, discovery against Plaintiffs has not even begun.

***Complete Diversity Exists***

22.     As the Complaint in this action indicates, I am a resident of New York City and the companies suing me are all domiciled outside of New York. Lipoid LLC is domiciled in New Jersey, American Lecithin Company is domiciled in Connecticut and Lipoid GmbH and Phospholipid GmbH are domiciled in Germany.

23.     All of the proposed third-party defendants are also domiciled outside of New York. Herbert is citizen and resident of Germany. Lipoid Grundstuecks GmbH ("Lipoid G") and Lipoid Verwaltungs GmbH ("Lipoid V") are organized and have their principal offices in Germany. Complector AG is organized and has its principal office in Switzerland. According to Herbert's Declaration filed with Plaintiffs' opposition papers, Complector is now LVAG, and I will amend my proposed amended answer, counterclaims and third-party claims (the "PAA") to reflect this.

24.     As the PAA indicates, the amount in controversy exceeds $75,000. If leave to amend is granted, I will make sure that this Court's diversity jurisdiction is clearly stated.

***Claims all Factually Related***

25.     Deciding Herbert's claims of wrongful acts while I was employed at Lipoid LLC and ALC and of breach of my fiduciary duties will require that this Court hear and consider the same facts as it will be required to hear in resolving the issues raised in the PAA. All of the claims are factually related. They involve the facts relating to my employment by Lipoid LLC and ALC, its termination by my father and the reasons leading up to this. The "dispute" over

domain names and computer software cannot be separated from the other issues that were in contention between us, and all of this ultimately relates to the breakdown of my relationship with my father. This can be seen in the following brief summary.

26.    In 2007, Herbert caused several of the Lipoid Group companies to finance the acquisition of an apartment in New York for the benefit of the Lipoid Group and me. I believe, but am not certain that the funds came from Lipoid G and from Lipoid AG.  At some point, Herbert had me sign an acknowledgment of the funds I had received from Lipoid G (Exhibit E hereto). The acknowledgment stated that I will repay this amount when it was convenient. Months, perhaps a year, later, Herbert had me sign a note in favor of Complector for $700,000 (see Exhibit C). I was told that this was for tax reasons. The note was not due until 2017 and was to be paid out of my earnings or otherwise through Lipoid Group funds.

27.    In 2009, when I received a small inheritance from my mother, Herbert's first wife, Herbert took the money and on information and belief, put it into the Lipoid Group.  I do not know if this money was used to pay down these "loans" or had been "invested" in the Lipoid Group. In any event, when I objected to this act, this exacerbated our relationship and Herbert intensified his efforts to assert his will on me.

28.    I had acted with considerable autonomy in running the Lipoid Group's American operations and had had considerable success in growing our U.S. business.  However, as our relationship grew contentious, Herbert began taking steps to make my job more difficult. He also insisted that I file certain tax returns for Lipoid LLC that I did not want to because I had been informed by our tax advisors that they were not in compliance with U.S. law.  This led to additional friction between us as he sought to impose his will on me.  In August 2011, as retaliation for my unwillingness to file these illegal tax returns in accordance with his wishes,

Herbert notified me that all of my positions with the Lipoid Group, including my positions as CEO of Lipoid LLC and ALC had been terminated.  My efforts at reconciliation were to no avail, as were my efforts to settle our differences over the termination and its consequences. When I refused to drop my claims altogether, Herbert seized upon an inconsequential non-issue relating to the domain names to sue me in New York.

29.     When I continued to press for his deposition to establish the facts needed to defend against his claims, he seized my shares in retaliation.  This occurred in direct response to my actions and this Court's Orders in this case.

**Personal Jurisdiction Exists**

30.     Contrary to his assertions in his Declaration (Dkt. 67-1), Herbert has conducted and continues to conduct business in New York, and he has committed tortious acts in New York that are the subject of my claims against him.   I believe that I am able to provide enough facts in this affidavit to establish this point beyond a doubt. But, to the extent that any further proof is necessary, then I request that a decision on the jurisdiction issue be delayed until I am able to obtain discovery from Herbert and take Herbert's deposition in aid of jurisdiction.

31.     The wrongful termination of my employment took place in New York, New York. Annexed hereto as Exhibit F is a copy of Herbert's termination letter to me, dated August 25, 2011, which was sent by fax and mail to my residence in Manhattan.

32.     This letter, in addition to showing that the termination took place in New York, illustrates that Herbert ignored corporate structures and formalities and used the members of the Lipoid Group to carry out his personal wishes. Note that Herbert acted unilaterally and by personal fiat to terminate my employment with "Lipoid LLC (the "Company) [and] any and all other positions you have held with the Company's affiliates and with American Lecithin

8

Company." Note that he is acting on behalf of all of the members of the Lipoid Group, which would include all of the Plaintiffs and proposed corporate third-party defendants. Note that he did not articulate what my positions were with the other Group companies or what his position was with any of them. In any event, these were fungible commodities. He could assume whatever position he wanted or bestow upon me and others whatever position he chose in order to meet his needs of the moment. No formal elections were necessary and positions with the Lipoid Group companies could change at his whim from one moment to the next.

33.    Note that he wrote the letter on Lipoid LLC letterhead without any indication as to what his title or authority was to send this letter. To my knowledge, Herbert had no formal position with Lipoid LLC. This is consistent with the way he acted throughout in that he didn't need any titles and had complete personal authority over all of the Lipoid Group companies. He ruled by decree and his power was absolute. These companies and Herbert were one and the same.

34.    Note that Herbert wrote this letter unilaterally and not on behalf of any board, or other governing body of any of the Lipoid Group companies that ostensibly fired me. This is consistent with the way he and all of the Lipoid Group companies worked – no formal resolutions or votes were necessary - personal decree by Herbert was sufficient.

35.    Note that the reason that Herbert gave for terminating my employment was my "unwillingness to work with the parent company and others within our group." This is his way of saying that I refused to work with him, which was not true. He is *de facto* the parent company and the group. While employed by Lipoid LLC and ALC, I did not report to a board or any other group of individuals; the only person I reported to was Herbert.

36.     Note that "parent company" is left undefined as there is more than one (one in Switzerland and another in Germany) and at any given time, this term could mean something else. The corporate structure of the Group is not always clear and it is often changed by Herbert to achieve various personal and business objectives.  Even when I was CEO of Lipoid LLC and ALC, Herbert changed the ownership structure of these companies without telling me.

37.     Moreover, the procedures followed by Herbert in taking my shares were legally deficient and ineffective. Further, the reason given was not true.  The issues relating to this unlawful taking – which was in direct response to me seeking discovery sanctions against him - should be decided by this Court, as should the issues relating to Herbert's other retaliatory and wrongful acts against me.

38.     This lawsuit, which was initiated by Herbert in New York using four members of the Lipoid Group as his proxies, is being pursued by Herbert in New York.  The taking of my shares took place in Germany, but this was in direct response to events that took place in this Court in New York.

39.     Other tortious acts directly relevant to this litigation were committed by Herbert and the Lipoid Group in New York.  Herbert tried to cause me to file improper tax returns with the IRS during telephone calls in which he called me in New York (and Connecticut).  Herbert took improper steps to impede my ability to set up a lecithin and phospholipids supply business in New York and to keep me from competing with the Lipoid Group in New York by predatory pricing strategies and attempts to monopolize the market through exclusive long-term supply agreements. Many of these acts took place, or had impact, in New York.  Herbert retaliated against me by dramatically lowering the prices for several key products below his own costs and selling these products to customers in New York.

40.     Not only did Herbert commit tortious and wrongful acts in New York that are the basis for this lawsuit, he has regularly conducted business in New York.

41.     While I was the CEO of Lipoid LLC and ALC, Herbert visited the United States, including New York, on a fairly regular basis for the purpose of conducting business in the United States, as well as personally visiting me.  Herbert stayed in my apartment in New York, New York on at least three occasions. During these visits, he frequently conducted business on behalf of the Lipoid Group both from the apartment and from other locations in New York.  He met with business associates while in New York, including lawyers performing services for him and the Lipoid Group and the landlord of Lipoid LLC.

42.     In the months after I was terminated (in the latter part of 2011), Herbert was, upon information and belief, present in New York City on a number of occasions for business reasons and he personally conducted business meetings in Manhattan.

43.     I am aware, for example, that he met with Dr. Richard Deckelbaum in September or October 2011 at Columbia University's Medical Campus in Washington Heights for the purpose of commissioning phospholipid research that might be useful to the Lipoid Group. I had introduced him to Dr. Deckelbaum earlier that year.

44.     I am aware that Herbert hosted a Christmas party for the employees of Lipoid LLC in New York City in December 2011.

45.     I am aware that after I was terminated, Herbert cut his prices to customers located in New York, including Estee Lauder, below cost in order to interfere with and prevent me from completing deals that I was working on to sell products to them.

46.     Plaintiffs Lipoid GmbH and Phospholipid GmbH and proposed third-party defendants LVAG (according to Herbert, f/k/a Complector) regularly ship goods into New York,

directly or through affiliated intermediaries.  These goods are sometimes shipped on to Lipoid LLC and ALC and sometimes shipped directly to customers in New York on their behalf.

47.     Herbert caused Lipoid G and upon information and belief, Lipoid AG[1], companies he states do no business in New York, to finance the acquisition of a cooperative apartment in New York City for the benefit of the Lipoid Group and me.  As noted, this apartment – while technically not an office – served as a place from which Herbert conducted business on behalf of the Lipoid Group.

48.     I was instructed by him to sign a $700,000 note in favor of Complector, a different member of the Lipoid Group in relation to the financing of the apartment.   Apparently, this note was paid down to $490,000. I recollect making some payments towards the principal of the note out of my Lipoid LLC earnings, but far less than $210,000. It is possible that Herbert applied the money I had received from my mother's estate to pay down this note (and perhaps the Lipoid G funds used to buy the apartment). Also, upon information and belief, the interest on this note was at least in some years charged as an intra-company transaction, to ALC and/or Lipoid LLC, and/or other members of the Lipoid Group. All of this illustrates the interchangeable nature of the Lipoid Group companies.

49.     As illustrated by the termination notice Herbert sent me, all of the Lipoid Group Companies act as Herbert's alter ego and corporate titles and formalities are routinely ignored. He exercises complete dominion over them and acts as if he and the Lipoid Group companies are one and the same.

50.     This is also illustrated by an October 11, 2011 letter he wrote to Kurt-Hartwig Richter, a German attorney that he learned I had consulted about the funds he had taken that I

---

[1] I state, upon information and belief that Lipoid AG provided the funds, but I do not know this for sure as I was never told precisely which Lipoid Group entities the funds came from.

had received from my mother's estate (see Exhibit G hereto).  In this letter, he states (translated from the German):

> Your client owes me approx. $400,000 and approx. 140,000 Euro to the company Lipoid Grundstucks GmbH, that I represent.  Both amounts have been past due for months.
>
> Furthermore, as leader of our company in the U.S.A., he failed unfortunately to submit balance sheets and to report foreign accounts.
>
> There, according to our consultant we have to expect penalties up to or even more than $5 million that we will charge to your client, respectively send the court after him.
>
> Both proceedings [sic!] have criminal content, and if we don't undertake very big efforts, your client might be in American prison by the end of this criminal investigation. And I really don't see a reason why we should make an effort to interfere with this.
>
> Therefore, I have to advise you that you collect in advance; because afterwards not much will be left

51.   Herbert treats the Lipoid Group companies as a single entity and the various members of the Lipoid Group are used interchangeably by Herbert to pursue his business and personal affairs.  This is illustrated by his August 25, 2011 termination letter and his January 9, 2013 taking of my shares in Lipoid G purportedly for things I did relating to domain names belonging to the four Plaintiffs, but not Lipoid G.

52.   Lipoid Group companies' formal ownership and management structures are variable, as Herbert unilaterally changes these as and when he wishes.  This is illustrated by the fact that in his Declaration, Herbert states that he is the President of Lipoid LLC. Yet, in LinkedIn, the President is listed as Bruce Baretz (see Exhibit H annexed hereto).

53.   Herbert pays no regard to the separate identities of the various Lipoid Group companies.  To illustrate this, I am aware that at Herbert's instruction, a tax refund check written

by the IRS and payable to Lipoid LLC was deposited to bank account of Lipoid GmbH in Germany. I am not sure what the purpose of this maneuver was.

54.     As CEO and board member of ALC, I reported to Herbert, and not to a board, shareholders or LLC members.  Corporate formalities and structures were ignored and Herbert ruled by fiat and decree – bypassing me when he wanted to, even though I was CEO, and going directly to other employees of these companies.  ALC did not have regular board or shareholders' meetings.  To the best of my information and belief, all of the companies in the Lipoid Group operated in the same way, with Herbert doing as he pleased and with corporate structures and formalities ignored if he deemed this expedient.

55.     As noted above, Herbert caused multiple Lipoid Group Companies to finance the acquisition of the coop apartment in New York.  I was instructed by him to sign a note in favor of Complector, which to the best of my knowledge had not provided the financing.  Upon information and belief, the interest on this note was at least in some years charged as an intra-company transaction, to ALC and/or Lipoid LLC, and/or other members of the Lipoid Group.

**Tortious Interference and Defamation**

56.     Upon my termination from Lipoid LLC, I was contacted by long-standing customers of the Lipoid Group that sought to source lecithin and phospholipids from me.  I decided to establish and operate my own lecithin and phospholipid sale and distribution business in New York.  Based on my years of experience and previous success in the industry, I had developed a network of industry contacts that I readily expected to leverage in his efforts to establish this business.  However, Herbert, individually and through the Lipoid Group entities, intentionally and wrongfully interfered with my efforts to enter the lecithin and phospholipids business.  Herbert took a number of wrongful and anti-competitive acts to prevent me from

establishing my own phospholipid business and from completing specific transactions with prospective customers. When he found out that I was in the process of concluding deals with several customers, including Estee Lauder, Maxhealth and Hospira, he immediately lowered his prices below cost so I could not complete these transactions.

57.     Herbert made representations to a number of customers and industry professionals, including Jarrow, that I was subject to a non-compete and confidentiality agreement so they would not do business with me. I did not have a non-compete, but persons who were told by him that I did were afraid to do business with me.

58.     Herbert terminated my membership in the Phospholipid Research Center, an industry group I had helped found.  He also he had me barred from this industry group to impede my ability to establish myself in the phospholipid business.

59.     Herbert also slandered me to my former coworkers and upon information and belief, other in the industry, by falsely alleging that I was fired for not sending company reports.

60.     Herbert defamed me to a lawyer I had consulted in Germany by sending him an email accusing me of professional incompetence and "criminal behavior" and threatening that I would be "imprisoned."  As a direct result of this intimidation, the lawyer stated that he could not represent me.

61.     All of these steps by Herbert further illustrate why it is critical that all of the issues between me and my father be resolved in one action in this Court – a forum he selected.

Carsten Matthias Rebmann

Sworn to before me this
18th day of October, 2013

Notary Public

15

MORRIS K. MITRANI
Notary Public, State of New York
No. 02MI6008152
Qualified in New York County
Commission Expires October 8, 2013

## CERTIFICATE OF SERVICE

I am an attorney at Samuel Goldman & Associates, counsel for Defendant, in the above-captioned proceeding. I hereby certify that on October 18, 2013, I caused the foregoing Affidavit of Carsten Matthias Rebmann to be served electronically via the United States District Court, Southern District of New York Court's ECF system upon those parties entitled to receive electronica notice.


*/s/ Samuel Goldman*
Samuel Goldman