UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN LECITHIN COMPANY,
LIPOID GmbH, LIPOID, LLC, and
PHOSPHOLIPID GmbH,

                              Plaintiffs,

-v-

CARSTEN MATTHIAS REBMANN,

                              Defendant and
                              Third-Party Plaintiff,

-v-

HERBERT REBMANN, LIPOID STIFTUNG, LIPOID
BETEILIGUNGS GmbH, LIPOID VERWALTUNGS AG,
LIPOID GRUNDSTUECKS GmbH, and PHOSPHOLIPID
FORSCHUNGSZENTRUM e.V.,

                              Third-Party Defendants.

Case No. 12-cv-00929-VSB

**AFFIDAVIT OF CARSTEN
MATTHIAS REBMANN**

CARSTEN MATTHIAS REBMANN, being duly sworn, declares and says:

   1.     I am the Defendant and Third-Party Plaintiff in this action and make this Affidavit

in opposition to the Motion by Plaintiffs and Third-Party Defendants (the "Lipoid Parties") to

Dismiss Counterclaims and Third Party Claims. The facts recited herein are intended to

supplement the facts recited in my Second Amended Answer, Counterclaims and Third-Party

Claims ("SAA").

   2.     Herbert Rebmann ("Herbert") urges this Court to dismiss my claims on multiple

grounds and states that I should have to litigate them in Germany.  But, it is important for this

Court to know and take into consideration that he has already prevented me from pursuing my

legal rights in Germany and that there is no doubt that if I am forced to litigate in Germany, he

will do so again.  In October 2011, after I could not obtain a logical explanation from my father, as to what happened to my inheritance from my mother and his first wife, I retained German counsel, Kurt-Haartwig Richter, to investigate. Herbert replied to an initial letter from Dr. Richter by email warning him not to take me on as a client because I "will not be able to pay any bills after [he and the Lipoid Group] are done with [me]." He also threatened that he would report me to the authorities for prosecution and that I would wind up in jail (See email dated October 25, 2011 from Herbert to Dr. Richter, with translation, annexed hereto as Exhibit ("Exh.") A). Shortly thereafter, Dr. Richter resigned as my counsel and stated that he could no longer pursue my interests in this case.

3.      This is not an isolated incident.  Herbert routinely intimidates opponents and ignores decrees of the German judiciary, which does not have the same enforcement and sanctioning powers as do United States Courts. Herbert is a very powerful man in Germany who often resorts to threats and intimidation and has a history of not taking court orders seriously.

4.      My father has faced off with the German legal system on multiple occasions and has developed strategies to impose his will – legally and through extra-judicial means. For instance, in or around 1983, when my father left my mother to move in with another woman, my mother obtained a court order that awarded custody to her of their two children – me and my brother Dominik. I was 11 years old at the time. My father ignored the court order and refused to turn me over. The court sent a Court Marshall to enforce the order. When the Court Marshall requested that my father comply with the court's ruling, my father told the Court Marshall that he certainly would not. My father even threatened the Court Marshall by telling him his car was parked behind the Court Marshall's car in a one-lane road, and that the Court Marshall had no way of leaving if my father would not move his car. My father took me with him and drove me to his

new house in Neustadt, Germany. He kept me hidden there for several weeks. No German court punished him for these unlawful actions.

5.      My father has deep contempt for governmental and judicial authority. I know from personal experience that he does not obey laws and judicial orders, but rather calculates the cost of compliance as against the cost of non-compliance. This is what he did when he asked me to file false tax returns in the United States mis-stating the value of American Lecithin Company ("ALC") when he caused it to be transferred from Lipoid LLC to Lipoid Verwaltungs AG ("Lipoid V"), a Swiss company.

6.      Further, Herbert ignored several orders of the Court in this case seeking to cause him to be deposed and provided the Court with manufactured excuses for his refusal. He continued to do so until the sanctions imposed by the Court became too severe, and the cost of compliance became less than the cost of non-compliance.

7.      As illustrated below, Herbert completely dominated the Lipoid Group companies and managed them as a single business entity. He used the various members of the Lipoid Group interchangeably to pursue his business and personal affairs.

8.      This is demonstrated by how he used the Lipoid Group companies to wrongfully attack me from multiple directions;

> (a) He unilaterally terminated my employment by Lipoid LLC and ALC and my positions with other Lipoid entities notwithstanding his repeated assurances that I could have my jobs at Lipoid LLC and ALC for as long as I wished;
>
> (b) He unilaterally caused Lipoid LLC, ALC, Lipoid GmbH and Phospholipid GmbH to sue me in this Court;
>
> (c) He unilaterally caused Lipoid Grundstuecks GmbH ("Lipoid G") to take my inheritance from my mother to repay Lipoid G the dividends I had received from it to purchase the apartment in New York (according to his statement at his deposition);

(d) He unilaterally caused Lipoid Verwaltungs AG ("Lipoid V") to demand repayment of a loan from me that was used to purchase an apartment in New York at his request and was to be repaid out of Lipoid LLC and ALC funds; .

(e) He unilaterally caused Lipoid G to take my 10% ownership interest in that company; and

(f)  He unilaterally caused the Phospholipid Research Center a/k/a/ Phospholipid Forschungszentrum e.V. ("PRC") to terminate my membership in this supposedly industrywide organization that in fact served as a part of the Lipoid Group.

9.      In running the Lipoid Group. Herbert ignored formal structures, corporate formalities and legal requirements.  He paid no regard to the separate identities of the various Lipoid Group companies. These points are illustrated by his August 25, 2011 termination letter (a copy of which is annexed as Exh. B hereto), which he wrote on Lipoid LLC letterhead, but apparently on  behalf of the entire Lipoid Group, without stating his authority to act for any of them. In this letter, he terminated all of my positions with the Lipoid Group.  This was typical of the way he acted and dominated the entire Lipoid Group. He did not need titles, formalities, resolutions or anyone else's concurrence and he had no need to maintain the entities separate identifies.  This is also illustrated by his January 9, 2013, taking of my shares in Lipoid G, purportedly on behalf of Lipoid G for things I had allegedly done relating to Lipoid Group entities, none of whom was Lipoid G.

10.      Herbert changed the Group's ownership structure at his whim and fancy.  He designated officers and managing directors, and removed them, at will, usually without any corporate formalities. Officerships and other titles were bestowed and taken away unilaterally as he saw fit and often not even documented.  This is illustrated by the fact that he did not even know what titles I had with other Lipoid Group entities when he fired me and by the fact that in his Declaration he states that he is President of Lipoid LLC and Chairman of ALC (Herbert Decl. ¶

4

19). Yet, I was the President/CEO of these entities and I was not aware that he was President of Lipoid LLC and Chairman of ALC. Moreover, in LinkedIn, the Lipoid LLC President is listed as Bruce Baretz, so presumably, he must have made Mr. Baretz President too.

11.     Lipoid Group entities were not set up to have separate identities and survive on their own. This is illustrated by the fact that at its formation, Lipoid LLC was capitalized with a single dollar and maintained operations through inter-company loans from other Lipoid Group entities.

12.     The separate identities of these entities was often ignored, I am aware that at Herbert's instruction, a tax refund check written by the Internal Revenue Service and payable to Lipoid LLC was deposited to the bank account of Lipoid GmbH, and ultimately Lipoid G.

13.     Lipoid V and my father completely dominated Lipoid LLC and ALC. Lipoid LLC and ALC did not have a separate financial existence and were completely dependent on Lipoid V and the other members of the Lipoid Group. They were permitted to sell only Lipoid Group products, with the prices they paid for them and the prices they could sell them at determined by Herbert and Lipoid V. Herbert even personally controlled what products could continue to be sold by acquired companies. When ALC was acquired by Lipoid LLC, it had been sourcing products from a company called Solae. Herbert personally went over each product and determined whether it was eligible to continue to be sold by ALC; in the process, he removed several products from ALC's portfolio.

14.     Lipoid LLC and ALC were not separate profit centers and were not intended to make profits because any profits they made would be taxed at the higher United States tax rates, as compared to profits diverted to Switzerland. At his deposition, Herbert tried to cover up this fact by testifying that the objective of the Lipoid Group was not to make profits, but to develop

5

markets (4/29/15 Herbert Rebmann Deposition ("Herbert Dep.") at 295). Excess revenues from Lipoid LLC and ALC were channeled to other Lipoid Group entities via repayment of intracompany loans, transfer pricing, and the payment of substantial services fees. For example, in 2006, despite being a small developing company, Lipoid LLC was required to pay an annual service charge of $200,000 to Lipoid AG, a predecessor of Lipoid V (see a copy of the 2006 Lipoid AG-Lipoid LLC Services Agreement annexed hereto as Exh. C). These services fees were determined and paid annually depending on the size of profits that needed to be sheltered in the respective year. All marketing efforts and policies were determined centrally in Ludwigshafen, Germany and Lipoid V and Herbert exercised dominant control over Lipoid LLCs and ALC's marketing. Further, all Lipoid Group-wide operational policies were centrally determined, and Lipoid LLC and ALC operated within the confines of those policies.

15.    I was terminated as CEO of Lipoid LLC and ALC by fiat of Herbert, without any formal action under the Lipoid LLC's Operating Agreement or ALC's operative corporate governance documents. No notice of termination was voted on or sent by Lipoid V, the managing member of Lipoid LLC. I was on the board of ALC, and there was no board meeting for ALC and no board or shareholder resolutions adopted. There were no resolutions adopted terminating any of my other positions with the Lipoid Group. These terminations were carried out by unilateral decree of Herbert. No resolutions were adopted by Lipoid G either authorizing it to finance the acquisition of my apartment in New York or authorizing the offsetting of my inheritance from my mother against these sums. I have until this day not been provided with any documents showing what happened to my inheritance or how much money was offset by Lipoid G. No proper notice of a shareholders meeting of Lipoid G was given to me of the meeting that was allegedly held to strip me of my 10% interest in that company. My requests for a copy of the company by-laws and

for information were unlawfully ignored, as were the resolutions, and issues which I raised for discussion at this meeting.

16.     When Herbert directed that ALC's ownership be transferred from Lipoid LLC to Lipoid V, corporate formalities were ignored and I was not even informed of the transfer when it happened.   Later on, I was asked to sign tax returns which stated an unrealistically and insupportably low valuation of ALC.  On the advice of the company's tax accountant, I refused to sign.

17.     Despite my request that they produce them, the Lipoid Parties have produced no minute books or corporate resolutions for any of the Lipoid Group entities that would demonstrate even minimal adherence to corporate formalities. .

18.     Lipoid LLC was grossly undercapitalized when it was formed, with a capitalization of $1.00 and $49,000 in loans from Lipoid V (see Exh. D annexed hereto, for copies of the exhibits to the Lipoid LLC Operating Agreement memorializing these facts)   To date, the Lipoid Parties have refused to provide me with complete financial statements for Lipoid LLC and ALC, so I cannot verify whether this state of undercapitalization continued.   I did not retain any financial statements after I left the companies and all I have received to date in response to my discovery requests are a handful of pages showing incomplete financial information (see Exh. E annexed hereto).  All of Lipoid LLC's and ALC's available cash flow was channeled to Lipoid V or other Lipoid Group entities through repayments of intracompany loans, transfer pricing, payment of service fees and other means. For example, a tax refund check payable to Lipoid LLC was inappropriately deposited in a bank account belonging to Lipoid GmbH.

19.    My father interfered with the executive personnel and operations of Lipoid LLC and ALC. Though I was the CEO of Lipoid LLC and ALC, I was instructed by my father that I did not have authority to terminate Bruce Baretz under any circumstances (Herbert Dep. at 119-200). In or about July 2011, I was sent a "decree" by my father stating that I could not hire, suspend or remove any employee of Lipoid LLC, and in particular could not remove Dr. Baretz. (see Exh. F annexed hereto for a copy thereof).

20.    Despite being the CEO of ALC, my father transferred ownership of ALC from Lipoid LLC to Lipoid V without my knowledge or approval.

21.    My father told me I could serve as the head of the Lipoid Group's American operations "for as long as I wanted" not once, but on multiple occasions. This was stated by him many times, particularly when he wanted to incentivize me to stay in these positions and when he acknowledged my contributions to the Group, and to Lipoid LLC and ALC in particular. These were not isolated friendly assurances of employment, or promises of indeterminate employment, as the Lipoid Parties now seem to contend.

22.    I recall several specific instances in which Herbert reiterated that I could lead Lipoid LLC and ALC for as long as I wanted. One was during a telephone conversation in late February or early March 2006, after Frank Schubert decided to transfer to Lipoid Group's Swiss office rather than to the New Jersey office that I had set up. At that point, my father needed me to run the New Jersey office, as he had nobody else to do this. I told my father that to continue, I needed to install a new team in the New Jersey office. He explicitly assured me that I could do so, and that I would be able to manage Lipoid LLC for as long as I wanted. Another occasion was a June 17, 2009 conversation while we were driving in Switzerland on our way from a Lipoid subsidiary in Nice, France to Neustadt, Germany. During this trip, he assured me once again that

8

I could have my position as head of North American operations for as long as I wanted. This was part of a conversation on how we could enhance this position and make it more interesting and fulfilling for me so that I would want to continue on in this position.

23. On this trip and on numerous other occasions, my father encouraged me to act as a shareholder with a personal stake in the business. There was no ambiguity in his statements, which were clearly intended to convey to me that I was for all intents and purposes an equity holder in the Lipoid Group and that I would have my nominal share ownership restored at the appropriate time. In furtherance of these assurances and statements, I agreed to be paid a salary which was much lower than what someone in a comparable position would have been paid. I did whatever was necessary to advance the interests of the Lipoid Group generally, and the American subsidiaries in particular and often paid corporate expenses with my personal monies. For instance, when I went to Germany to visit my mother and also attended Lipoid meetings, I typically paid for such trips with personal monies. Even my father told me to charge more of these expenses to the company. I always worked from home, but never charged any related expenses for home office or the like to the company.

24. My father fully acknowledged the existence of my lifetime employment agreement by not terminating me when my relationship with him became strained in 2010. He spent one year trying to force me to resign voluntarily before finally violating our agreement and terminating my employment in August 2011.

25. The terms of my employment agreement were simple. My father had run the Lipoid Group since its creation on an informal and absolute basis, with no limitations on his powers. My role with respect to the United States operations was to be similarly broad, subject of course, to my father's overriding instructions. My salary was set by myself and initially approved by my

father. Later on, with my father's full knowledge and encouragement, as an owner of the business, I adjusted my salary as I deemed appropriate and kept it substantially below market to promote the long-term prosperity of the company. I took no compensation from ALC or any of the other Lipoid entities at the time, although I did significant work for them, as described below.

26. Initially, my role involved setting up the office and managing the operations of Lipoid LLC in Newark, New Jersey. Later, I was instrumental in the acquisition of ALC, located in Oxford, Connecticut. I assumed a similar role with respect to ALC.

27. The Lipoid Parties, in their brief, question whether Herbert had approved the 2011 letter to the United States immigration authorities that is referred to in the SAA ¶ 107): . The letter was one of a series of letters to the United States immigration authorities over the years of my employment, substantially written by Lipoid LLC's immigration attorneys, and approved by Herbert for submission. He assigned the task of completing these filings to me and I discussed its contents with him including the description of my duties with Lipoid LLC and ALC. Further, the 2011 letter is consistent with other ones he definitely reviewed and approved. Annexed hereto as Exh. G is a 2005 letter to the immigration authorities for a visa extension detailing the "broader managerial and executive duties" I performed in my capacity as head of the Lipoid Group's United States operations:

- [M]anage and supervise all future employees and managers of Lipoid and will plan, develop and establish policies and objectives of the company in New Jersey;

- [C]onfer with Lipoid officials to plan business objectives, to develop organizational policies to coordinate functions and operations between divisions and departments, and to establish responsibilities and procedures for attaining objectives;

- [R]eview activity reports and financial statements to determine progress and status in attaining objectives and...revise objectives and plans in accordance with current market conditions in both the United States and Germany;

- [D]irect and coordinate formulation of financial programs to provide funding for new or continuing operations to maximize returns on investments, and to increase productivity;

- [P]lan and develop labor and public relations policies designed to improve [the Lipoid Group's] image and relations with its customers, particularly in the United States;

- [E]valuate performance of all executives in Lipoid and...have a broad discretionary authority to hire and fire managerial and other personnel;

- [R]esponsible for mergers and acquisitions[.]

This 2005 letter was, to my knowledge, reviewed by my father. Following the advice of an immigration attorney, my father instructed Dr. Juergen Zirkel to sign the letter on behalf of the Lipoid Group.

28.     In addition, my father assigned to me projects that served the entire Lipoid Group, and not just the United States entities. These projects included the following:

- Beginning around 2004, I sourced certain raw materials for the Lipoid Group, including North American egg yolk powder for Lipoid GmbH and soy lecithin through ALC and as member of the negotiating team for Phospholipid GmbH;

- In 2007-2008, after the acquisition of Phospholipid GmbH Cologne, I was assigned to integrate the products manufactured at Phospholipid GmbH Cologne into the Lipoid product portfolio;

- In 2009, after the acquisition of Cosmetochem Switzerland, I was assigned to integrate the products manufactured by Cosmetochem into the Lipoid product portfolio;

- In 2008-2010, considering that my father considered me an equity owner and senior executive in the Lipoid Group, I initiated and designed new products manufactured at Lipoid GmbH Ludwigshafen (e.g. lysolecithin), Phospholipid GmbH Cologne (e.g., pharma-grade triple-strength lecithin) and Cosmetochem Switzerland;

- Around 2010, I initiated and managed new application projects with important strategic partners of the Lipoid Group including, for example, the encapsulation of Phosphatidylcholine-Propylenglycol mixture product (Phosal 50 PG) into soft gelatin capsules with Catalent of Tampa, Florida;

- I registered trademarks like Cerasome™, Nanosolve™, Phytosolve™, Ultraspheres™ and domain names for the Lipoid Group, e.g. www.lipoidllc.com, www.nanosolve.com, www.phytosolve.com for various members of the Lipoid Group; .

- From 2007-2011. I managed global accounts for the entire Lipoid Group including Estee Lauder and Schering-Plough; and

- Generally, my father assigned to me the job of looking for company and product acquisitions, especially in the area of cosmetic ingredients.

29.   In the performance of all of these duties, I spoke to my father on a regular and frequent basis. I discussed what I was doing and routinely accepted his guidance and instructions.

30.   In or about September 2010, I was asked by my father to file certain tax returns with the U.S. Internal Revenue Service on behalf of Lipoid LLC.  I was concerned about filing these tax returns because they exaggerated intra-company service fees as well as deflated the asset price for the intra-company transfer of ALC from Lipoid LLC to what is now Lipoid V. I consulted Dr. Guenther Grewe, who was the accountant for Lipoid LLC and ALC at the time, regarding this matter. He advised that the asset price for ALC in the return was not justified and that I could face civil and criminal penalties for filing the improper tax returns. He also questioned the deductibility of the service fees.

31.     I had several discussions about this with my father in which I tried to talk him out of taking such an aggressive tax reporting position. Regarding the service fees, my father told me on the phone (which as I recall was while I was riding home on New Jersey Transit from the Newark office), that it was worth taking the risk since taxation is Switzerland was very low, about five percent he said. The possible risk of double taxation in Switzerland and the United States was worth taking. With respect to the asset price, my father would not compromise.  As my father did not even create a formal record to support this price, I prepared a memorandum and requested that the asset values that were dictated by my father be reexamined. I later turned to Dr. Grewe regarding this matter. My father ordered me to file the returns and I told him that I would not do so unless a formal valuation was conducted and approved by Dr. Grewe. Apparently, Herbert took this refusal as an unpardonable affront.

32.     It would appear to be beyond doubt that it is a violation of a "recognized public policy" and a "clear mandate of public policy" to terminate someone for an "unwillingness" to file false tax returns. A tax return which values a company without any substantiation or at an unsupportably low valuation is a false tax return.

33.     My father did everything imaginable to force me to quit. He wouldn't speak to me for approximately one year, even when I needed to consult him on critical business matters. Finally, on August 25, 2011, I received a letter from my father on Lipoid LLC letterhead (Exh. B) that stated, "[my] employment by Lipoid LLC (the "Company") is terminated effective immediately. This letter also terminates any and all other positions [I] have held with the Company's affiliates and with American Lecithin Company." The letter further stated my termination was "based on [my] unwillingness to work with the parent company and others within our group."

34.     Right after I asked this Court to sanction my father for failing to appear for his deposition, he acted to take away my 10% interest in Lipoid G for various wrongs I had allegedly committed to other members of the Lipoid Group. On January 25, 2013, I received a letter of the minutes of a January 9, 2013 shareholder meeting of Lipoid G (a copy of which is annexed as Exh. H) at which my 10% interest was deemed forfeited "for cause." The decision was taken because I had "not fulfilled [my duties]...as Managing Director of the affiliated companies American Lecithin Company and Lipoid LLC...[by] not prepar[ing] and submit[ing] balance sheets and tax returns despite repeated requests."

35.     At my father's deposition in Frankfurt, Germany on April 29, 2015, I learned for the first time that a primary reason for the reorganization by him of the Lipoid Group in 1996 was to exclude me from ownership in this business. Prior to his deposition, I had always been told by him that the reasons for the reorganization was for tax and liability reasons and that it was not to deprive me of my 10% ownership interest in the Lipoid business (SAA ¶¶ 85-89).

36.     Of significance, my father does not dispute that I had a 10% ownership interest in the Lipoid Group (Herbert Dep. at 82) or that after he decided that I had become an "extreme socialist" (*Id.* at 141-142), in 1996, he set up a parallel group of companies and transferred the Lipoid business to this group (*Id.* at 88-104, 137). While I retained an interest in Lipoid G (*Id.* at 39), a successor to Lipoid KG, I was given no interest in the parallel structure of the Lipoid Group, which was set up in Switzerland and Germany.

37.     My father does not dispute that I was paid dividends on account of my 10% ownership interest (*Id.* at 134, 160) and that I attended shareholder meetings (*Id.* at 146, 151).

38.     Until my termination, I had always assured by my father that I was an equity owner in the entire Lipoid Group and that I should act as one.  I now realize that all of these assurances were not true or intended to be true.

39.     Based on my father's repeated assurances, I had always acted, with his full encouragement and support, as an equity owner in the entire Group. My father also does not dispute that I am entitled to the value of my 10% interest in Lipoid G (*Id.* at 39), which he wrongfully took from me in 2012. The issue is the value of the interest. If my father stripped Lipoid G of its business under false pretenses, which he did, then I am entitled to the value of 10% of the Lipoid Group. If my father knew that his repeated assurances that I act as an equity owner in the Lipoid Group (because I was one) were not true and that he did not intend it to be true – as apparently, from his testimony, was the case - then I am entitled to 10% of the value of the Lipoid Group.

40.     In addition to Herbert, I am suing Lipoid V, through which my father acted to wrongfully deprived me of my employment, Lipoid G through which he acted to wrongfully deprive me of my ownership interest, and PRC, through which my father wrongfully acted to prevent me from participating in the phospholipids industry.  I am also suing Lipoid B and Lipoid S, who are his successors, as the top entities in the Lipoid Group. They should be responsible for paying any judgment I obtain against Herbert.

41.     I was aware of the reorganization of the Lipoid business in around 1996 from a single company in Germany (Lipoid KG) to multiple companies with two distinct holding companies at the top in Germany and in Switzerland. I had always been told by my father that the motivation for the reorganization was for tax and liability reasons. It was not to deprive me of my 10% ownership interest in the entire Lipoid business. As noted above, I did not learn until my

father's deposition several months ago that he in fact intended to deprive me of my share ownership in the Lipoid business by transferring the business to newly entities in which I had no ownership.

42.     Thus, all of his statements that the purpose of the reorganization was not to deprive me of my interest in the Lipoid business were untrue when made.  My father repeatedly assured me that I should continue to act as an owner of the business with a stake in its success. These statements were also untrue when made.

43.     Although I did have some rocky moments in my relationship with my father in the mid-1990's, I had come to believe that these were in the past and that we were once again on good terms.  I began to work with my father closely and we got together frequently.  At one point my father told me that he had initially planned to disinherit me (as he had done with my brother Dominik), but that he had changed his mind. Before the 2010 fallout, we were on very friendly terms and my father indicated that I would succeed to a senior position in the entire Lipoid Group and would receive an additional 1% interest in the Group.  Notably, my father admitted during his deposition that I had helped him significantly with two cases in the United States against the Lipoid Group's former U.S. distribution partners (Vernon Walden and Peter Rohde) and had helped him establish the Group's American operations (Id. at 174, 177, 204). He also admitted that Lipoid LLC's business had grown dramatically under my stewardship from a starting point of $1 million when I took over (Herbert Dep. at 127-128).

44.     At his deposition, my father demonstrated that since 1995 his animus against me had never really receded. From this, one can only conclude that when he promised me I could be employed by Lipoid Group in the United States for as long as I wish, and that I could have an additional 1% in equity of the entire Group, he did not intend to honor those promises when he made them.

45.     Needless to say, I have been damaged greatly by these statements.

46.     In 2008, when my mother passed away, Herbert initially sent me an email stating that he was the sole inheritor of her estate (see email; dated August 15, 2008, annexed hereto as Exh. I). This was not plausible given their relationship and the fact that my father had left her for another woman. When I pressed him on this, he told me in 2010 that he had invested my inheritance in a Lipoid Group holding company.  This did not make sense to me and when I objected to this unilateral act, my father took offense and intensified his efforts to assert his will over me.

47.     During his deposition in April 2015, he testified that my inheritance money was used to pay down the €110,000 "loan" I had taken from Lipoid G to finance the apartment in New York that I had purchased at his urging. The Lipoid G money he was referring to, was, as he testified, my accumulated, but unpaid, dividends from Lipoid G. This was my money, but he said it a "loan" to me of my money.  In any event, according to Herbert, the money was used to buy the apartment in New York and my entitlement to this money should be decided by this Court, together with all of the other financial issues relating to the New York apartment.

48.     After I sought sanctions against Herbert in this case for failing to sit for his deposition, Herbert caused Lipoid G to wrongfully take my 10% interest as a shareholder in Lipoid G. Herbert admits that Lipoid G is obligated to pay me the fair market value of my interest (*Id.* at 39), but has so far made no effort to do so. He has stated that in fact I owe Lipoid G money, consisting of the money I was provided by Lipoid V to buy the New York apartment.

49.     My father does not dispute that I am entitled to receive the value of my 10% interest in Lipoid G, so there can be no dispute that I am entitled to an accounting with respect to that interest. I became entitled to this accounting when my father caused me to forfeit my 10% ownership interest in Lipoid G in 2012.  This is when the right to an accounting accrued and there

is no statute of limitations for an accounting. As part of that accounting, I am entitled to 10% of the value of assets wrongfully removed from Lipoid G.

50.    Only after my father stripped me of my 10% interest in Lipoid G, did I realize that he was not going to restore my 10% ownership interest in the Lipoid Group and that his explicit and implicit assurances that I was still an equity owner in the Group were untrue.

51.    The taking of my 10% interest in Lipoid G was clearly improper under German law. I was not given sufficient notice of the shareholder meeting and vote, which was originally scheduled in Herbert's living room on Christmas day. I had a right to attend the meeting which was deliberately set so that I could not attend. I was not provided with a copy of the company's by-laws, as was my right, and my motions, submitted to all shareholders long before the meeting, were not even put on the agenda. In the end, the only people present were Herbert and his wife, with she voting for my brothers and fellow shareholders, Balder and Helge, by proxy, which was also legally improper.

52.    Upon my termination from Lipoid LLC, I was contacted by long-standing customers of the Lipoid Group who sought to source lecithin and phospholipids from me. I decided to establish and operate my own lecithin and phospholipid sale and distribution business in New York. Based on my years of experience and previous success in the industry, I had developed an understanding of the industry's' requirements and a good reputation in the industry. I readily expected to leverage my know-how and my industry contacts to establish my business.

53.    My father, individually and through the Lipoid Group entities, intentionally and wrongfully interfered with my efforts to enter the lecithin and phospholipids business. Herbert took a number of wrongful, anti-competitive measures to prevent me from establishing my own phospholipid business and from competing specific transactions with prospective customers. For

example, when he found out that I was in the process of concluding deals with several customers including Estee Lauder, Maxhealth and Hospira, he immediately lowered the Lipoid Group's product prices by 50%, well below cost, so I could not complete these transactions.

54.     Herbert made representations to a number of customers and industry professionals, including Jarrow Rogovin, the founder and President of Jarrow Formulas Inc. that I was subject to a non-compete and confidentiality agreement so they would not do business with me. I did not have a non-compete, but Herbert used this to intimidate my prospective customers. It stands to reason that nobody would want to be involved in a lawsuit claiming they were an accessory to the violation of a non-compete agreement.  As a result, customers were intimidated to do business me.

55.     Herbert terminated my membership in the Phospholipid Research Center. It is an industry group that I helped found. He had me barred from PRC meetings to impede my ability to establish myself in the phospholipid business.

56.     As late as April 2015, my father, personally and through the Lipoid Group, wrongfully interfered with my business interests.  On April 10, 2015, the staff of the Phospholipid Research Center confirmed my registration for the PRC conference scheduled for September 2015. However, when Herbert learned of my registration he directed that it be cancelled.  This was especially damaging to my ability to establish myself in the industry, since attendance brings credibility and the opportunity to interact with industry participants and potential customers. Tellingly, the cancellation letter was sent from the Lipoid offices in Ludwigshafen and signed by a Lipoid employee.  This demonstrated and confirmed that the PRC, although nominally independent, was just another member of the Lipoid Group, completely dominated by Herbert.

57.    At his deposition, Herbert said that going forward, he would have me permanently excluded from the Phospholipid Research Center because the Center was only for scientists (Herbert Dep. at 179,. 281-282).  This testimony is plainly contradicted by the statement of the requirements for membership set forth on the PRC website, which states that scientists may become "honorary members" and pretty much anybody can become a "ordinary" member:

> All persons having full legal capacity, natural persons or legal entities at home or abroad who are interested in the purpose of the associations and are not members of an organisation actively working against the objectives of the association may become ordinary or sustaining members.

> Scientifically educated persons in prominent public or private positions may become honorary members. Furthermore any persons who have earned special merits with regard to the research center may become honorary members.

(see Exh. J annexed hereto, which is a true copy of the membership page of the PRC website).

58.    I learned in September 2011 that Herbert also slandered me to my former co-workers in Switzerland by falsely alleging that I was fired for not preparing company reports. Upon information and belief, he also slandered me to others in the very small lecithins and phospholipids community by making the same false allegations. I have only the email he sent to Dr. Richter in German, in which he falsely accused me of professional incompetence and "criminal behavior" and threatening that I would be "imprisoned." Upon information and belief, he has made similar statements to others in the industry, including prospective customers in the United States. I will need discovery in this case to be able to prove these allegations.

Carsten Matthias Rebmann

Sworn to before me this

20

9th the day of October, 2015

Notary Public

**CALIFORNIA JURAT WITH AFFIANT STATEMENT**          GOVERNMENT CODE § 8202

☐ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

_____          _____
*Signature of Document Signer No. 1*          *Signature of Document Signer No. 2 (if any)*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of   SAN MATEO

**Seal**
*Place Notary Seal Above*

MY-LE DEA
Commission # 1993565
Notary Public - California
San Mateo County
My Comm. Expires Oct 11, 2016

Subscribed and sworn to (or affirmed) before me

on this   9   day of   OCTOBER   , 20 15
        *Date*           *Month*              *Year*
by

(1) CARSTEN MATTHAS REBMANN

(and (2)   N/A                          ),
                  *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Signature _____
                    *Signature of Notary Public*

───────────────────── **OPTIONAL** ─────────────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____  Document Date: _____

Number of Pages: _____  Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5910