UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                    :
AMERICAN LECITHIN COMPANY,                          :
LIPOID GmbH, LIPOID LLC, and                        :
PHOSPHOLIPID GmbH,                                  :
                                                    :
                              Plaintiffs,           :
                                                    :
            - against -                             :
                                                    :
CARSTEN MATTHIAS REBMANN,                           :
                                                    :
                              Defendant and         :
                              Third-Party           :
                              Plaintiff,            :
                                                    :
            - against –                             :
                                                    :
HERBERT REBMANN, LIPOID STIFTUNG, :
LIPOID BETEILGUNGS GmbH, LIPOID                     :
VERWALTUNGS AG, LIPOID                              :
GRUNDSTUECKS GmbH, and                              :
PHOSPHOLIPID FORSCHUNGSZENTRUM :
e.V.,                                               :
                                                    :
                              Third-Party           :
                              Defendants.           :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/30/2017___

12-CV-929 (VSB)

**MEMORANDUM & OPINION**

Appearances:

Gregory F. Hauser
Sherica R. Bryan
Wuersch & Gering LLP
New York, New York
*Counsel for Plaintiffs and Third-Party Defendants*

Samuel Goldman
Samuel Goldman & Associates
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

      Before me are three motions to dismiss the counterclaims and third-party claims of

Defendant Carsten Matthias Rebmann ("Defendant"): (1) the motion to dismiss of Plaintiffs and Third-Party Defendants American Lecithin Company ("ALC"), Lipoid GmbH, Lipoid LLC, Phospholipid GmbH, Dr. Herbert Rebmann ("Dr. Rebmann"), Lipoid Verwaltungs AG ("Lipoid V'), and Lipoid Grundstuecks GmbH ("Lipoid G") (collectively, the "First Movants") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b) for lack of subject matter jurisdiction and personal jurisdiction, insufficient process, and failure to state a claim, (Doc. 170); (2) the First Movants' motion to dismiss on grounds of *forum non conveniens*, (Doc. 197); and, (3) the motion to dismiss of Third-Party Defendants Lipoid Stiftung ("Lipoid S"), Lipoid Beteiligungs GmbH ("Lipoid B"), and Phospholipid Forschungszentrum e.V. ("Phospholipid F") (collectively, the "Second Movants," and, together with the First Movants, the "Movants") joining the motions of the First Movants seeking dismissal pursuant to Federal Rules of Civil Procedure 9(b) and 12(b) for lack of subject matter jurisdiction and personal jurisdiction, insufficient service of process, and failure to state a claim, and on grounds of *forum non conveniens*, (Doc. 214).

Plaintiffs initiated this lawsuit against Defendant alleging that Defendant improperly registered and retained certain internet domain names. In a series of counterclaims and third-party claims against Plaintiffs and various Third-Party Defendants, Defendant asserts in his Second Amended Answer, Counterclaims and Third-Party Claims, With Jury Demand (Doc. 156-1) ("Second Amended Answer" or "SAA"), causes of action related to his (1) employment with Plaintiffs and Third-Party Defendants and his (2) alleged financial interest in the corporate Plaintiffs and Third-Party Defendants. Plaintiffs and Third-Party Defendants now move to dismiss the counterclaims and third-party claims against them. For the following reasons, Movants' motions to dismiss are GRANTED in part and DENIED in part.

## I. **Background**

I assume familiarity with the underlying factual background as set forth in my three prior decisions in this case, (Docs. 140, 141, 243). Therefore, I will only set forth a summary of the facts and proceedings here.

### A. *Factual Background*[1]

Plaintiffs are four corporate entities, and Third-Party Defendants are five corporate entities and one individual. According to Defendant, Plaintiffs and Third-Party Defendants are interrelated and are dominated and controlled by Dr. Rebmann. Plaintiff ALC is a Delaware corporation with its principal place of business in Connecticut. (SAA ¶ 72.) Plaintiff Lipoid LLC is a New Jersey limited liability company with its principal place of business in New Jersey. (*Id.* ¶ 73.) Plaintiffs Lipoid GmbH and Phospholipid GmbH are German limited liability companies with principal places of business in Germany. (*Id.* ¶¶ 74–75.) Third-Party Defendants Lipoid B and Lipoid G are German limited liability companies. (*Id.* ¶¶ 77, 80.) Third-Party Defendant Lipoid S is a German foundation with a principal place of business in Germany. (*Id.* ¶ 78.) Third-Party Defendant Phospholipid F is a German non-profit corporation. (*Id.* ¶ 81.) Third-Party Defendant Lipoid V is a Swiss holding corporation. (*Id.* ¶ 79.) Each of these corporations are members of a consortium of related entities known collectively as the "Lipoid Group." (*Id.* ¶ 92.)

---

[1] Unless otherwise indicated, the following facts are taken from the SAA and are assumed to be true for purposes of this motion. *Moran v. Tryax R, Inc.*, No. 15-cv-8570 (RJS), 2016 WL 3023326, at *2 (S.D.N.Y. May 23, 2016) ("In deciding a motion to dismiss a counterclaim pursuant to Rule 12(b)(1), '[t]he court must take all facts alleged in the [pleading] as true and draw all reasonable inferences in favor of [the claimant]. . . .'" quoting *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)). However, subject matter "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003). Likewise, I may consider averment of facts, i.e., evidence, outside the pleadings to establish that exercising personal jurisdiction is appropriate. *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). Moreover, I do not credit the legal conclusions or conclusory allegations contained in the SAA.

In or about 1978, Dr. Rebmann began a business organized as Lipoid KG to manufacture, sell, and distribute lecithin and phospholipid products for use in the pharmaceutical, cosmetic, and dietetic industries.  (*Id.* ¶ 82.)  The initial shareholders of Lipoid KG were Dr. Rebmann (with 70%), his sister (with 20%), and Birgit Wortberg, Dr. Rebmann's student (with 10%).  (*Id.*)

In orabout 1989, Lipoid KG was reorganized, and Defendant received a 10% ownership interest in Lipoid KG.  (*Id*. ¶ 85.)  Dr. Rebmann divorced Defendant's mother in 1985.  (*Id*. ¶ 83.)  In approximately 1996, Dr. Rebmann changed the name of Lipoid KG to Lipoid Grundstueks GmbH (i.e., Lipoid G), and established the other corporate Plaintiffs and Third-Party Defendants to continue the business of Lipoid KG.  (*Id.* ¶ 87.)  Lipoid G's only asset is certain real estate used by the Lipoid Group.  (*Id.* ¶ 88.)  Following the reorganization of Lipoid KG's assets among and between the Lipoid Group, Defendant no longer had a 10% interest in the entire Lipoid Group, but was given a 10% interest in Lipoid G as successor to Lipoid KG. (*Id.*)  Dr. Rebmann told Defendant that the reason for the name change and the creation of the corporate Plaintiffs and Third-Party Defendants was to "promote operating efficiencies and address liability issues, and not to take away his interest in the Lipoid business."  (*Id*. ¶ 89.)

At Dr. Rebmann's request, Defendant on or about March 12, 2004, filed Certificate of Formation for Lipoid LLC in New Jersey.  (*Id*. ¶ 99.)  In or about late 2005, Dr. Rebmann offered Defendant the opportunity to assume full management responsibility of the Lipoid Group's U.S. operations.  (*Id*. ¶ 101.)  At that time, Defendant was located in New York City and enrolled in a Ph.D. program in economics at the New School.  (*Id*. ¶ 97.)  Defendant and Dr. Rebmann negotiated the agreement whereby Defendant "gave up his Ph.D. studies and assumed the position of head of the Lipoid Group's United States operations."  (*Id*. ¶ 103.)  During these negotiations, Dr. Rebmann also assured Defendant that, if he took the position, "he could have it

for as long as he wanted," and promised Defendant that he would "succeed to a senior position (director and officer) of the entire Lipoid Group."  (*Id.* ¶ 102.)  In 2007, Defendant engineered the acquisition of ALC by the Lipoid Group and became its President and CEO.  (*Id.* ¶ 115.) Defendant's duties at ALC were the same duties he had with respect to Lipoid LLC.  (*Id.*).

In 2010, Dr. Rebmann requested that Defendant file certain U.S. tax returns on behalf of Lipoid LLC.  (*Id.* ¶ 123.)  Defendant believed—based upon the advice of the company's accountant—that filing such returns would likely violate U.S. tax laws; therefore, Defendant refused to file the returns.  (*Id.* ¶ 123–24.)  In August 2011, Dr. Rebmann terminated Defendant's employment with Lipoid LLC and ALC "for cause," because Defendant purportedly was "unwilling[] to work with the parent company and others within our group."  (*Id.* ¶¶ 130.) However, employees of the Lipoid Group in Europe were told that Defendant was terminated "because he did not prepare reports."  (*Id.* ¶ 131.)

Since having his employment terminated, Defendant has attempted to establish his own business selling lecithin and phospholipid products.  (*Id.* ¶ 138.)  However, Dr. Rebmann has made efforts to undermine Defendant's attempts to enter the lecithin and phospholipid business by, among other things:  (1) improperly cancelling Defendant's membership in the Phospholipid Research Center; (2) discouraging third-parties from conducting business with Defendant; (3) making false representations to Defendant's business associates, including, among other false representations, that Defendant had engaged in criminal behavior and "he was subject to a non-competition and confidentiality agreement"; and (4) reducing the product prices of the Lipoid Group by as much as 50% to discourage competition.  (*See id.* ¶¶ 139–45.)

In January 2013, during the pendency of this law suit, Dr. Rebmann caused the adoption of resolutions by Lipoid G that took away Defendant's 10% interest in that company and allowed

Dr. Rebmann to determine how much Defendant would be paid for his 10% interest.  (*Id.* ¶ 149.)

The resolutions indicated Defendant's 10% interest was taken away "for cause," because

Defendant "(a) had taken certain domain names that belonged to other members of the Lipoid

Group, (b) had failed to file tax returns on behalf of Lipid LLC and ALC, and (c) had not repaid

a loan from" Lipoid V.  (*Id.*)  Defendant alleges that the taking of his interest in Lipoid G was

done in retaliation for Defendant seeking sanctions against Dr. Rebmann for his failure to appear

for his deposition in this case.[2]  (*Id.* ¶¶ 151–52.)

### B.  *Procedural History*

Plaintiffs filed this lawsuit on February 6, 2012.  (Doc. 1.)  On February 13, 2014,

Defendant filed the Amended Answer, Counterclaims and Third-Party Claims, with Jury

Demand ("First Amended Answer" or "FAA").  (Doc. 82.)  On December 12, 2014, I granted in

part and denied in part Plaintiffs' motion to dismiss the First Amended Answer, without

prejudice to Defendant seeking leave to amend.  (Doc. 141.)  On May 15, 2015, Defendant

sought leave to file the Second Amended Answer.  (Doc. 156-1.)  By Stipulation and Order,

entered May 18, 2015, (Doc. 157), the parties agreed, pursuant to Fed. R. Civ. P. 15(a)(2), to the

filing of the SAA.

The Second Amended Answer asserts twelve claims:  six are counterclaims and third-

party claims, and six are third-party claims only.  Those claims are:  (1) a wrongful termination

claim related to the termination of Defendant's employment with Lipoid LLC and ALC asserted

as a counterclaim against those two Plaintiffs and as a third-party claim against Dr. Rebmann,

(*id.* ¶¶ 203–07); (2) a breach of contract claim related to the termination of Defendant's

---

[2] After finding that Dr. Rebmann was deliberately avoiding sitting for his deposition, (Doc. 140), I ordered Dr. Rebmann's deposition to take place by a date certain, (Doc. 155), and granted Defendant's motion for fees and expenses in connection with his efforts to depose and the costs associated with deposing Dr. Rebmann in Frankfurt, Germany, (Doc. 243).

employment with Lipoid LLC and ALC asserted as a counterclaim against those two Plaintiffs and as a third-party claim against Dr. Rebmann, (*id.* ¶¶ 208–16); (3) a breach of contract claim related to Defendant's equity interest in the Lipoid Group asserted as a third-party claim against all Third-Party Defendants, (*id.* ¶¶ 217–23); (4) a common law fraud claim asserted as a third-party claim against Dr. Rebmann, (*id.* ¶¶ 224–27); (5) a breach of fiduciary duties claim relating to Defendant's equity interest in Lipoid G asserted as a third-party claim against Dr. Rebmann, (*id.* ¶ 228–33); (6) two claims—one for oppression and appraisal and another for an accounting—related to Defendant's 10% interest in Lipoid G brought as counterclaims against all Plaintiffs and as third-party claims against all Third-Party Defendants, (*id.* ¶¶ 234–43, 269–83); (7) a claim of tortious interference with business relations related to Defendant's post-termination business activities brought as a counterclaim against all Plaintiffs and as a third-party claim against all Third-Party Defendants, (*id.* ¶¶ 244–52); (8) two claims—one for misappropriation and another for conversion—relate to Defendant's interest in Lipoid G asserted as third-party claims against all Third-Party Defendants, (*id.* ¶¶ 253–63); (9) a defamation claim relating to statements made about Defendant after his employment was terminated by Dr. Rebmann and members of the Lipoid Group asserted as a counterclaim against all Plaintiffs and as a third-party claim against all Third-Party Defendants, (*id.* ¶¶ 264–68); and (10) a derivative claim of breach of fiduciary duties asserted on behalf of Lipoid G as a counterclaim against all Plaintiffs and as a third-party claim against all Third-Party Defendants, (*id.* ¶¶ 284–89). With the exception of the two claims related to the termination of Defendant's employment with Lipoid LLC and ALC, the counterclaims against Plaintiffs and third-party claims against Third-Party Defendants are based on the conduct of Dr. Rebmann and are premised on a theory of alter ego liability.

On June 29, 2015, First Movants filed their motion to dismiss the SAA pursuant to Rules 9(b) and 12(b) with supporting papers, (Docs. 170–74), and, on September 11, 2015, First Movants filed their motion to dismiss the SAA for *forum non conveniens* with supporting papers, (Docs. 197–98).  Defendant filed his combined opposition to First Movants' motions on October 9, 2015, with supporting papers, (Docs. 204–07), and First Movants filed their reply on November 11, 2015, with supporting papers, (Docs. 215–20).  On November 6, 2015, Second Movants filed their motion to dismiss the SAA pursuant to Rules 9(b), 12(b) and *forum non conveniens*, (Doc. 214), Defendant filed his opposition on December 14, 2015, (Doc. 233), and Second Movants filed their reply on December 23, 2015, (Doc. 241).

## II.     Subject Matter Jurisdiction

Plaintiffs and Third-Party Defendants argue that Defendant's derivative claim for breach of fiduciary duty, brought on behalf of Third-Party Defendant Lipoid G, (*see* SAA ¶¶ 284–89), destroys diversity because it realigns Lipoid G with Defendant and thus places aliens—citizens or subjects of a foreign nation—in the position of both third-party plaintiff and third-party defendants.  (First Movants' Mem. 5; Second Movants' Mem. 2.)[3]  As an initial matter, Defendant addressed diversity in his opposition, but Plaintiffs and Third-Party Defendants failed address the issue in their replies and thus may have abandoned this argument.  *See Persh v. Petersen*, No. 15 Civ. 1414(LGS), 2015 WL 5326173, at *6 (S.D.N.Y. Sept. 14, 2015) ("Plaintiff responded to Defendant's service argument, but Defendant did not mention service at all in his reply brief, and therefore may have abandoned it.").  In any event, because the issue is

---

[3] "First Movants' Mem." refers to the Brief in Support of Motion by Plaintiffs and Third-Party Defendants to Dismiss Counterclaims/Third-Party Claims Pursuant to Rules 9(b) and/or 12(b).  (Doc. 171.)  "Second Movants' Mem." refers to the Brief in Support of Motion by Third-Party/Counterclaim Defendants Lipoid Stiftung, Lipoid Beteiligungs GmbH and Phospholipid Forschungszentrum e.V. in Support of Their Motion to Dismiss the Third-Party/Counterclaims Pursuant to Rule 12(b)(1), (2), (4), (5) & (6), Rule 9(b), and/or the Ground of *Forum Non Conveniens*.  (Doc. 219.)

jurisdictional, I will address the merits of the argument.

Whether a corporation is aligned as a plaintiff or a defendant in a derivative suit is determined "on the face of the pleadings and by the nature of the controversy." *Smith v. Sperling*, 354 U.S. 91, 97 (1957). In making this determination, I look to the interests of and alignments between the parties and realign a corporation as a defendant when the "corporation is actively antagonistic to the plaintiff's interests." *ZB Holdings, Inc. v. White*, 144 F.R.D. 42, 45 (S.D.N.Y. 1992) (internal quotation marks omitted); *see also In re Pfizer Inc. S'holder Deriv. Litig.*, No. 09 Civ. 7822(JSR), 2010 WL 1459441, at *1 (S.D.N.Y. Apr. 6, 2010) (where the corporation "has consistently taken positions adverse to the plaintiffs in every respect, while never controverting the positions taken by the other defendants . . . the Court readily concludes that [the corporation] is properly treated here as a defendant for diversity purposes." (internal quotation marks and citation omitted)). Here, Defendant is a third-party plaintiff with respect to the derivative claim and it is clear from, among other things, the series of direct claims asserted by Defendant against Lipoid G that Defendant and Lipoid G are antagonistic. Accordingly, I find that diversity remains intact such that I may properly exercise subject matter jurisdiction over Defendant's claims.[4]

### III.    Personal Jurisdiction and Service

Lipoid V, Lipoid B, Lipoid S, Lipoid G, and Phospholipid F are all foreign entities. (*See* SAA ¶¶ 77 (Lipoid B), 78 (Lipoid S), 79 (Lipoid V), 80 (Lipoid G), 81 (Phospholipid F).) The First and Second Movants argue that there is no personal jurisdiction over these entities because (1) they are foreign corporations, and (2) the "mere department" test, the "alter ego" test, and/or

---

[4] Because I find that diversity is intact, I need not address the parties' additional arguments regarding supplemental jurisdiction.

successor-in-interest theory are not supported by the circumstances presented here such that jurisdiction is appropriate. They also assert that service on these Third-Party Defendants was improper. Defendant in his Second Amended Answer and his opposition to the instant motion asserts that personal jurisdiction is established with respect to his claims against these Third-Party Defendants because of their relationships with Dr. Rebmann and/or Lipoid LLC and ALC under the "mere department" test, the "alter ego" test, and/or successor-in-interest theory, and, in the case of Phospholipid F, directly under New York Civil Practice Law and Rules § 302(a)(1). (*See* D's First Opp. 17–26 (Lipoid V and Lipoid G); D's Second Opp. 4–7 (Lipoid B and Lipoid S), 7–10 (Phospholipid F); *see also* SAA ¶¶ 156–58.)[5]

## A. *Applicable Law*

Under Federal Rule of Civil Procedure 12(b)(2), the claimant "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Gr. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010); *accord MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). A plaintiff can make a prima facie showing of personal jurisdiction "through his own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal quotation marks and citation omitted); *accord Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999); *see also Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 138 F. Supp. 2d 449, 452 (S.D.N.Y. 2000) (on motions to dismiss for lack of personal jurisdiction, "a court may

---

[5] "D's First Opp." refers to Defendant and Third-Party Plaintiff's Memorandum of Law in Opposition to Plaintiffs' and Third-Party Defendants' Motion to Dismiss Counterclaims and Third-Party Claims. (Doc. 204.) "D's Second Opp." refers to Defendant and Third-Party Plaintiff's Memorandum of Law in Opposition to Motion by Third-Party Defendants Lipoidstiftung, Lipoid Beteiligungs GmbH and Phospholipid Forschungszentrum e.V. to Dismiss the Third Party Claims Pursuant to Rules 9(b) & 12(b) and/or the Ground of *Forum Non Conveniens*. (Doc. 233.)

consider matters outside the pleadings without converting the motion to dismiss into a motion for summary judgment"). In considering the pleadings and supporting materials, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993); *accord Whitaker*, 261 F.3d at 208. Although pleadings and affidavits are construed in the light most favorable to the plaintiff, "conclusory non-fact-specific jurisdictional allegations or a legal conclusion couched as a factual allegation will not establish a *prima facie* showing of jurisdiction." *Bracken v. MH Pillars Inc.*, No. 15-CV-7302 (RA), 2016 WL 7496735, at *2 (S.D.N.Y. Dec. 29, 2016) (quoting *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015)).

In determining whether personal jurisdiction is established, courts engage in a two-step analysis. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d at 124. First, district courts must determine if there is statutory jurisdiction, and second, "[i]f there is a statutory basis for jurisdiction, the court must then determine whether . . . extension of jurisdiction in such a case would be permissible under the Due Process Clause of the Fourteenth Amendment." *Id.* When a court is sitting in diversity, the "breadth of a federal court's personal jurisdiction is determined by the law of the state in which the district court is located." *Reich v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014) (quoting *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006)).

### B. *Application*

#### 1. Lipoid V and Lipoid G

In his Second Amended Answer and his opposition brief, Defendant argues that Lipoid V and Lipoid G are subject to personal jurisdiction because Lipoid LLC and ALC are mere

departments and/or alter egos of Lipoid V and Lipoid G, thus making service on Lipoid LLC also proper service on Lipoid V and Lipoid G.  I address each theory in turn.

a.    Mere Department

Under New York law, "a New York court may assert jurisdiction over [a] foreign corporation as a 'mere department' of the local corporation."  *Gundlach v. IBM Japan, Ltd.*, 983 F. Supp. 2d 389, 394 (S.D.N.Y. 2013) (quoting *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984), *aff'd*, 594 F. App'x 8, 9 (2d Cir. 2014) (summary order).  "Where . . . the claim is that [a] foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone does not establish the parent's presence in the state."  *Janzini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998).  "For New York courts to have personal jurisdiction in that situation, the subsidiary must be . . . a 'mere department' of the foreign parent."[6]  *Id.*

To determine whether a corporation is a "mere department" of the foreign parent sufficient to confer jurisdiction over the foreign parent, courts consider the four factors articulated in *Beech Aircraft Corp*:  "first, common ownership—which is essential—; second, financial dependency of the subsidiary on the parent corporation; third, the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and fourth, the degree of control over the marketing and operational policies of the subsidiary exercised by the parent."  *Jazini*, 148 F.3d at 184–85 (quoting *Beech Aircraft Corp.*, 751 F.2d at 120–22) (internal quotation marks omitted).  While the first factor is essential, it is not sufficient alone to establish jurisdiction.  *See, e.g.,*

---

[6] In *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), the Supreme Court expressed some doubt regarding the ongoing viability of mere department theory, but this Circuit has not definitely addressed this issue.  Because I find jurisdiction lacking under the mere department test, I need not resolve the question here.

*Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp. 2d 404, 416 (S.D.N.Y. 2009) (declining to find defendant was "mere department" where moving party demonstrated essential factor but failed "allege or provide much, if any, evidence as to the other three factors"); *Philip Morris Inc. v. Otamedia*, No. 02Civ7575(GEL)(KNF), 2004 WL 1348987, at *4 (S.D.N.Y. June 14, 2004) (finding defendant was not a "mere department" where common ownership established but no other factor established).

Defendant asserts that service of and jurisdiction over Lipoid V and Lipoid G are proper under the mere department test. Defendant alleges that Lipoid V is a holding company holding 100% of Lipoid LLC and ALC. (SAA ¶¶ 79, 159.) Lipoid V indirectly owns 94% of Lipoid G.[7] (*See* First Movants' Mem. 11 n.5.) As the First Movants concede, common ownership is established with respect to Lipoid V and Lipoid G. (*See id.*)

With respect to the second factor, financial dependency, Defendant must show that the subsidiary "cannot run its businesses without the financial backing of its parent." *In re Ski Train Fire*, 230 F. Supp. 2d 403, 410 (S.D.N.Y. 2002). A demonstration that the subsidiary derives income from the parent, without more, does not show financial dependency. *See Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 164 (E.D.N.Y. 2006). Instead, "examples of a subsidiary's financial dependency on a parent corporation include the parent's provision of no-interest loans to the subsidiary, the parent's control of the subsidiary's finances, and the parent's financing of inventory for the subsidiary." *Id.*

Defendant asserts financial dependency based on several facts. First, Defendant asserts

---

[7] Defendant asserts in the Second Amended Answer that Lipoid G is a "mere department" of a series of entities, Lipoid V, Lipoid B, Lipoid S, and Dr. Rebmann. (*See* SAA ¶ 157.) Insofar as Defendant argues that jurisdiction over Lipoid G is proper under the mere department test, this appears to be derivative of finding that Lipoid LLC and ALC are mere departments of the entities listed in the SAA. Because, as discussed herein, I find that they are not, jurisdiction over Lipoid G cannot be established through jurisdiction over or service on ALC or Lipoid LLC.

that Lipoid LLC sells only products manufactured by the Lipoid Group of companies and at prices set by Lipoid V. (SAA ¶ 161.) Assuming that this is true, the sale of Lipoid Group products at prices set by Lipoid V does not establish that Lipoid V backed Lipoid LLC financially, in particular because there is no allegation that Lipoid V provided financing for those products. Second, Defendant asserts that Lipoid V and Lipoid GmbH charge Lipoid LLC and ALC annual "management" and other fees and thus these entities were not really intended to make and retain profits. (*Id.* ¶ 160; D's First Opp. 19.) That Lipoid LLC and ALC were able to and did pay fees to the Lipoid V and Lipoid GmbH, however, does not show that they were financially dependent on Lipoid V and Lipoid GmbH; if anything, it demonstrates the opposite relationship. *See J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 549–60 (S.D.N.Y. 2001). In other words, it demonstrates the ability of Lipoid LLC and ALC—as subsidiaries—to generate profits sufficient to pay fees. Third, Defendant argues that Lipoid V provides intracompany loans and guaranteed obligations to its subsidiaries. (D's First Opp. 19.) Defendant specifically points to a no-interest loan that provided capital to Lipoid LLC when it formed, (D's Aff. ¶ 18, Ex. D),[8] but this "start-up" loan was repaid in 2005, (*see* SAA ¶ 10; Dr. Rebmann Decl. Ex. B at PL001736; *see also* D's Aff. ¶ 18).[9] In any event, Defendant does not assert and has not identified anything in the record that demonstrates that Lipoid V provided day-to-day financing to either Lipoid LLC or ALC. *See Jerge v. Potter*, No. 99-CV-312E(F), 2000 WL 1160459, at *3 (W.D.N.Y. Aug. 11, 2000) (finding financial dependence factor not satisfied where initial investment derived from parent but subsidiary had financially independent operations and received no day-to-day financing).

---

[8] "D's Aff." refers to the Affidavit of Carsten Matthias Rebmann. (Doc. 206.)

[9] "Dr. Rebmann Decl." refers to the Declaration of Dr. Herbert Rebmann in Support of Motion to Dismiss Counterclaims and Third-Party Claims by Plaintiffs and Third-Party Defendants. (Doc. 173.)

Accordingly, while there is some indication of financial interdependence, Defendant has not asserted facts sufficient to tilt the second factor in his favor. *See Gallelli v. Crown Imps., LLC*, 701 F. Supp. 2d 263, 273–74 (E.D.N.Y. 2010) (holding subsidiary was not "mere department" of parent and noting that "[c]ourts considering this factor have held that a finding of financial dependency requires a showing that the subsidiary would be unable to function without the financial support of the parent").

Although a somewhat closer question, the third factor also weighs against finding personal jurisdiction. Defendant alleges that Dr. Rebmann generally "interfered in the selection and assignment of Lipoid LLC's and ALC's executive personnel" and "interfere[d] in executive work assignments." (SAA ¶ 162.) Defendant also asserts that when he was CEO of Lipoid LLC he was not able to terminate another executive, Bruce Baretz ("Baretz"), and that Defendant himself was unilaterally terminated. (*See id.*; *see also* Dr. Rebmann Tr. 199–200; D's Aff. ¶ 19, Ex. B.)[10] Drawing inferences in his favor, there is support for Defendant's assertions that he was unilaterally terminated because the termination letter, which is on Lipoid LLC letterhead, is addressed to Defendant from Dr. Rebmann and indicates that Defendant's employment with Lipoid LLC was terminated, as were "any and all of positions you have held with [Lipoid LLC's] affiliates and with [ALC]." (D's Aff. Ex. B.) Nowhere does the letter indicate that it was written on behalf of or with the authorization of any other Lipoid Group affiliates; instead, the termination letter suggests that Dr. Rebmann, acted on his own on behalf of Lipoid LLC and the other Lipoid Group companies. While these facts would have some relevance to the third factor, they represent the state of affairs while Defendant was CEO; I cannot assume that these

---

[10] "Dr. Rebmann Tr." refers to the transcript of the deposition of Dr. Herbert Rebmann taken on April 29, 2015. (Doc. 207-1.)

facts are suggestive of the circumstances existing at the time of service and Defendant provides

no materials supporting such a view. *See Gundlach*, 983 F. Supp. 2d at 395 (noting that in

context of "mere department" analysis, "the relevant time period for jurisdictional inquiry under

CPLR § 301 . . . is the time of service of the summons and complaint [and not] ancient and

apparently isolated transactions"). Defendant's employment was terminated in August 2011, and

this action was filed on February 6, 2012.

In contrast, the evidence presented by the Third-Party Defendants indicates that Baretz,

who is now Manager and President of Lipoid LLC, and Randall Zigmont ("Zigmont"), the

President of ALC, make the hiring decisions for their respective companies. (*See* Baretz Decl.

¶ 6; Zigmont Decl. ¶ 6.)[11] Additionally, prior to December of 2014, Dr. Rebmann was the sole

board member[12] and co-President of ALC, (*see* Zigmont Decl. Ex. B), and Lipoid V was the sole

member and Co-Manager of Lipoid LLC, (*see* Baretz Decl.), but these facts by themselves do

not establish the third factor as "overlapping officers and directors are intrinsic to the parent-

subsidiary relationship, and . . . are not determinative as to whether the subsidiary is a mere

department of the parent," *J.L.B. Equities*, 131 F. Supp. 2d at 549–60 (internal quotations

omitted). In addition, although Dr. Rebmann may have control over the hiring and firing

decisions of senior management of Lipoid V's subsidiaries that level of control by the individual

"at the highest level" of the business, such as Dr. Rebmann, is different than executives at the

parent participating in "day-to day operational or personnel decisions" at the subsidiary. *See*

*Gundlach*, 983 F. Supp. 2d at 396 (holding that third factor not satisfied despite crediting

---

[11] "Baretz Decl." refers to the Declaration of Dr. Bruce Baretz in Further Support of Motion to Dismiss by Third-Party Defendants. (Doc. 218.) "Zigmont Decl." refers to the Declaration of Randall Zigmont in Further Support of Motion to Dismiss by Third-Party Defendants. (Doc. 217.)

[12] Delaware law, under which ALC is organized, allows a board of directors comprised of only one member. *See* Del. Gen. Corp. L. § 141(b).

allegation that chairman and chief executive of parent exercised authority over operations at subsidiary); *see also Beech Aircraft Corp.*, 751 F.2d at 120 ("The officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to [personal] jurisdiction.").

Finally, the fourth factor also weighs against finding that Lipoid LLC and ALC were "mere departments" of their parent company. Baretz, who has been manager of Lipoid LLC since at least 2013, (Baretz Decl. Ex. B), and Zigmont, who has been President of ALC since 2012, (Zigmont Decl. Ex. B), both state that they control the day-to-day operations of their companies, (Baretz Decl. ¶ 8; Zigmont Decl. ¶ 8). Defendant states that "[a]ll marketing efforts and policies were determined centrally in Ludwigshafen, Germany," that "all Lipoid Group-wide operational policies were centrally determined, and [that] Lipoid LLC and ALC operated within the confines of those policies." (D's Aff. ¶ 14.) Defendant does not indicate the nature of the policies that were centrally determined, nor does Defendant indicate the manner in which Lipoid LLC and ALC followed any such policies. This broad assertion does not negate Baretz's and Zigmont's sworn statements regarding the state of ALC and Lipoid LLC at the time of service, nor does it suggest the level of control sufficient to establish the fourth *Beech Aircraft* factor.[13] *See Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 157–58 (S.D.N.Y. 2004) ("[I]t is not clear whether plaintiffs' allegations with respect to [the parent's] employment, environmental, risk prevention, and other policymaking show anything more than the ordinary control that parent corporations exert over their subsidiaries [and] the fact that subsidiaries share a logo, or that the

---

[13] I also note that webpage evidence suggesting that Lipoid V and its subsidiaries were loosely distinguished—or not distinguished at all—is insufficient to show that the parent controls the subsidiary's marketing and operational policies. *See J.L.B. Equities*, 131 F. Supp. 2d at 550.

parent decides to present several corporations on a website in a unified fashion, is insufficient to show lack of formal separation between the two entities."); *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65, 71 (S.D.N.Y. 1979) (that a parent "may make broad policy decisions for its subsidiaries . . . is inherent in the parent-subsidiary relationship and does not justify labeling a subsidiary a 'mere department' of the parent.").

Balancing these factors, I find that the mere department test does not provide a basis for proper service or jurisdiction.

### b. Alter Ego

Defendant also argues that service on Lipoid LLC establishes jurisdiction over, and service on, Lipoid V and Lipoid G because each of those entities is an alter ego of Dr. Rebmann for jurisdictional purposes. (*See* D's First Opp. 20–26.) "[I]n general, 'alter egos are treated as one entity' for jurisdictional purposes." *Transfield ER Capt Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) (quoting *Wm. Passalucqu Builders, Inc. v. Resnick Developers S. Inc.*, 933 F.2d 131, 142–43 (2d Cir. 1991)).[14] Alter ego theory examines "whether the affiliate is so dominated by the defendant as to be its alter ego," and not just the "affiliate's importance to the defendant." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014). Accordingly, "jurisdiction based on an alter ego theory applies in a far narrower set of circumstances" than agency or mere department jurisdiction. *NYKCool*, 66 F. Supp. 3d at 393. For purposes of the alter ego analysis, "[t]he critical inquiry i[n] determining whether a

---

[14] Defendant argues that *American Fuel Corp. v. Utah Energy Development Co., Inc.*, 122 F.3d 130 (2d Cir. 1997), supplies the test for Defendant's alter ego theory and thus there is personal jurisdiction if Dr. Rebmann "exercised complete domination over Lipoid V, Lipoid G and Lipoid LLC with respect to the transactions at issue; and . . . that such domination was used to commit a fraud or wrong that injured" Defendant. (*See* D's First Opp. 21.) The issue here is personal jurisdiction; the *American Fuel* analysis applied to liability. In this context, "[i]t is not necessary to show . . . for jurisdictional purposes that the shell was used to commit a fraud." *NYKCool A.B. v. Pacific Int'l Servs., Inc.*, 66 F. Supp. 3d 385, 392 (S.D.N.Y. 2014) (citation omitted).

corporation is a 'shell' company is whether it is being used by the alleged dominating entity to advance its own personal interests as opposed to furthering the corporate ends." *USHA Holdings, LLC v. Franchise Indian Holdings Ltd.*, 11 F. Supp. 3d 244, 266 (E.D.N.Y. 2014) (citation omitted). Specifically, "[f]or alter ego analyses involving an individual shareholder, courts have considered, either explicitly or implicitly: (1) the absence of corporate formalities normally attendant on corporate existence, such as issuance of stock, election of directors, keeping of corporate records, and so forth; (2) inadequate capitalization; (3) the intermingling of corporate and personal finances; and (4) the amount of business discretion displayed by the purported alter ego corporation." *In re Lyondell Chemical Co.*, No. 09-10023 (REG), 2016 WL 74649, at *14 (Bankr. S.D.N.Y. Jan. 4, 2016).

For the same reasons that Defendant has not established that Lipoid LLC was a "mere department" of its parent, Defendant has not established that Lipoid LLC was an alter ego of Dr. Rebmann. (*See supra* Part III.B.1.a.) Additionally, while Defendant alleges that Lipoid LLC was initially inadequately capitalized, Defendant does not make the same allegations regarding Lipoid V or Lipoid G. Defendant admits that corporate funds were not commingled with personal funds or diverted by Dr. Rebmann, (D's Opp. 24), and Defendant makes no allegations as to whether Lipoid V and Lipoid G were undercapitalized or otherwise used as "shell" companies. Defendant also fails to address why, as the shareholder of a closely held company, Dr. Rebmann's degree of control over the business decisions of the company warrants a finding that Lipoid V and Lipoid G were merely shell companies. Instead, Defendant appears to admit that these companies, while subject to a degree of control from their majority owner, were legitimate profit-seeking entities. The majority of Defendant's "alter ego" allegations, while insufficient, relate to Lipoid LLC; Defendant offers far less support for his conclusory claim that

Lipoid V and Lipoid G were alter egos of Dr. Rebmann. The fact that these companies were referred to as the "Lipoid Group" is not sufficient to support a finding that Lipoid V and Lipoid G were Dr. Rebmann's alter egos. Accordingly, alter ego theory is not a basis for jurisdiction over Lipoid V or Lipoid G, service on Lipoid LLC did not constitute service on Lipoid V or Lipoid G, and this Court lacks personal jurisdiction over those entities.

### 2. The Second Movants

As an initial matter, I note that the Second Movants argue that service on them was not timely. I agree that service on Lipoid B, Lipoid S, and Phospholipid F, even if properly made by serving at the address for Lipoid LLC, was untimely because it occurred more than 120 days[15] after the filing of the Second Amended Answer. Defendant argues that this delay should be excused because of various procedural hurdles he encountered at the Clerk's Office and because the Second Movants would not suffer prejudice. While I doubt Defendant's proffered excuses would amount to good cause, I need not definitively resolve the issue of whether I would excuse Defendant's failure to effectuate timely service, because I find that service on Lipoid LLC was not proper service and this Court lacks personal jurisdiction over the Third Party Defendants who were not timely served.[16]

### a. Lipoid B and Lipoid S

Lipoid B is a German limited liability company, based in Germany. (SAA ¶ 77.) It is an

---

[15] For the majority of 2015 and during the entirety of the relevant time period, the time limit for service under Federal Rule of Civil Procedure 4(m) was 120 days. Rule 4(m) was amended in December 2015 to provide for a 90-day time limit on service.

[16] The Second Movants argued in their opening brief that "[t]o the extent Defendant may try to argue that service on any one Third-Party/Counterclaim Defendant results in jurisdiction over all that party's *alter egos*, that is simply not the law," and that Defendant was required to individually summon each party. (Second Movants' Mem. 3-4.) The Second Movants acknowledge that this argument is not central to their position on service/personal jurisdiction given that Defendant has not asserted that service on one of the Counterclaim/Third-Party Defendants constitutes good service on all of them. (Second Movants' Reply 3 n.2.) Accordingly, I need not address that argument here.

indirect majority owner of Plaintiffs Lipoid GmbH and Phospholipid GmbH, (*id*.), and the majority owner of Lipoid V, (*id*.). Lipoid S is a German foundation based in Germany that is a majority owner of Lipoid B. (*Id*. ¶ 78.)

Defendant argues that I have jurisdiction over his claims against Lipoid B and Lipoid S because these entities are Dr. Rebmann's successors in interest and thus "assumed [Dr. Rebmann's] liability in this litigation when they succeed him . . . and because [Dr. Rebmann's] acts are attributable to them."[17] (P's Second Opp. 7.) While in certain circumstances "various courts have held that when a person is found to be a successor in interest, the court gains personal jurisdiction over them simply as a consequence of their status as a successor in interest," *LiButti v. United States*, 178 F.3d 114, 123 (2d Cir. 1999), those circumstances are not present here. First, the cases cited by Defendant all involve predecessor corporations; it is not clear that successor-in-interest theory applies to a predecessor individual and a successor corporation. *See, e.g.*, *Transfield*, 571 F.3d at 224 ("[I]t is compatible with due process for a court to exercise personal jurisdiction over an individual or corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a *corporation* that would be subject to personal jurisdiction in that court." (emphasis added) (citation omitted)); *Fly Shoes S.R.L. v. Bettye Muller Designs Inc.*, No. 14 Civ. 10078, 2015 WL 4092392 (S.D.N.Y. July 6, 2015) (personal jurisdiction established over successor-in-interest to New York corporation); *Leon v. Shmukler*, 992 F. Supp. 2d 179, 190-91 (E.D.N.Y. 2014) (questioning whether successor-in-interest theory applies to the relationship between two individuals, as opposed to corporations and finding allegations nevertheless

---

[17] Defendant does not argue that the mere department test applies to Lipoid B and Lipoid S. In any event, this theory would not support jurisdiction for the same reasons it does not support jurisdiction over Lipoid V and Lipoid G. (*See* Part III.B.1.a.)

insufficient); *Time Warner Cable, Inc. v. Networks Grp., LLC*, No. 09 Civ. 10059 (DLC), 2010 WL 3563111, at *6 (S.D.N.Y. Sept. 9, 2010) ("Because the plaintiff has stated a claim against the [successor] [e]ntities for successor liability [based on the predecessor corporations' acts], there is personal jurisdiction over the [successor] [e]ntities."); *Linzer v. EMI Blackwood Music, Inc.*, 904 F. Supp. 207, 213 (S.D.N.Y. 1995) (transfer between corporation and partnership gives rise to successor-in-interest jurisdiction); *see also In re N.Y.C Asbestos Litig.*, 112 A.D.3d 529, 530 (1st Dep't 2013) (addressing jurisdiction over corporation based on jurisdiction over New York predecessor corporation). Second, even if successor-in-interest theory applied to predecessor individuals, Defendant has not established the conditions required for its application. (*See* D's Second Opp. 6.) New York law recognizes successor-in-interest jurisdiction if "the predecessor and successor were one and the same and the predecessor continued to exist as part of the successor." *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 230 (S.D.N.Y. 2013). In general, a corporation that acquires another corporation's assets is not liable for the predecessor's debts unless (1) the buyer formally assumes the debts, (2) the transaction was undertaken to defraud creditors, (3) the buyer de facto merged with the seller, or (4) the buyer is a "mere continuation" of the seller. *Aguas Lenders Recovery Grp. LLC v. Suez, S.A.*, 585 F.3d 696, 702 (2d Cir. 2009). Defendant's conclusory statement that "Lipoid B and Lipoid S were [Dr. Rebmann's] successors as the owners of the Lipoid Group" is insufficient to establish any of these circumstances, and there is nothing in the cited deposition testimony, (*see* Doc. 207-1 at 50-57), establishing any of these exceptions.

Accordingly, Defendant has not established a prima facie case for jurisdiction over Lipoid B or Lipoid S and the claims against those entities must be dismissed.

b. Phospholipid F

Defendant asserts that there is alter ego-based jurisdiction over Phospholipid F because Dr. Rebmann asserted complete domination over Phospholipid F and Lipoid LLC with respect to Defendant's termination.  (D's Second Mem. 7–10.)  As discussed above, for purposes of jurisdiction, I examine whether Phospholipid F was so dominated by Dr. Rebmann as to be his alter ego, and not just the affiliate's importance to Defendant.  *See Sonera Holding B.V.*, 750 F.3d at 225 (noting that inquiry focused on importance of the affiliate "stacks the deck" in favor of pro-jurisdiction answer).  As an initial matter, Defendant does not allege that Dr. Rebmann owned Phospholipid F, nor does Defendant, other than in conclusory terms, address the factors relevant to alter ego jurisdiction—there are no non-conclusory allegations regarding the state or structure of Phospholipid F's finances and, as discussed above, Dr. Rebmann's termination of Defendant does not, in itself, support jurisdiction.

Defendant alternatively asserts that there is jurisdiction over Phospholipid F under CPLR § 302(a)(1) because the entity "transacts business" within New York state and those transactions gave rise to Defendant's claims.  However, Defendant fails to demonstrate jurisdiction under CPLR § 302(a)(1) since his cause of action does not arise from business transacted by Phospholipid F in New York.

Under CPLR § 302(a)(1), "a court may exercise personal jurisdiction over a defendant if it (1) 'transacts any business' in New York *and* (2) the plaintiff's cause of action arises from the business transaction."  *Schultz v. Safra Nat. Bank of N.Y.*, 377 F. App'x 101, 103 (2d Cir. 2010) (summary order); *see also Hinsch v. Outrigger Hotels Haw.*, 153 F. Supp. 2d 209, 212 (E.D.N.Y. 2001) ("In such cases [where jurisdiction is based on transaction of business within the state], however, personal jurisdiction may be exercised only as to causes of action that arise from the

transaction of business relied upon."). "A defendant transacts business if he has 'purposely availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws.'" *Reich*, 38 F. Supp. 3d at 457 (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006)). "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Bracken*, 2016 WL 7496735, at *3 (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)). "Section 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff or commits a commercial tort against plaintiff in the course of transacting business or contracting to supply goods or services in New York." *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir. 1983) (citations omitted); *see also Chloe v. Queen Bee of Beverley Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (explaining, in response to the defendant's argument that Section 302(a)(1) applies more readily to contract claims as opposed to trademark infringement actions, that trademark infringement is "just such [the] tort" mentioned in *Beacon*).

Defendant claims that Phospholipid F conducted some business from Defendant's apartment in New York, sought research grants and developed scientific projects in New York, and participated in conferences in New York. (*See* D's Aff. ¶¶ 12–14.) Even assuming that these activities are significant enough to establish that Phospholipid F was transacting business in New York—a dubious proposition at best—the activities did not give rise to Defendant's claims against Phospholipid F. Defendant's claims relate to Phospholipid F's cancellation of Defendant's membership, not its business activities in New York. The fact that Defendant was denied some of the benefits of inclusion in Phospholipid F, including the potential to engage in the activities Defendant describes through Phospholipid F, does not mean that his claims arise

from those activities.

Based on the foregoing, I find that Defendant has not asserted a basis for personal

jurisdiction over Phospholipid F and thus dismiss the Defendant's claims against that entity.

## IV.    *Forum Non Conveniens*

Plaintiffs and Third-Party Defendants have also made motions to dismiss the remaining

third through twelfth counterclaims and third-party claims on *forum non conveniens* grounds.

"District courts have considerable discretion in applying the principle of *forum non conveniens.*"

*Flynn v. Nat'l Asset Mgmt. Agency*, 42 F. Supp. 3d 527, 534 (S.D.N.Y. 2014).  In this Circuit,

there is

> a three-step process to guide the exercise of [a district court's] discretion
> [in doing so].  At step one, a court determines the degree of deference
> properly accorded the plaintiff's choice of forum.  At step two, it considers
> whether the alternative forum proposed by the defendants is adequate to
> adjudicate the parties' dispute.  Finally, at step three, a court balances the
> private and public interests implicated in the choice of forum.

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citations omitted).

"Any review of a *forum non conveniens* motion starts with 'a strong presumption in favor of the

plaintiff's choice of forum.'"  *Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255

(1981)).  Courts assess the totality of the circumstances in determining to what degree that

preference applies.  The strongest degree of deference is usually afforded the plaintiff's home

forum.  *See Id.*  New York is Defendant's home forum, since he has been a resident of New York

since 2003, (SAA ¶¶ 96–97), and many of his allegations involve events occurring after 2003.

Moreover, this District is also the chosen forum for Plaintiffs' claims.  Accordingly, since

Plaintiffs initiated their lawsuit here, and Defendant has since filed counterclaims and third-party

claims, this court as the parties' chosen forum for their respective claims is accorded substantial

deference.

With respect to the second step, Movants represent that Defendant's claims could be adequately adjudicated in Germany and cite several instances where courts in the United States have dismissed similar claims on *forum non conveniens* grounds with the understanding that such claims would be brought and adjudicated in Germany. (*See* First Movants' FNC Mem. 6.) Contrary to Defendant's assertion, the possibility that a German court may determine his claims are time barred does not render Germany an inadequate forum because a United States court would apply German law and reach the same result. Accordingly, I find that Germany would be an adequate forum for Defendant's claims.

With respect to the third step in the analysis, I consider private interest factors such as, "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (emphasizing that "unless the balance [of private interest factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"). In light of the fact that certain entities and Defendant are based in the United States and certain entities and Dr. Rebmann are based in Germany, I find that the private interest factors do not strongly favor either forum. The public interest factors, however, counsel in favor of adjudicating Defendant's claims in Germany. *See id.* at 508–09 (listing such public interest factors as relative congestion of the courts, local adjudication of local disputes, relative familiarity with the law governing the case, etc.). Although Defendant is a resident of the Southern District of New York and has been since approximately 2003, (SAA ¶ 71), Defendant's claims involve equity interests in German businesses, including ownership of real property in Germany. However, I note that dismissing

only a subset of the claims at issue in this case, as Movants request, introduces the possibility of inconsistent rulings.

Because I find that Plaintiffs' and Defendant's choice of the Southern District of New York as the forum for their respective claims should be accorded substantial weight and because I find that the public and private interest factors do not strongly favor litigating Defendant's claims in Germany, Movants' motion to dismiss Defendants' counterclaims and third-party claims on *forum non conveniens* grounds is DENIED.

## V.    Failure to State a Claim

Having found that I lack jurisdiction over Lipoid V, Lipoid G, Lipoid B, Lipoid S, and Phospholipid F, I need not consider Defendant's claims against those entities. However, because I have jurisdiction over Defendant's claims against Plaintiffs and against Dr. Rebmann, I consider the sufficiency of each of those claims below.

As an initial matter, I note that while I may consider materials outside the pleadings with respect to the parties' jurisdictional motions, I may not, without converting the motion to one for summary judgment, consider such materials with respect to a motion for failure to state a claim under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(d). The parties do not argue that the affidavit, declarations and appended materials are attached to, incorporated by reference in, or otherwise relied on by the SAA. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Nor is there any basis for me to find that they fall within the category of documents that I may consider on a Rule 12(b)(6) motion. *See id.* Accordingly, I consider only the allegations in the SAA with respect to Plaintiffs/Third-Party Defendants' motion under Rule 12(b)(6).

### A.    *Legal Standard*

The pleading standard under Rule 12(b)(6) applies to all claims, including counterclaims

asserted in answers. *See Reach Music Pub'g, Inc. v. Warner/Chappell Music, Inc.*, No. 09Civ. 5580 (LTS)(GWG), 2011 WL 3962515, at *3 (S.D.N.Y. Sept. 7, 2011); *Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 363 (S.D.N.Y. 2002). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal citation omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

### B. *Alter Ego and Veil Piercing*

Since five of Defendant's counterclaims against Plaintiffs are based on the legal theory that Dr. Rebmann is the alter ego of each Plaintiff, I initially address whether the allegations

contained in the counterclaims are sufficient to support a plausible claim for alter ego liability such that veil piercing is warranted.

In general, alter ego liability allows a plaintiff to disregard the corporate form of one or more companies to reach the assets of controlling entities or individual shareholders. *See Wm. Passalacqua Builders*, 933 F.2d at 139-40. "[U]nder New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded . . . ." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks omitted). The rule applies equally where the entity is a foreign company as opposed to a company incorporated in another state. *See, e.g.*, *Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 257–58 (E.D.N.Y. 2014) (applying English law to entity incorporated in British Virgin Islands); *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A. – Petrobras*, No. 98 Civ.3099(THK), 2005 WL 289575, at *5 (S.D.N.Y. Feb. 4, 2005) (applying Brazilian law to entity incorporated in Brazil), as *amended*, 2005 WL 736149 (Mar. 29, 2005). Accordingly, the alter ego analysis as to Plaintiffs is decided as follows: Lipoid LLC by reference to New Jersey law, ALC by reference to Delaware law, and Lipoid GmbH and Phospholipid GmbH by reference to German law.

### 1. Lipoid LLC

Under New Jersey law, "the corporate veil may be pierced only where (1) 'the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent' and (2) 'the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.'" *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir. 1988) (quoting *State Dep't of Envt'l Protection v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983)); *see also Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002). "The control which a parent

must exercise over a subsidiary so as to warrant piercing the veil between them is more than mere majority or complete stock control; instead it is complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Craig*, 843 F.2d at 150 (internal quotation marks omitted).  Courts consider the following factors in determining whether one corporation is completely dominated by another:

> gross undercapitalization[,] failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Foodtown, Inc.*, 296 F.3d at 172 (quoting *Craig*, 843 F.2d at 150).

In the Second Amended Answer, Defendant re-alleges many of the same conclusory allegations in favor of a finding of alter ego contained in the First Amended Answer, (*compare* FAA ¶¶ 71, 73, *with* SAA ¶¶ 185, 199), despite my prior ruling that such allegations were inadequate, (*see* Doc. 141 at 11–15).  Additionally, insofar as Defendant attempts to bolster the alter ego allegations, the new allegations merely parrot the legal conclusions from alter ego cases without providing the necessary underlying factual detail.  With respect to the new allegations alleging undercapitalization and financial dependence, (SAA ¶¶ 183–84), I find that these conclusory allegations fail make out a plausible claim that Lipoid LLC was Dr. Rebmann's alter ego.  Additionally, Defendant's allegation that "Lipoid LLC's function was not to make profits or build up its own equity," (*id.* ¶ 183), is contradicted by Defendant's allegation that he was responsible for "dramatically" increasing the Lipoid Group's U.S. sales from $1 million to $20 million, (*id.* ¶ 119).

Accordingly, Defendant has again failed to adequately plead facts in support of piercing

Lipoid LLC's corporate veil.

## 2. ALC

Delaware law requires a demonstration of two elements to support an alter-ego claim, and is similar to the law in New Jersey. "To prevail under the alter-ego theory of piercing the veil, a plaintiff . . . must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'" *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)); *accord Fletcher*, 68 F.3d at 1457. Factors relevant to the mingling of operations

> include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*NetJets*, 537 F.3d at 177 (citation omitted). No one factor is sufficient or controlling; the entities must have "operated as a single economic entity such that it would be inequitable . . . to uphold a legal distinction between them." *Id.* (citation omitted). Only after determining that the entities operate "as a single economic entity" should a court address whether there was fraud or misuse. *See id.* "A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces 'a difficult task.'" *Fletcher*, 68 F.3d at 1458 (quoting *Harco*, 1989 WL 110537, at *4).

As was the case with the alter ego allegations contained in the First Amended Answer, Defendant fails to fulfill this "difficult task," even after having the opportunity to amend. The alter ego allegations related to ALC are virtually identical to and indistinguishable from those recited for Lipoid LLC. (*Compare* SAA ¶ 183, *with* ¶ 190 (undercapitalization); *compare id.*

¶ 184, *with* ¶ 191 (financial dependence); *compare id.* ¶ 186, *with* ¶ 193 (siphoning); *compare id.*

¶ 187, *with* ¶ 194 (intermingling).)  There is nothing in Delaware law to suggest that the outcome

for ALC should be different from that for Lipoid LLC.

Accordingly, Defendant has failed to plead facts that meet the "difficult task" of piercing

ALC's corporate veil.  *Fletcher*, 68 F.3d at 1458 (quoting *Harco*, 1989 WL 110537, at *4).

### 3.    Lipoid GmbH and Phospholipid GmbH

"Although not identical, cases of 'piercing the corporate veil' under German law are very

similar to those under U.S. common law."  *Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 957 n.1

(6th Cir. 1976); *see also* Carsten Alting, *Piercing the Corporate Veil in American and German*

*Law – Liability of Individuals and Entities: A Comparative View*, 2 Tulsa J. Comp. & Int'l L.

187, 249–51 (1994) (describing similarities between German and U.S. law).  As with New Jersey

and Delaware law,[18] "[w]here the dominated company is a German limited liability company, the

corporate veil of a subsidiary may be pierced to hold the shareholder liable where the parent has

exercised pervasive control over the subsidiary."  Sandra K. Miller, *Piercing the Corporate Veil*

*Among Affiliated Companies in the European Community and in the U.S.: A Comparative*

*Analysis of U.S., German, and U.K. Veil Piercing Approaches*, 36 Am. Bus. L.J. 73, 83 (1998).  I

therefore apply German law as requiring a similar showing to pierce the corporate veil as New

Jersey or Delaware law.

Defendant failed to cure the deficiencies in his allegations regarding the corporate

formalities of Lipoid GmbH and Phospholipid GmbH that I identified in the First Amended

Answer, (*see* Doc. 141 at 15), and, accordingly, the Second Amended Answer is deficient for

---

[18] Both parties argue that German and U.S. law regarding veil-piercing is substantially the same, and neither tries to distinguish between the two.

many of the same reasons.  Specifically, the allegations in the Second Amended Answer consist of conclusory statements regarding Dr. Rebmann's control and domination of all entities within the Lipoid Group.  (*See* SAA ¶¶ 196–202.)  In fact, unlike with Lipoid LLC or ALC, there are no specific allegations regarding domination and control from which an inference could be made that the corporate formalities of Lipoid GmbH or Phospholipid GmbH were ignored or that the entities were alter egos of Dr. Rebmann.  (*See id*. ¶¶ 198–202 (referring generically to the "Lipoid Group").)  Accordingly, Defendant has failed to adequately plead facts that demonstrate the pervasive control necessary to support piercing the corporate veil of either Lipoid GmbH or Phospholipid GmbH.

### C.  *Defendant's Remaining Claims*

#### 1.  Claim 1:  Wrongful Termination Against Lipoid LLC, ALC, and Dr. Rebmann

Defendant contends that he was wrongfully terminated for refusing to file improper U.S. tax returns.  (*Id*. ¶ 204.)  He brings this claim against Lipoid LLC, ALC, and Dr. Rebmann. Wrongful termination is generally recognized as a public-policy tort.  *See Donelson v. DuPont Chambers Works*, 20 A.3d 384, 400 (N.J. 2011) (explaining that New Jersey Supreme Court "created a common law cause of action in tort for wrongful discharge when the discharge is contrary to a clear mandate of public policy" (internal quotation marks omitted)); *Rice v. Reg'l Sch. Dist. No. 4 Bd. of Educ.*, No. MMXCV116006468, 2014 WL 4746869, at *17 n.7 (Conn. Super. Ct. Aug. 15, 2014) ("The only 'public policy' tort recognized by the Connecticut Supreme Court is a wrongful discharge tort.").

New York courts apply an interest-analysis test to tort claims, so that the law of the jurisdiction having the greatest interest in the litigation will be applied.  *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013).  Although the SAA does not allege which jurisdiction had the

greatest interest in Defendant's employment, Defendant relies in his opposition brief primarily on New Jersey law,[19] which comports with the allegations that Defendant established the Lipoid Group's U.S. operations in New Jersey, (SAA ¶¶ 99, 101). Additionally, Lipoid LLC is incorporated in New Jersey and maintains its principal place of business therein. (*Id.* ¶ 73.) I therefore apply New Jersey law.

"Under New Jersey law, employment is considered at-will in the absence of 'explicit, contractual terms' providing otherwise." *Robles v. U.S. Env't'l Universal Servs., Inc.*, 469 F. App'x 104, 108 (3d Cir. 2012) (summary order) (quoting *Bernard v. IMI Sys., Inc.,* 618 A.2d 338, 346 (N.J. 1993)). "An at-will employee may be terminated 'for any reason, be it good cause, no cause, or even morally-wrong cause, but not when the discharge is contrary to a clear mandate of public policy.'" *Id.* (quoting *D'Agostino*, 628 A.2d at 311).

Here, Defendant argues that his termination was against a clear mandate of public policy, as expressed by the U.S. tax law. By alleging that he was terminated for refusing to participate in an activity illegal under U.S. tax law, Defendant has pleaded an adequate claim of wrongful termination. Accordingly, with respect to Defendant's wrongful termination claim, Movants' motions are DENIED.

### 2. Breach of Contract Claims

Defendant asserts two separate breach of contract claims. Specifically, Defendant argues

---

[19] Plaintiffs briefed New Jersey as well as Connecticut law. ALC is a Delaware corporation but has a principal place of business in Connecticut. Analysis under Connecticut law would not change the outcome. In Connecticut, "an employer may terminate an at-will employee for any reason unless that reason violates some important public policy." *Thibodeau v. Design Grp. One Architects, LLC*, 802 A.2d 731, 733 (Conn. 2002). Connecticut courts have concluded that refusing to falsify tax records implicates an important public policy. *See Drucker v. Corporate Property Mgmt., Inc.*, No. 295563, 1997 WL 12158, at *2 (Conn. Super. Ct. Jan. 6, 1997); *Raible v. Essex Yacht Club, Inc.*, No. CV030564783S, 2003 WL 22133986, at *3-4 (Conn. Super. Ct. Aug. 19, 2003) (speech concerning compliance with tax code implicated public policy). Under New Jersey law, federal law and policy as expressed by federal statutes "can constitute New Jersey's clear mandate of public policy." *D'Agostino v. Johnson & Johnson, Inc.*, 628 A.2d 305, 312 (N.J. 1993) (collecting cases and noting that New Jersey is consistent with other states that "have found a wrongful-discharge cause of action when based on a clearly-articulated federal policy").

that Lipoid LLC, ALC and Dr. Rebmann (1) breached Dr. Rebmann's promise of lifetime employment at Lipoid LLC and ALC by terminating him, (SAA ¶¶ 208–16), and (2) breached the agreement by which Dr. Rebmann gave Defendant an interest in Lipoid KG by taking away Defendant's shares in Lipoid G, (*id*. ¶¶ 217–23).

<strong>a.      Claim 2: Breach of Contract for Lifetime Employment<br>Against Lipoid LLC, ALC, and Dr. Rebmann[20]</strong>

Defendant alleges an oral agreement that he would serve as CEO of Lipoid LLC and ALC "for as long as he wished." (*Id*. ¶ 209.) Defendant further alleges that Dr. Rebmann reiterated this oral promise "on a number of occasions," (*id*. ¶ 210), but the parties did not reduce the agreement to writing at any point, (*id*. ¶ 105). Defendant argues that Lipoid LLC, ALC and Dr. Rebmann breached Dr. Rebmann's promise of lifetime employment at Lipoid LLC and ALC by terminating him. (*Id*. ¶ 212.)

"New York courts adopt a 'center of gravity' approach to choice-of-law questions in contract cases. This approach requires application of the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Bank of N.Y. v. Yugoimport*, 745 F.3d 599, 609 (2d Cir. 2014). Therefore, because I find that New Jersey has the most significant interest and relationship to Defendant's employment relationship, (*see supra* Part V.C.1.), I apply New Jersey law.

New Jersey courts are willing to uphold lifetime employment contracts, "so long as [the

---

[20] As with the wrongful termination claim, Plaintiffs briefed New Jersey as well as Connecticut law because ALC has a principal place of business in Connecticut. Analysis under Connecticut law would not change the outcome. Under Connecticut law, "contracts of permanent employment, or for an indefinite term, are terminable at will." *Sheets v. Teddy's Frosted Foods, Inc.*, 427 A.2d 385, 386 (Conn. 1980) (citation omitted). "Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." *Cweklinsky v. Mobil Chem. Co.*, 837 A.2d 759, 768 (Conn. 2004). Defendant does not allege that he negotiated any exception to this rule. His lifetime employment claim would therefore fail under Connecticut law because he could be terminated at any time.

contracts] clearly and unequivocally state their intention" to be of lifelong duration. *Eilen v. Tappin's Inc.*, 83 A.2d 817, 818 (N.J. Super. Ct. App. Div. 1951). However, a lifetime employment contract "is extraordinary and considered outside the regular custom and usage of business," and "there has been a marked reluctance to enforce this type of contract, mainly because the obligations it contains are primarily one-sided." *Alter v. Resorts Int'l, Inc.*, 560 A.2d 1290, 1292–93 (N.J. Super. Ct. Ch. Div. 1989); *see also Woolley v. Hoffman-La Roche, Inc.*, 491 A.2d 1257, 1262 (N.J. 1985) (noting "reluctance to impose employment contracts other than at-will"). Accordingly, to be enforceable,

> two distinct requirements [must be] satisfied: [(1)] there must be clear and convincing proof of a precise agreement, setting forth all of the terms of the employment, including, in addition to the duration thereof, the duties and responsibilities of both employee and employer; and [(2)] the long-term undertaking by the employer must be supported by consideration from the employee in addition to his continued work.

*Woolley*, 491 A.2d at 1262; *accord Savarese v. Pyrene Mfg. Co.*, 89 A.2d 237, 239–41 (N.J. 1952).

Further, under New Jersey law, an oral agreement need not be performable within one year to be enforceable. *See Graziano v. Grant*, 741 A.2d 156, 162–63 (N.J. Super. Ct. App. Div. 1999). In addition, oral promises of lifetime employment are enforceable subject to the additional requirements that they be clearly and unequivocally expressed in the contract itself. *See Shebar v. Sanyo Bus. Sys. Corp.*, 544 A.2d 377, 381 (N.J. 1988). Where these requirements are met, courts have upheld oral promises of lifetime employment. *See, e.g., id.* at 383–84 (reversing summary judgment because jury could reasonably infer promise of lifetime employment from oral statements and additional consideration from plaintiff); *Smith v. Squibb Corp.*, 603 A.2d 75, 76 (N.J. Super. Ct. App. Div. 1992) (noting court's earlier decision that "held that plaintiff's claim of an oral contract of employment supported by an act of forbearance

alleged a cause of action similar to that alleged in *Shebar*"); *cf. First Atl. Leasing Corp. v. Tracey*, 738 F. Supp. 863, 872–73 (D.N.J. 1990) (claim of oral promise of lifetime employment sufficient to survive summary judgment, but summary judgment granted because defendant established cause for termination). Where the requirements are not met, courts applying New Jersey law have refused to enforce the purported oral contracts. *See, e.g.*, *Nardi v. Stevens Inst. of Tech.*, 60 F. Supp. 2d 31, 41–43 (E.D.N.Y. 1999) (terms of oral promise too vague to enforce, and no demonstration of forbearance); *Scudder v. Media Gen., Inc.*, No. 95-1073, 1995 WL 495945, at *5–6 (D.N.J. Aug. 15, 1995) (same); *Fregara v. Jet Aviation Bus. Jets*, 764 F. Supp. 940, 945–49 (D.N.J. 1991) (same); *Savarese*, 89 A.2d at 240–41 (same).

Contrary to what was alleged in the First Amended Answer, in the Second Amended Answer, Defendant alleges that he was already living in the United States and was enrolled in a Ph.D program when Dr. Rebmann offered him the lifetime employment with Lipoid LLC, (*compare* FAA ¶ 95,[21] *with* SAA ¶209). Defendant alleges that his agreement to give up his Ph.D program and accept employment with Lipoid LLC constitutes consideration. (SAA ¶ 209.) Whether Defendant relocated to the United States or dropped out of his Ph.D program so that he could work at Lipoid LLC, either probably satisfies the second requirement for a lifetime employment contract, i.e., that the employee provide additional consideration. *See Shebar*, 544 A.2d at 383 (consideration found where employee relinquished position at competitor company); *Piechowski v. Matarese*, 148 A.2d 872, 878 (N.J. Super. Ct. App. Div. 1959) (consideration found where employee made capital contribution to company).

As was the case in the First Amended Answer, however, Defendant's breach of contract

---

[21] In the First Amended Answer, Defendant alleges that he relocated to the United States in 2003-4 to serve as CEO of Lipoid LLC and ALC for as long as he wished. (FAA ¶ 95.)

of lifetime employment claim fails because the agreement itself does not "set[] forth all of the terms of the employment," in particular "the duties and responsibilities of both employee and employer." *Woolley*, 491 A.2d at 1262; *accord Savarese*, 89 A.2d at 240–41 ("The responsibilities assumed and the obligations imposed will be neither created nor spelled out by mere inference when they are not clearly and unequivocally expressed *in the contract itself*." (emphasis added)). The SAA alleges that Lipoid LLC submitted a letter to the U.S. Department of Citizenship and Immigration Services in support of Defendant's visa application, (SAA ¶ 106). The letter "spelled out in detail" Defendant's "key management responsibilities" as CEO of Lipoid LLC. (*Id.* ¶ 107.) Assuming these allegations as true for the purposes of this motion, Defendant's claim still fails because Defendant does not allege that the agreement for lifetime employment "clearly and unequivocally" expressed these terms "in the contract itself." *Savarese*, 89 A.2d at 240–41. Like the alleged oral promise of lifetime employment in *Savarese*, the terms of the agreement itself (as opposed to a subsequently created document referencing the agreement) "are vague and uncertain and do not comply with the precision and clarity required by the law." *Id.* at 241.

These allegations are also problematic in several other respects. First, the letter at issue was drafted and submitted when Defendant was already working as CEO of Lipoid LLC. In other words it was not created at the time Defendant was purportedly offered lifetime employment. Second, the letter does not state that Defendant and Lipoid LLC agreed that Defendant had lifetime employment and/or that his employment could only be terminated for cause. Third, the letter does not set forth Defendant's current or past compensation, vacation benefits, health benefits, procedures regarding resignation, or any other provisions typical of employment agreements such as election of remedies, governing law, confidentiality, and non-

compete.  *See Woolley*, 491 A.2d at 1262 (noting that under New Jersey law oral contracts for lifetime employment must "set[] forth all of the terms of the employment, including . . . the duties and responsibilities of both employee and employer").  Fourth, the letter is not an adequate proxy for the employment agreement because the stated purpose of the letter indicates that its drafter would have incentives to inflate Defendant's role at Lipoid LLC to secure his residency in the United States, and those incentives would be absent from the actual employment agreement.

Accordingly, Movants' motion to dismiss is GRANTED with respect to Defendant's claim for breach of contract for lifetime employment.

        b.      Claim 3:  Breach of Contract (Equity in Lipoid Group)
                          Against Dr. Rebmann

Defendant's third claim alleges that Dr. Rebmann breached his agreement to give Defendant a 10% equity interest in the entire Lipoid Group.  (SAA ¶ 218.)  Specifically, Defendant argues that Dr. Rebmann breached the agreement whereby Dr. Rebmann gave Defendant a 10% equity interest in Lipoid KG by:  (a) redistributing the assets of Lipoid KG among Lipoid G and entities in which Defendant had no equity interest, (*id.* ¶ 218); (b) stripping Defendant of his shares in Lipoid G,[22] (*id.*); and (c) failing to fulfil his obligation to transfer an additional 1% equity interest in the Lipoid Group to Defendant as a "bonus," (*id.* ¶¶ 121, 220).  Plaintiffs argue that dismissal is warranted because the SAA fails to allege that any contract existed, and, to the extent a contract did exist, Defendant's alleged breaches are time barred.  (First Movants' Mem. 31–32.)

The parties agree that Germany's three year statute of limitations applies.  (*See* First

---

[22] Although Defendant raises the stripping of his equity in Lipoid G as part of this claim, Defendant clarified that this breach of contract claim "relates to the failure of [Dr. Rebmann] to restore [Defendant's] 10% interest in the entire Lipoid Group."  (D's Opp. 46-47.)

Movants' Mem. 32; D's Opp. 41.)  Under German law, the limitation period begins to run at the

end of the year in which:  (1) the claim arose and (2) plaintiff obtains knowledge of the

circumstances giving rise to the claim and of the identity of the defendant.  *See* BURGERLICHES

GESETZBUCH § 199.  Courts in the United States applying the German statute have held that the

limitation period begins to run when the plaintiff obtains "knowledge of the facts necessary to

commence an action in Germany with an expectation of success or some prospect of success,

though not without risk and even if the prospects of success are uncertain." *IKD Deutsche*

*Industriebank AG v. McGraw Hill Fin., Inc.*, 634 F. App'x 19, 22 (2d Cir. 2015) (summary

order) (internal quotations omitted); *see also In re Countrywide Fin. Corp. Mortgage–Backed*

*Sec. Litig.* No. 2:11-ML-02265-MRP (MANx), 2014 WL 3529686, at *5 (C.D. Cal. July 14,

2014) ("[K]nowledge under German law exists when the plaintiff possesses sufficient

information to formulate a consistent and coherent statement of the claim. . . . A plaintiff need

not possess evidence sufficient to sustain its allegations, know every detail of its claim, or

exclude every potential litigation risk." (internal quotation marks and citations omitted))

　　　Defendant alleges that "in or about 1996" Dr. Rebmann restructured the Lipoid KG

business, (SAA ¶ 87), such that Defendant's 10% equity interest in what became the Lipoid

Group was reduced to a 10% equity interest solely in Lipoid G, (*id.* ¶ 88).  In light of the fact that

Defendant alleges he knew of the reorganization at that time, (*id.* ¶ 89), Defendant's cause of

action relating to the alleged breach accrued in or about 1996.  *See* BURGERLICHES GESETZBUCH

§ 199.  In the SAA, Defendant alleges that his claim did not accrue until 2015, when he realized

that Dr. Rebmann would never restore his 10% equity interest in the entire Lipoid Group.  (SAA

¶ 89.)  Throughout Defendant's Opposition, however, Defendant acknowledges that the claim

accrued around "early 2013."  (D's Opp. 42.)  Whether it was in 2013 or 2015, Defendant's

ultimate realization that Dr. Rebmann would not reverse his alleged breach does not inform when the underlying claim accrued, i.e., when Defendant knew facts sufficient to state a claim. As alleged in the SAA, Defendant had knowledge of the circumstances giving rise to the claim since 1996.  (SAA ¶ 89.)  Defendant does not assert that the limitations period was tolled in connection by Dr. Rebmann's statements that he would reverse his alleged breach, and I do not find any legal basis for such a proposition.  Accordingly, I find that the alleged breach arising from Dr. Rebmann's 1996 redistribution of Lipoid KG's assets accrued at the time of the redistribution and is therefore time barred.

With respect to the alleged breach relating to the unpaid bonus, for there to be a breach, the bonus must be a term of the underlying employment agreement.  *See Giannone v. Deutsche Bank Sec., Inc.*, 392 F. Supp. 2d 576, 593 (S.D.N.Y. 2005) (dismissing breach of contract claim where promise to pay bonus did not constitute a term of employment).  Here, Defendant has not alleged that the bonus was a term of his agreement.  Additionally, Dr. Rebmann allegedly promised Defendant a 1% equity interest in the Lipoid Group as a "bonus" because Dr. Rebmann was "very pleased with [Defendant's] performance."  (SAA ¶ 121.)  The fact that Dr. Rebmann's promise came after and as a result of Defendant's performance suggests it was not a term of Defendant's employment at the time when Defendant first began working for Lipoid LLC or ALC.  Defendant has not alleged sufficient factual basis to state a breach of contract claim relating to the bonus.

Accordingly, Movants' motion is GRANTED with respect to Defendant's breach of contract claim relating to his equity in the Lipoid Group and his bonus.

### 3.     Claim 4:  Fraud Against Dr. Rebmann

Defendant's fourth claim alleges that Dr. Rebmann's misrepresentations to Defendant

regarding Defendant's 10% equity interest in the Lipoid Group, lifetime employment at Lipoid LLC and ALC, and bonus of 1% equity interest in the Lipoid Group constitute fraud. (SAA ¶ 225–226.)  Plaintiffs argue that Defendant's fraud claim must be dismissed because it is time barred, duplicative of Defendant's contract claims, and does not comply with the heightened pleading requirements of Rule 9(b).  (First Movants' Mem. 33.)

Although New Jersey law governs Defendant's wrongful termination claim, the interests at issue in Defendant's fraud claim are purely economic, (SAA ¶ 227), and do not exclusively relate to the New Jersey employment relationship.  Additionally, I note that Defendant cites primarily New York law in connection with the fraud claim, (P's Opp. 42–45), and Plaintiffs cite German, New York and New Jersey law, (First Movants' Mem. 34–36).  As discussed *supra* at Part V.C.1, New York courts apply an interest-analysis test to tort claims, under which the law of the jurisdiction having the greatest interest in the claim will be applied.  *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013).  "Although the law is somewhat unresolved on this point, New York courts consider the locus of a fraud to be the place where the injury was inflicted and not the place where the fraudulent act originated."  *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 142 (S.D.N.Y. 2001); *see also Glob. Fin. Corp. v. Triarc Corp.*, 693 N.Y.S.2d 479, 482 (1999) ("When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.").  Because Defendant was a resident of New York during the alleged fraud and the "financial harm," (SAA ¶ 227), was therefore sustained in New York, I find that New York has the greatest interest in Defendant's fraud claim and therefore apply New York law.[23]

---

[23] New Jersey and New York law are "substantially the same" with respect to fraud claims, and I would reach the same result even if I applied New Jersey law.  *Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 509-10 (S.D.N.Y. 2009); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006); *Interstate Foods, Inc. v. Lehmann*, No. 06 Civ. 13469(JGK), 2008

To state a claim for common law fraud in New York, a complaint must allege: "(1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Additionally, the claim must comply with Rule 9(b) which requires that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As for any alleged mental state, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Defendant's fraud allegations fail to satisfy Rule 9(b) in several key respects. Additionally, Defendant's does not adequately plead damages resulting from the alleged fraud.

### a. Material Misrepresentation

To plead a fraudulent misstatement, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co ., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

Defendant's fraud allegations fail to plead with specificity where and when the alleged false statements were made. *See Aronov v. Mersini*, No. 14-cv-7998 (PKC), 2015 WL 1780164, at *4 (S.D.N.Y. Apr. 20, 2015) (finding fraud claims were improperly pleaded where the complaint "specifies an approximate eight-month period during which the statements were made, [and] lacks particularity with regard to the timeframe of the alleged misrepresentations"); *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 324 (S.D.N.Y. 2012) ("In the present case, [plaintiff]

---

WL 4443850, at *2 (S.D.N.Y. Sept. 30, 2008).

identifies the speakers, but gives only a general description of the statements that he contends were fraudulent and fails altogether to identify where and when the statements were made. Such failures are fatal to [p]laintiff's fraudulent inducement claim." (internal citation and quotation marks omitted)). Instead, Defendant primarily relies on his affidavit for the much of the requisite particularity, (*see* D's Opp. Mem. 43), and appears to concede that amendment is necessary to cure these pleading deficiencies, (*id*.).

b.    Knowledge of Falsity and Intent to Defraud

A party alleging fraud "must also plead facts giving rise to a strong inference of fraudulent intent," which may be done "by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Brown v. Lower Brule Cmty. Dev. Enter., L.L.C.*, No. 13-cv-7544 (PKC), 2014 WL 5508645, at *5 (S.D.N.Y. Oct. 31, 2014) (internal quotation marks omitted), *aff'd sub nom. Brown v. Lower Brule Cmty. Dev. Enter., LLC*, 606 F. App'x 626 (2d Cir. 2015) (summary order).

Defendant's allegations concerning Dr. Rebmann's knowledge of the falsity of his statements are purely conclusory. (*See* SAA ¶ 225–26 (claiming without any analysis that Dr. Rebmann "knew [each statement] was false when made").). Similarly deficient is Defendant's allegation that Dr. Rebmann's "intent all along was to take [Defendant's] shares in the business." (*Id*. ¶ 89.) Defendant points to no allegations that support this conclusory statement. Therefore, these allegations fail to plead knowledge or intent to defraud with Rule 9(b) particularity. *See Randolph Equities, LLC v. Carbon Capital, Inc.*, No. 05 Civ. 10889(PAC), 2007 WL 914234, at *7 (S.D.N.Y. Mar. 26, 2007) ("Further, pursuant to Rule 9(b), [p]laintiff is required to plead facts sufficient to show that at the time [d]efendants made these representations to provide

financing, they did not intend to follow through with them.  [p]laintiffs have failed to do so. Their conclusory allegations, and allegations based on 'information and belief' that [d]efendants did not intend to honor the contract are insufficient."); *Rubenstein v. S1 Corp.*, No. 04 Civ. 2781TPG, 2005 WL 743121, at *3–4 (S.D.N.Y. Mar. 31, 2005) ("[Plaintiff] argues that the evidence of [defendant's] intention not to honor the commitment at the time it was made may be inferred from its failure to do so after plaintiff acted in reliance upon it.  This is not sufficient pleading as to what actually constituted fraud.") (internal quotation marks omitted).  Thus, Defendant's fraud claim fails to satisfy the heightened pleading requirements of Rule 9(b).

c.       Defendant Fails to Plead Damages Resulting from the <u>Alleged Fraud</u>

Under New York law, the alleged losses stemming from a fraud must "be the direct, immediate, and proximate result of the misrepresentation."  *Kregos v. Assoc. Press*, 3 F.3d 656, 665 (2d Cir. 1993); *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 426 (S.D.N.Y. 2014) (dismissing fraud claim where "losses [were] not independent of [plaintiff's] myriad other state and federal claims").  In *Kregos*, plaintiff's fraud claim was dismissed because "the only conceivable damages plaintiff could claim [was] that the fraudulent representations . . . prevented plaintiff from commencing a copyright infringement action . . . before the three-year statute of limitations expired."  *Kregos*, 3 F.3d at 665 (citation omitted).  Such a theory of damages is "too remote" because it requests the court to "speculate what potential award [plaintiff] might have obtained from winning" the time barred claim.  (*Id.*)

In light of the fact that Defendant has not pled the alleged fraud with particularity, I need not reach the damages issue.  Nevertheless, Defendant's fraud claim fails for the independent reason that the injuries Defendant allegedly suffered are not the "direct, immediate, and proximate result," *Kregos*, 3 F.3d at 665, of Dr. Rebmann's alleged misrepresentations.  (SAA

¶¶ 225–26.)  In fact, Defendant argues that his "fraud claim . . . arose from [Dr. Rebmann's] misstatements that induced [Defendant] to forbear demanding compensation for the loss of his 10% in Lipoid KG."  (D's Opp. 44.)  Thus, Defendant fails to allege damages resulting from the alleged fraud.

Because Defendant fails to plead fraud with the requisite particularity in accordance with Rule 9(b) and because he fails to adequately plead damages resulting from the alleged fraud, Movants' motion to dismiss is GRANTED with respect to Defendant's fraud claim.

### 4.      Claim 5:  Breach of Fiduciary Duties Against Dr. Rebmann

The parties agree that German law, which applies here, provides for a three year limitations period for Defendant's breach of fiduciary duties claim.

Defendant alleges that a father-son fiduciary relationship existed between Dr. Rebmann and Defendant, (SAA ¶ 229), and Dr. Rebmann breached the fiduciary duties he owed pursuant to that relationship by:  "(a) stripping Lipoid KG of its business assets; (b) telling [Defendant] that the purpose of [the alleged asset stripping] was for operational efficiencies . . . ; (c) stripping [Defendant] of his interest in the Lipoid Group and in Lipoid [G]; and (d) wrongfully terminating [Defendant's] employment with Lipoid LLC and ALC," (SAA ¶ 231).  Plaintiffs argue that the claims are time barred, duplicative of Defendant's contract claims, and Defendant was not owed a fiduciary duty with respect to Lipoid LLC and ALC.  (First Movants' Mem. 34.)

For the reasons already stated, subparts (a) and (b), which relate to the alleged stripping of Lipoid KG's assets in or about 1996, are both time barred.  (*See supra* Part V.C.2.b.) Additionally, I find that dismissal of subparts (c) and (d) is warranted because they are duplicative of Defendant's breach of contract claims relating to his alleged lifetime employment at Lipoid LLC and ALC, (*see* SAA ¶¶ 208–16), and stripping of equity in the Lipoid Group, (*id.*

¶¶ 149–52, 230).[24] *See Commerzbank AG v. Bank of N.Y. Mellon*, No. 15 Civ. 10029 (GBD),

2017 WL 1157278, at *5 (S.D.N.Y. Mar. 21, 2017) (dismissing breach of fiduciary duty claim as

duplicative of breach of contract claim); *82 Retail LLC v. Eighty Two Condominium*, 986

N.Y.S.2d 106, 108 (1st Dept. 2014) (same).

Accordingly, Movants' motion to dismiss is GRANTED with respect to Defendant's

claim for breach of fiduciary duty.

### 5. Claim 6: Oppression Against All Plaintiffs and Dr. Rebmann[25]

Defendant alleges that Dr. Rebmann "acted unfairly," (SAA ¶ 241), towards him which

"frustrated . . . [Defendant's] reasonable expectations," (*id*. ¶ 240), concerning his: (1) equity

interests in Lipoid KG and Lipoid G, (*id*. ¶¶ 236, 239); (2) lifetime employment at Lipoid LLC

and ALC, (*id*. ¶ 238); and (3) belief that Dr. Rebmann would restore Defendant's equity interest

in the Lipoid Group, (*id*. ¶ 237). Plaintiffs argue that dismissal is warranted because the claim is

time barred, Defendant has not referenced German law such that I can evaluate whether his claim

is plausible, and Defendant is not entitled to damages under German law. (First Movants' Mem.

36.)

New York law recognizes the tort of oppression where minority shareholders are "frozen

out" of the management of the corporation by majority shareholders. *See Barbour v. Knecht*,

743 N.Y.S.2d 483, 491 (1st Dep't 2002) (citing Robert B. Thompson, *The Shareholders Cause of

Action for Oppression*, 48 Bus. Lawyer 699, (1993)) (dismissing oppression claim where

allegations consisted of "hodge-podge of plaintiff's personal claims, claims derivative in nature,

and claims allegedly asserted in behalf of the other minority shareholders"). Defendant's

---

[24] *See supra* footnote 22.

[25] I determined above that alter ego liability has not been adequately pleaded between Dr. Rebmann and any of the Plaintiffs, so the claim cannot be asserted against Plaintiffs.

allegations of oppression do not allege that he was frozen out, are purely conclusory, and do not provide sufficient factual detail to adequately state claim for oppression.  In addition, the claims are a "hodge-podge" of Defendant's different claims against Dr. Rebmann.  *See id.*  For example, Defendant alleges that "[Dr. Rebmann] acted unfairly towards [Defendant] and did not deal fairly with him."  (SAA ¶ 241.)  Similarly, Defendant alleges that "[Dr. Rebmann] acted fraudulently and illegally when he mismanaged Lipoid LLC, ALC and the other Lipoid Group companies, abused his authority as the person in control of these entities, and when he acted oppressively and unfairly toward [Defendant]."  (*Id.* ¶ 242.)  Such conclusory allegations fail to state a claim.

Accordingly, Movants' motion to dismiss is GRANTED with respect to Defendant's claim for oppression.

### 6.     Claim 7:  Tortious Interference with Business Relations Against All Plaintiffs and Dr. Rebmann[26]

Defendant claims that Dr. Rebmann and Plaintiffs tortuously interfered with his business relations by revoking Defendant's membership in the Phospholipid Research Center, (*id.* ¶ 247), making false statements regarding Defendant to Defendant's business contacts, (*id.* ¶¶ 248–49), and lowering the prices of the Lipoid Group's products to prevent Defendant "from successfully marketing his products," (*id.* ¶ 250).  Plaintiffs argue that the claim must be dismissed because Defendant has failed to allege the requisite factual detail.  (First Movants' Mem. 36–37.)

For the same reasons that New York law governs Defendant's fraud claim, (*see supra* Part V.C.3), I find that New York law governs Defendant's tortious interference claim.  To state a claim for tortious interference with business relations under New York law, a party must

---

[26] I determined above that alter ego liability has not been adequately alleged between Dr. Rebmann and any of the Plaintiffs, so the claim cannot be asserted against Plaintiffs.

allege: (i) business relations with a third party; (ii) defendants' interference with those business relations; (iii) that defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (iv) ensuing injury to the relationship. *Wolff v. Rare Medium, Inc*, 65 F. App'x 736, 739 (2d Cir. 2003) (summary order). With respect to the first element, the complaint must allege "interference with a specific identified business relationship with a third party." *Camp Summit of Summitville, Inc. v. Visinksi*, No. 06-CV-4994 (CM)(GAY), 2007 WL 1152894, at *14 (S.D.N.Y. Apr. 16, 2007) (citation omitted).

Because the Second Amended Answer fails to identify any particular business relations with a third party with which Dr. Rebmann and Plaintiffs allegedly interfered, I find that Defendant has failed to state a claim for tortious interference with business relations.

Accordingly, Movants' motion to dismiss is GRANTED with respect to Defendant's claim for tortious interference with business relations.

### 7. Claim 8: Misappropriation Against Dr. Rebmann

Defendant alleges that Dr. Rebmann "misappropriated [Defendant's] shares in the Lipoid Group and in [Lipoid G] and the funds [Defendant] received as an inheritance." (SAA ¶ 254.) Plaintiffs argue that this claim is duplicative of Defendant's conversion claim and must be dismissed because misappropriation "does not cover a claim for the alleged wrongful taking of property that is not involved in commercial competition." (First Movants' Mem. 38.) Defendant states in his opposition that his misappropriation claim is not duplicative of his conversion claim because the misappropriation claim "seeks redress for the involuntary taking of his inheritance from his mother," and the conversion claim relates to the stripping of his interest in Lipoid G. (D's Opp. 51.) Defendant may not amend his claims through his opposition to Movants' motion. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (explaining that plaintiff is

not entitled to amend its complaint through statements made in its motion papers). Defendants' misappropriation claim plainly relates to both his shares in Lipoid Group, his shares in Lipoid G, and his inheritance. (*See* SAA ¶ 254.)

Defendant correctly notes that, under New York law, misappropriation is a "broad and flexible doctrine that depends more upon the facts set forth than in most causes of action." (D's Opp. 51 (quoting *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. CBS*, 672 F.2d 1095, 1105 (2d Cir. 1982)).) Defendant, however, ignores the fact that misappropriation claims relate to improper commercial competition and unfairly appropriating "the skill, expenditures and labors of a competitor." *Roy Exp. Co.*, 672 F.2d at 1105 (quoting *Electrolux Corp. v. Val-Worth, Inc.*, 190 N.Y.S.2d 977, 986 (1959)). Defendant claims that Dr. Rebmann "misappropriated" his personal property, (SAA ¶ 254; D's Opp. 51), but fails to allege any improper competition or how the taking amounts to an appropriation of Defendant's skill, expenditure or labors, *see Roy Exp. Co.*, 672 F.2d at 1105. In addition, Defendant's misappropriation claim is duplicative of his conversion claim to the extent it relates to Defendant's interest in the Lipoid Group or Lipoid G.

Accordingly, Movants' motion to dismiss is GRANTED with respect to Defendant's misappropriation claim.

### 8. Claim 9: Conversion Against Dr. Rebmann

Defendant alleges that Dr. Rebmann is liable for conversion because he "wrongfully exercised dominion" over Defendant's shares in Lipoid G and "converted such shares to his own use." (SAA ¶ 261.) Plaintiffs argue that dismissal is warranted because the claim is time barred, Defendant has not set forth the elements for the claim under German law such that I can evaluate whether it is plausible, and Defendant is not entitled to damages under German law. (First

Movants' Mem. 36.)[27]

I find that Defendant has alleged a plausible claim that Dr. Rebmann wrongfully exercised dominion over Defendant's 10% equity interest in Lipoid G. The claim is not time barred since Dr. Rebmann is alleged to have taken the wrongful actions with regard to Defendant's 10% interest in 2013.

Accordingly, Plaintiffs' motion to dismiss is DENIED with respect to Defendant's claim for conversion.

### 9. Claim 10: Defamation Against All Plaintiffs and Dr. Rebmann[28]

Defendant's defamation claim alleges that Dr. Rebmann "made and caused members of the Lipoid Group to make false statements" about Defendant to "third parties, including without limitation, that [Defendant] had committed crimes and would soon face imprisonment and that [Defendant] had failed to file reports as part of his duties with ALC and Lipoid LLC." (SAA ¶ 265.) Plaintiffs argue that Defendant's defamation claim must be dismissed because Defendant "does not state all the allegedly defamatory statements and he does not describe to whom they were made, when, where or how." (First Movants' Mem. 39.)

Defamation "is defined as the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Foster v. Churchill*, 642 N.Y.S.2d 583, 587 (1996) (internal quotation marks omitted). In order to state a cognizable defamation claim, plaintiffs need not "plead the allegedly defamatory

---

[27] I note that Plaintiffs also do not set forth the elements of a properly pled conversion claim under German law or identify which element is absent from Defendant's claim.

[28] I determined above that alter ego liability has not been adequately pleaded between Dr. Rebmann and any of the Plaintiffs, so the claim cannot be asserted against Plaintiffs.

statements *in haec verba*," but must provide a detailed description of the defamatory statements sufficient to "afford defendant sufficient notice of the communications complained of to enable him to defend himself." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (citation omitted). Additionally, a plaintiff must identify to whom the allegedly defamatory statements were made. *See Ello v. Singh*, 531 F. Supp. 2d 552, 581 (S.D.N.Y. 2007) (finding the plaintiff failed to state a claim for defamation because the plaintiff "fail[ed] to identify to whom [the alleged defamatory] statements were made, or the time and manner in which they were made"); *Camp Summit*, 2007 WL 1152894, at *12 (dismissing a defamation claim because the claimant "neither allege[d] who at Camp Summit made the defamatory remarks, nor to whom the comments were made").

Defendant alleges that Dr. Rebmann made certain allegedly defamatory statements, (SAA ¶ 265), but fails to identify the other members of the Lipoid Group who allegedly made false statements. Additionally, the SAA fails to allege to whom the statements were made, when, where or how they were communicated.

Accordingly, Movants' motion to dismiss is GRANTED with respect to Defendant's defamation claim.

### 10. Claim 11: Appraisal and Accounting Against All Plaintiffs and Dr. Rebmann[29]

Defendant's appraisal and accounting claim, although inartfully pled, appears to allege that Defendant is entitled to information concerning his 10% equity interest in Lipoid G. (SAA ¶ 271.) The claim further alleges that the procedure by which certain other shareholders were added, (*id*. ¶ 276), and the procedure by which Defendant's shares were stripped from him, (*id*.

---

[29] I determined above that alter ego liability has not been adequately pled between Dr. Rebmann and any of the Plaintiffs, so the claim cannot be asserted against Plaintiffs.

¶ 274), each constituted a violation of German GmbH law.

To the extent that Defendant's claim is for information sufficient to establish the value of Defendant's former 10% equity interest in Lipoid G, Defendant has stated a plausible claim for relief; however, to the extent that Defendant seeks additional relief, e.g., naming additional Third-Party Defendants, (*id*. ¶ 279), and appointment of court appointed valuation and accounting experts, (*id*. ¶ 282), Defendant fails to state a claim.

Accordingly, Movants' motion to dismiss Defendant's claim for appraisal and accounting is GRANTED, except it is DENIED solely with respect to information sufficient to establish the value of Defendant's former 10% equity interest in Lipoid G.

### 11.    Claim 12:  Derivative Breach of Fiduciary Duties Against All Plaintiffs and Dr. Rebmann

Defendant brings a derivative breach of fiduciary duties claim on behalf of Lipoid G against all Plaintiffs and Dr. Rebmann.  (*Id*. ¶ 284–89.)  The claim alleges that Dr. Rebmann breached his fiduciary duties when, in 1996, he caused the assets of Lipoid KG to be redistributed between various members of the Lipoid Group.  (*Id*. ¶¶ 80, 87, 286.)  Plaintiffs argue that dismissal is necessary because the claim is time barred and Defendant lacks standing to bring such a claim.  (First Movants' Mem. 39.)

The parties agree that the German three year statute of limitations applies to Defendant's derivative claim. (*Id*.; D's Opp. 53.)  Defendant argues that the claim did not accrue "until around 2013," (D's Opp. 53), when Dr. Rebmann stripped Defendant of his 10% stake in Lipoid G, (SAA ¶ 149), because it was not until then that Defendant "realized that his faith in his father to restore his interest in the Lipoid Group as a whole had been misplaced," (*id*. ¶ 152). Defendant's logic is flawed; the date when Defendant became aware that his stake in the reorganized Lipoid G would not be restored does not inform when Lipoid G's claim accrued.

Lipoid G's claim accrued, if at all, when Dr. Rebmann allegedly "'restructured' the Lipoid KG business . . . into three parts, . . ." in 1996.  (*Id*. ¶ 87.)

Accordingly, Movants' motion to dismiss Defendant's derivative breach of fiduciary duties claim is GRANTED.

**VI.**     <u>**Conclusion**</u>

For the foregoing reasons:

Movants' motion to dismiss for *forum non conveniens* is DENIED.  Movants' motion to dismiss for lack of subject matter jurisdiction is DENIED.  Movants' motion to dismiss for lack of personal jurisdiction and insufficient process is GRANTED with respect to a Lipoid V, Lipoid G, Lipoid B, Lipoid S, and Phospholipid F, and is DENIED with respect to Dr. Rebmann.

1. Movants' Motion to Dismiss Defendant's claim for wrongful termination is DENIED;

2. Movants' Motion to Dismiss Defendant's claim for breach of contract relating to Defendant's employment is GRANTED;

3. Movants' Motion to Dismiss Defendant's claim for breach of contract relating to Defendant's equity in the Lipoid Group is GRANTED;

4. Movants' Motion to Dismiss Defendant's claim for fraud is GRANTED;

5. Movants' Motion to Dismiss Defendant's claim for breach of fiduciary duties is GRANTED;

6. Movants' Motion to Dismiss Defendant's claim for oppression is GRANTED;

7. Movants' Motion to Dismiss Defendant's claim for tortious interference with business relations is GRANTED;

8. Movants' Motion to Dismiss Defendant's claim for misappropriation is GRANTED;

9. Movants' Motion to Dismiss Defendant's claim for conversion is DENIED;

10. Movants' Motion to Dismiss Defendant's claim for defamation is GRANTED;

11. Movants' Motion to Dismiss Defendant's claim for appraisal and accounting is DENIED solely with respect to information sufficient to establish the value of Defendant's former 10% equity interest in Lipoid G, and is GRANTED in all other respects; and

12. Movants' Motion to Dismiss Defendant's claim on behalf of Lipoid G for breach of fiduciary duties is GRANTED.

In light of the fact that the SAA represents Defendant's third attempt to adequately state a claim, and he has already been afforded two opportunities to re-plead, the dismissals set forth herein are made with prejudice.

The Clerk's Office is respectfully directed to terminate Docs. 170, 197, and 214.

The parties are directed to appear for a status conference on October 27, 2017 at 1:00 p.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007. The parties are further directed to submit a joint letter on or before October 20, 2017, addressing: (1) the status of discovery on Plaintiff's original claims; (2) a proposed schedule for completing discovery on the remaining counterclaims/third-party claims; (3) the status of settlement discussions, if any; and (4) any other issue the parties wish to address at the October 27 conference.

SO ORDERED.

Dated: September 30, 2017
      New York, New York

Vernon S. Broderick
United States District Judge