UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN LECITHIN COMPANY, LIPOID GmbH, LIPOID, LLC, and PHOSPHOLIPID GmbH,<br><br>        Plaintiffs,<br><br>-v-<br><br>CARSTEN MATTHIAS REBMANN,<br><br>        Defendant and<br>        Third-Party Plaintiff,<br><br>-v-<br><br>HERBERT REBMANN, LIPOID STIFTUNG, LIPOID BETEILIGUNGS GmbH, LIPOID VERWALTUNGS AG, LIPOID GRUNDSTUECKS GmbH, and PHOSPHOLIPID FORSCHUNGSZENTRUM e.V.,<br><br>        Third-Party Defendants. | **Case No. 12-cv-00929-VSB**<br><br>**Document Electronically Filed**<br><br>**DEFENDANT'S LOCAL RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Defendant Carsten Matthias Rebmann ("Matthias") contends that the following are the material facts in this action as to which there is no genuine issue to be tried, as established by the pleadings, the discovery record in this action, and the accompanying affirmation and exhibits thereto.

   1.  Matthias, while he was head of Lipoid LLC and ALC, set up hosting and email services for them, using domain names americanlecithin.com and lipoidllc.com; at the request of, and with full knowledge and participation, of employees of the Lipoid Group [Ex. 5 at 31, 37-38; Ex. 3 at 52-55, 92; Ex. 6; Ex. 7].

   2.  He did this to resolve major difficulties Lipoid LLC and ALC were having with their email and internet services [Ex. 5 at 31, 37-38; Ex. 3 at 52-55, 92; Ex. 6; Ex. 7].

3. Matthias had obtained the additional domain names alcolec.com; cerasome.com; nanosolve.com; phosal.com; phospholipon.com; and phytosolve.com at his own initiative to protect the Lipoid Group in case they might want to use them in the future [Ex. 3 at 70].

3. Matthias had used his personal account to set up these services and these domain names were registered in his account, but, in all respects, they were used, if at all, only for Lipoid Group purposes. [Ex. 12 at 41-42, 100; Ex. 5 at 84].

4. Matthias had been billed for and was personally paying all of the costs associated with these services [Ex. 3 at 59-60, 72].

5. All of this was done with the full knowledge of Lipoid Group personnel, including Herbert Rebmann, Matthias father and head of the Lipoid Group of companies based in Germany and Switzerland [Ex. 2 at 313-316, Exs. 6 and 7].

6. The domain names "Alcolec," "Phospholipon," "Phosal," "Cerasome," "Nanosolve," and "Phytosolve," had never been used [Ex. 3 at 70].

7. When Matthias was fired by his father as head of Lipoid LLC and ALC, he indicated a willingness to transfer of the domain names and asked that he reimbursed for the expenses he had incurred in establishing and maintaining services on them [Ex. 8].

8. Herbert ignored Matthias' offer and instead caused Lipoid and ALC personnel to set up new email accounts for all of Lipoid LLC and ALC employees and a new domain name for ALC [Ex. 11; Ex. 12; Ex 5 at 81, 132].

9. When Randall Zigmont, who replaced Matthias as President of ALC, registered the americanlecithin.us domain name, he personally was listed as the registrant (just as Matthias had been when he set up his domain names) [Ex. 11].

2

10. Herbert commenced this action alleging that Matthias had acquired the domain names to personally profit from them, and that Matthias was "cybersquatting," acting with a "bad faith intent to profit" under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and was causing Plaintiffs "irreparable harm." [Ex. 1].

11. In the Amended Complaint, Plaintiffs' did not allege that any of the trademarks they were seeking to protect in this lawsuit – "Lipoid," "American Lecithin," "Alcolec," "Phospholipon," "Phosal," "Cerasome," "Nanosolve," and "Phytosolve," - were "distinctive" or "famous." [Ex. 1, ¶ 9].

12. In the Amended Complaint, Plaintiffs did not allege a single fact to support their contention that Matthias had a "bad faith intent to profit" from the domain names [*See* Ex. 1, ¶ 22].

13. In the Amended Complaint, Plaintiffs speculate that he must have had a "bad faith intent to profit" because he did not turn over the domain names [*See* Ex. 1, ¶ 23].

14. Plaintiffs knew that the allegation that Matthias didn't turn over the domain names meant he had a bad faith intent to profit was not true [Ex. 6, Ex. 7].

15. Matthias had been willing to turn them over, but wanted reimbursement the expenses he had incurred in obtaining and maintaining them. [Ex. 8, Ex 3 at 111-112].

16. Plaintiffs also knew that Matthias had not acquired them for any purpose other than to protect their interests [see Pars. 3, 5 and 14 above].

17. During their depositions, Plaintiffs' witnesses, Herbert [Ex. 3 at 313-316], Bruce Baretz [Ex. 5 at 49-50, 86] and Randall Zigmont [Ex. 12 at 41-42, 100]. identified no facts supporting Plaintiffs' allegation that Matthias had a "bad faith intent to profit."

18. During his deposition, Herbert testified that he did not know if Matthias was acting

3

in bad faith [Ex 2 at 313-314]. He said he didn't know whether Matthias had ever used the domain names for anything other than the companies' benefit or for his own benefit. [*Id.* at 315].

19. Baretz, who replaced Matthias as President of Lipoid LLC, admitted that he was unaware of any facts that could be construed as Matthias acting in bad faith or with a bad faith intent to profit or wrongfully in registering the domain names [Ex. 5 at 48-50; 86]. He testified that he was not aware that Matthias used the lipoidllc.com account for anything other than Lipoid LLC business [Ex. 5 at 84]. He said that he was not even told about the lawsuit when it was filed and only found out about it later [Ex. 5 at 44]. He was not President of the Company for purposes of the lawsuit; Herbert was [Ex. 5 at 41].

20. Baretz acknowledged that Plaintiff's assertion that Matthias diverted traffic from Plaintiffs' websites, "thereby disrupting the accurate valuation of their websites [Ex. 1, ¶ 25], was, at least insofar as Lipoid LLC was concerned, untrue because Lipoid LLC had no traffic data [Ex. 5 at 90-91].

21. Zigmont, who replaced Matthias as President of ALC, testified that he was unaware of any use by Matthias of the domain name americanlecithin.com for his personal use or benefit [Ex. 12 at 41-42]. He testified that ALC had registered, but never used the domain names "Alcolec," "Phospholipon," "Phosal," "Cerasome," "Nanosolve," "Phytosolve," and "Cochleates." [Ex. 12 at 242-44], and that he was not aware of any use by Matthias of these domain names [Ex. 12 at 100].

22. He stated that he wasn't sure that he had seen the amended complaint in this action prior to his deposition in 2016, and that he had not authorized the complaint to be filed on behalf of ALC [Ex. 12 at 11-12].

4

23. Matthias had testified that domain name for "Nanosolve" had been filed by him even before the trademark. He purchased the domain name because he thought it might be of future use to the Group. It was never used. [Ex. 3 at 70].

24. Even when Matthias offered to transfer the email addresses without reimbursement, this was not good enough for Herbert to call off this litigation. He now demanded that Matthias pay his legal fees for bringing this baseless litigation [Ex. 18].

25. Lipoid LLC's operating agreement contained a provision that eliminated fiduciary duties for the LLC's Manager [Ex. 20; ¶ 4.11].

26. Matthias was listed in the agreement as Assistant Manager [Ex. 20; ¶ 1.11], and Herbert had delegated the Manager function to Matthias [Ex. 3 at 22-24], especially when it came to IT issues [Ex. 5 at 31-33].

27. Matthias was also listed as Manager in the Certificate of Authority of Lipoid LLC [Ex. 21].

28. Plaintiffs have suffered no damages (or at least, none that were not self-inflicted) as a result of what they allege Matthias did [Ex. 12 at 81-82, Ex. 2 at 321, Ex. 5 at 114].

29. At the instruction of his father, Matthias paid the company for the laptop he was using and the data that was on it, including the "CRM software" [Ex. 3 at 143].

30. Matthias purchased the laptop and the data on it to comply with his father's directive that company computers not be used for personal business. Since Matthias could not travel with two computers – one personal and the other professional – he paid the company for the computer he was using, including whatever was on it. His father was aware of this [Ex. 3 79-81].

31. He placed a copy of the check used for the payment in the file [Ex. 22].

5

32. Plaintiffs filed their amended complaint on April 10, 2012, seeking to compel Matthias to turn over or destroy the computer and CRM software and alleging "irreparable injury" as a result of Matthias' retention of them [Ex. 1 at ¶¶ 28, 34].

33. The laptop and "CRM software," belonged to Matthias [Ex. 3 at 79-81, 143; Ex. 22].

34. The so-called "CRM software" on Matthias' laptop was nothing more than a contact manager and contained no trade secrets or proprietary information [Ex. 3 at 81-83, 125-126 and 128].

35. The CRM software did not contain any specific customer information, but was just an address book containing information that was not proprietary to Lipoid LLC or ALC. It did not contain a customer list, but a contact list [Ex. 3 at 81-83, 125 and 128]. It was part of the Microsoft Outlook program on Matthias' computer [Ex. 3 at 126].

36. The Amended Complaint does not allege that the CRM program contained trade secrets [Ex. 1].

37. Matthias did not deprive the Lipoid Group of use of the software and data since all of it remained on the company server [Ex. 5 at 103-104].

38. To end the litigation, Matthias offered to "return" the laptop and "CRM software," even though they belonged to him [Ex. 19].

39. Herbert, rejected taking them in favor of continuing the lawsuit. [Ex. 1]

40. Plaintiffs sought to compel Matthias into turning over the domain names, notebook and software without paying the costs directly incurred by Matthias in maintaining the trade names for Plaintiffs' benefit or reimbursing Matthias for his duly incurred business expenses [Ex. 1, Ex. 8].

41. Plaintiffs misrepresented to the Court that Matthias was refusing to turn over the

6

domain names and that they were suffering "irreparable harm." [see Pars. 15, 24 and 38 above].

42. Within days after Matthias was fired, and months before they had brought this litigation, Herbert and Plaintiffs had established successful workarounds for whatever possible damages they could possibly suffer as a result of Matthias' retention of the domain names. [Ex 12 at 59, Ex. 5 at 132]

43. Notwithstanding their claims of "irreparable harm," Plaintiffs did not move for a preliminary injunction [Dkt. 1, Ex. 1].

44. Plaintiffs did not pursue the relief they were requesting from the alleged "irreparable harm" they were suffering for the next seven years [Ex. 1].

Date: March 11, 2019

Respectfully Submitted,

Samuel Goldman

To: Gregory F. Hauser
Sherica R. Bryan
Wuersch & Gering LLP
100 Wall Street, 10th Floor
New York, New York 10005
Tel: (212) 509-5050
Fax: (212) 509-9559
*Attorneys for Plaintiffs*

7

## CERTIFICATE OF SERVICE

I, Samuel Goldman, am an attorney at Samuel Goldman & Associates and am counsel for the Defendant and Third-Party Plaintiff, in the above-captioned proceeding. I hereby certify that on March 11, 2019, I caused the foregoing Local Rule 56.1 Statement in Support of Partial Summary Judgment to be served electronically via the United States District Court, Southern District of New York Court's ECF system upon those parties entitled to receive electronic notice.

Samuel Goldman