UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN LECITHIN COMPANY, LIPOID GmbH, LIPOID, LLC, and PHOSPHOLIPID GmbH, | Case No. 12-cv-00929-VSB |
| Plaintiffs, | **Document Electronically Filed** |
| -v- | |
| CARSTEN MATTHIAS REBMANN, | |
| Defendant and Third-Party Plaintiff, | |
| -v- | |
| HERBERT REBMANN, LIPOID STIFTUNG, LIPOID BETEILIGUNGS GmbH, LIPOID VERWALTUNGS AG, LIPOID GRUNDSTUECKS GmbH, and PHOSPHOLIPID FORSCHUNGSZENTRUM e.V., | |
| Third-Party Defendants. | |

**DEFENDANT AND THIRD-PARTY PLAINTIFF CARSTEN MATTHIAS REBMANN'S
MOTION FOR SUMMARY JUDGMENT DISMISSING
PLAINTIFFS' AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

Table of Authorities.................................................................................................... ii-iii

Introduction.................................................................................................................. 1-3

Background Facts......................................................................................................... 3-8

LEGAL STANDARD.................................................................................................. 9

ARGUMENT................................................................................................................ 9

    A. Summary Judgment Dismissing Plaintiffs' Cybersquatting

       Claim Should be Granted....................................................................... 9-13

    B. Summary Judgment Dismissing Plaintiffs' Breach of Fiduciary Duties

       Claims relating to the Domain Names Claims Should be Granted............... 13-14

    C. Summary Judgment Dismissing Plaintiffs' Conversion of Domain

       Names Claims Should be Granted................................................................. 15-16

    D. Summary Judgment Dismissing Plaintiffs' Breach of Fiduciary Duties

       Claims relating to the CRM Software and Laptop Should be Granted.......... 16-17

    E. Summary Judgment Dismissing Plaintiffs' Conversion Claim relating

       to the CRM Software and Laptop Should be Granted................................... 17

    F. Plaintiffs have not met the Requirements for Specific Performance............. 17-18

    G. Unclean Hands Bars the Relief Plaintiff is Seeking....................................... 18-19

i

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ............................................................ 9

*Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) ............................... 9

*Cameco, Inc. v. Gedicke*, 299 N.J. Super. 203, 217 (Sup. Ct. App. Div. 1997). .......................... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ....................................................................... 9

*Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 46 (2006) ............................... 15

*Cuban Cigar Brands N.V v. Upmann Int'l Inc.*, 457 F. Supp. 1090 (U.S.D.C. S.D.N.Y. 1978)...18

*Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998) ........................ 18

*Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) ............... 9

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648,654-655 (U.S.D.C. N.D.

    Tex 2001) ................................................................................................................................. 10

*McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661 (S.D.N.Y. 2018)........................................10

*McDonald v Elkholy*, 2017 WL 3503385, at *4 (E.D.N.Y. July 27, 2017)................................... 18

*Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009)............................................... 17

*NextEngine Ventures, LLC v Network Solutions, LLC*, 2017 N.Y. Misc. LEXIS 3913, *12-13

    (Sup. Ct. N.Y.Cty 2017)........................................................................................................... 15

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, (1945) ............... 17

*Premio Foods, Inc. v. Purdue Farms, Inc.*, 2012 U.S. Dist. LEXIS 107421, *17-18 (U.S.D.C.

    N.J. 2012)................................................................................................................................. 15

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2016 U.S. Dist. LEXIS 24850

    (S.D.N.Y. Feb. 29, 2016, No. 08cv0442(DLC)) ..................................................................... 18

*Row, Inc. v. Highgate Hotels, L.P.*, 2018 U.S. Dist. LEXIS 123608 (S.D.N.Y. 2018)................10

*Sea Trade Mar. Corp. v. Stelios Coutsodontis*, 744 Fed. Appx. 721 (2d Cir. 2018)....................15

*Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d. 1235, 1246 (11th Cir. 2009).................. 10

*Sporn v. MCA Records*, 58 N.Y.2d 482 (1983) ............................................................................ 15

*Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000) ..................... 10

*Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)........................................... 9

*TransPerfect Global, Inc. v. Elting (In re Shawe & Elting LLC)*, 2015 Del. Ch. LEXIS 211 (Ch Aug. 13, 2015, Nos. 9661-CB, 9686-CB, 9700-CB, 10449-CB)...................................................18

*Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983)...................................... 18

*Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) .............................. 9

*Winslow, Cohu & Stetson, Inc. v. Skowronek*, 136 N.J. Super. 97, 103-104 (Law Div. 1975) .... 16

*Wornow v Register. Coco, Inc.*, 8 AD3d 59, 59-60 (1st Dept 2004) ........................................... 15

## Statutes

Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)............................................... 1

Defendant and Third-Party Plaintiff Carsten Matthias Rebmann ("Matthias") respectfully submits this memorandum of law in support of his motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing Plaintiffs' amended complaint with prejudice, and granting Matthias such other and further relief as this Court may deem just and proper. In the alternative, Matthias seeks an order from the Court in the exercise of its equitable powers, directing Plaintiffs, as a condition to the transfer of the Domain Names (hereinafter defined) (which Matthias has many times offered to do), to reimburse Matthias for the expenses he incurred in registering and maintaining these domain names for Plaintiffs' benefit.

## INTRODUCTION

Plaintiffs commenced this lawsuit in February 2012, after Matthias was fired by his father, Dr. Herbert Rebmann ("Herbert") as head of the Lipoid Group's two United States subsidiaries, Lipoid LLC and American Lecithin Company ("ALC"). The suit sought the transfer by Matthias to Plaintiffs of eight domain names – alcolec.com; americanlecithin.com; cerasome.com; lipoidllc.com; nanosolve.com; phosal.com; phospholipon.com; and phytosolve.com (hereinafter the "Domain Names") – damages and punitive damages. The complaint asserted three causes of action – violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), breach of fiduciary duties and conversion. In March 2012, Plaintiffs filed an amended complaint adding causes of action for breach of fiduciary duties and conversion seeking the return or destruction of certain "CRM Software" and a laptop computer Matthias had been using for company business, as well as any damages and punitive damages [*see* Ex. 1] [All Exhibits referred to herein are annexed to the accompanying Affirmation of Samuel Goldman].

What the complaint, as amended, neglected to mention is that (a) Matthias had set up hosting and email services for Lipoid LLC and ALC at the request of, and with full knowledge

and participation, of employees of the Lipoid Group,  to resolve major difficulties they were having with their email and internet services, (b) he had obtained the other domain names at his own initiative to protect the Lipoid Group in case they might want to use them in the future, (c)  Matthias had used his personal account to set up these services and the domain names were registered in his account, but, in all respects, they were used, if at all, only for Lipoid Group purposes, (d) Matthias had been billed for and was personally paying all of the costs associated with these services, (e) all of this was done with the full knowledge of Herbert and others in the Lipoid Group, (f) when Matthias was fired, he was the one who raised the need to transfer of the domain names, as well as the need for him to be reimbursed for the expenses he had incurred for the Group's benefit, (g) Herbert ignored Matthias' offer and instead set up new email accounts for Lipoid LLC and ALC and a new domain name for ALC, so that the companies could function without needing anything from Matthias, and  (h) Herbert refused to reimburse Matthias and started this litigation, claiming "irreparable harm" and seeking to compel Matthias to transfer of the domain names without reimbursing his expenses in creating and maintaining them. Matthias at all times was willing to turn over the domain names, but initially sought reimbursement. To avoid protracted litigation with his father, he offered to turn them over without reimbursement, but even then, Herbert refused and opted instead to continue this litigation.

As for the laptop and "CRM software," the Complaint neglected to mention that (a) they belonged to Matthias, who had purchased them from Lipoid LLC at his father's instruction, (b) the so-called "CRM software" on Matthias' laptop was nothing more than a contact manager and contained no trade secrets or proprietary information.  To avoid ongoing litigation with his father, which he could not afford, Matthias offered to "return" them even though they belonged to him. Herbert, rejected taking them in favor of continuing the lawsuit.

Finally, after all of his efforts to avoid litigation and reach a settlement with his father failed, Matthias brought counterclaims and third-party claims against Herbert and various Lipoid Group companies in an effort to foster an omnibus settlement of all claims between him and his father.

Matthias now moves for summary judgment dismissing all of Herbert's meritless and exceedingly frivolous claims against him. In the alternative, Matthias would ask for an order directing Plaintiffs to accept the turnover of the Domain Names and to reimburse Matthias for his expenses in maintaining them.

As demonstrated below, each of Plaintiffs' claims are fatally flawed, there is no genuine dispute as to any material fact and Matthias is entitled to judgment as a matter of law.  Further, Plaintiffs' claims should be dismissed under the doctrines of unclean hands and laches.

## BACKGROUND FACTS

In 1978, Dr. Herbert Rebmann, a German scientist, founded what would become the world-wide Lipoid Group of Companies to engage in the manufacture, sale and distribution of lecithin and phospholipid products. The Lipoid Group was run as a family business and Herbert's son, Matthias began working for the Lipoid Group at a very young age and was encouraged to take a proprietary interest in the business. In fact, for a while, Matthias had been a 10% equity owner in the Group (in or about 1996, Herbert took his 10% interest away because he thought Matthias had expressed socialist tendencies in college [Ex. 2 at 79-83, 159-160]).

In or about, 2004, Matthias moved to the United States and helped organize the Group's first U.S. subsidiary, Lipoid LLC [Ex. 3 at 19]. In late 2005, Herbert placed him in charge of Lipoid LLC and the Group's U.S. operations [Ex. 3 at 22-23]. In 2007, Matthias engineered the acquisition of ALC, and was made head of that company as well [Ex. 3 at 23-24].  During his tenure from

3

2005 through 2011, Matthias took Lipoid LLC's sales from $800,000 to around $20 million and the companies were tremendously profitable [Ex. 3 at 75].

In addition to his role as head of Lipoid LLC and ALC, Matthias assisted the Group and its constituent companies in connection with Group-wide needs, such as patent and trademark filings in the United States, arranging for internet hosting services and obtaining domain names [*see* Ex. 5 at 31]. In or about 2007, Lipoid LLC and ALC employees were complaining that company emails were being diverted to accounts outside the company [see Ex. 4], that they couldn't access emails while traveling [Ex. 5 at 37-38], and that they were getting hundreds of spam emails a day, interfering significantly with their ability to work productively [Ex. 3 at 52-54]. In order to address these complaints, Matthias switched their email services and web hosting to a company he had been using for his personal email services. This was done with the full knowledge and consent of others in the Lipoid Group. Illustrating this, when he switched the hosting of Lipoid LLC to his own account, Andreas Kolodziej, who was in charge of internet services for the Lipoid Group, specifically had to sign off on this and the transfer could not have occurred without it [*see* Ex. 6].   When the hosting for nanosolve.com was moved to Matthias' account in May 2011, Kolodziej was also fully involved in the transfer [*see* Ex. 7].   When Matthias switched the email services and web hosting for americanlecithin.com and alcolec.com, he did so with the full knowledge and participation of ALC's operations manager and its information technology consultant [*see* Ex. 3 53-55, 92]. He paid the fees associated with this move from his own funds [Ex. 3 at 59-60] and Herbert was aware of Matthias' role in these matters [*see* Ex. 2 at 313].

Once the hosting was switched to his account, he paid the expenses incurred in connection with it [Ex. 3 at 72]. As Matthias later discovered, when hosting services are set up, the domain

4

names are registered by the hosting company either in its own name or in the name of its client. In this case, the hosting company registered the domain names in Matthias' name, rather than its own. Matthias was not even aware of this at the time, and substantively, it made no difference [Ex. 3 at 52-54 and 61-63]. Matthias was encouraged by his father to act as an "owner" of the company, and he often incurred expenses personally that were for the benefit of the company. As an owner (and consistent with Herbert's practice), he did not differentiate whether things were in his name or the company's name [Ex. 3 at 58-60]. There was never any doubt that he was acting for the benefit of the company and not for his personal benefit [Ex. 3 at 64-65].

On August 11, 2011, Herbert terminated Matthias' employment at Lipoid LLC and with the Lipoid Group [Ex. 3 at 98]. Matthias, despite his belief that the termination was unlawful, set out to make sure that the transition was smooth and that all property in his possession that belonged to the company was turned over to it [Ex. 8]. Matthias sought a proper severance agreement, but Herbert made it clear that he wouldn't pay Matthias anything and instead wanted Matthias to pay him money [Id]. Herbert had consistently used the fact that he had more money than Matthias to harass Matthias in the legal system [Ex. 3 at 110].

As events unfolded, Matthias at all times acted in good faith and Herbert did not. On August 17, 2011, Matthias sent Herbert a list of open items that needed to be addressed in connection with the transition. This included transfer of internet domain names and reimbursement of his expenses for maintaining them, transfer of the companies' cell phone service which had also been in Matthias' account, and reimbursement of Matthias' prepaid travel expenses [Id.].

Herbert ignored Matthias' offer of an orderly transition, and instead decided to eliminate the need for one, while at the same time pursuing vindictive steps towards Matthias. Herbert cut off Matthias' cell phone service on his personal number, without telling him.  He somehow

5

accomplished this even though he was not authorized to make changes on Matthias' account [Ex. 3 at 118]. Matthias reconnected his number, and went to the Sprint store to arrange for the transfer of the others. All Herbert needed to do was send a Lipoid LLC employee to Sprint to accept the transfer [Ex. 119]. Instead, he set up a new cell phone account and obtained new cell phone numbers for the companies' employees [Ex. 5 at 132].

On August 25, 2011, Herbert sent Matthias a formal letter confirming his termination, and his refusal to reimburse him for his past business expenses [Ex. 10].

On the same day, Herbert caused Randall Zigmont, who was a consultant to ALC and was named President by Herbert after Matthias was fired, to register the domain name americanlecithin.us. Notably, Zigmont, and not ALC, was listed as the registrant [Ex. 11]. Zigmont's new email address, Randy.Zigmont@americanlecithin.us, had also been established [*Id.* at 2], and the other ALC employees were also given .us email addresses. At his deposition on March 30, 2016, Zigmont said that ALC was getting complaints that emails from customers were not being answered, but this appears to have been self-inflicted. Zigmont never asked ALC employees to check their .com emails [Ex. 12 at 57-58], which Matthias had left in place. Zigmont also testified that he set up a new .us website for ALC without checking if he could upload information to the .com website [Ex. 12 at 59].

Herbert also caused the email accounts for Lipoid LLC to be switched from the lipoidllc.com domain name to the lipoid.com domain name [Ex. 5 at 132], which was being used by the Lipoid Group's European members [Ex. 5 at 81]. On August 26, 2011, Lipoid LLC informed its customers and suppliers to use the new email addresses, and to not write to Matthias, who was no longer with the firm [Ex. 13].

6

As for the americanlecithin.com website, Matthias testified at his July 19, 2012 deposition that he did not change a thing and it continued to direct all viewers to ALC. Lipoid LLC never had its own website, but simply redirected from lipoidllc.com to lipoid.com's website – the main one for the Group. Matthias did not change this either [Ex. 3 at 129-133].  As for alcolec.com; cerasome.com; nanosolve.com; phosal.com; phospholipon.com; and phytosolve.com, these domain names had never even been used [Ex. 12 at 43-44].

On September 1, 2011, Matthias informed Herbert and Bruce Baretz of Lipoid LLC that he, on his own initiative, had gone to Sprint and arranged to transfer the cell phone service to the company, other than his own number which he had predating the company. He stated that Sprint was waiting for a representative of Lipoid LLC to authorize the transfer [see Ex. 9].  No one responded to him.

Meanwhile, Matthias was forwarding all emails he received to the appropriate persons at Lipoid LLC and ALC [Ex. 3 at 131; Ex. 5 at 81]]. Sometimes he just replied and told the sender who at the company he needed to contact [Ex. 3 at 132].  At some point later on, Matthias stopped forwarding emails on the advice of his counsel [*Id.* at 132-33].

On November 7, 2011, Wuersch & Gering LLP, Herbert's lawyers in the United States, demanded among other things, the transfer of the domain names and "[c]ompany and customer data in electronic form which are or were stored . . . on your personal laptop computer."  They threatened litigation if Matthias used the domain names or any of the materials demanded in connection with the new company he had formed called Perimondo [Ex. 14]. On December 16, 2011, they sent another letter to Matthias reiterating their demands and threatening litigation again [Ex. 15].

7

On February 6, 2012, Herbert caused Lipoid LLC, ALC, and two European members of the Lipoid Group to commence this lawsuit alleging claims under the Anti-Cybersquatting Act, and for conversion and breach of fiduciary duties relating to the domain names [Dkt. 1]. Plaintiffs alleged irreparable harm. Herbert appointed himself President of Lipoid LLC, only for purposes of the lawsuit with Matthias, and Baretz for all other purposes [Ex. 5 at 41].

On March 21, 2012, Matthias, through his lawyers, made a formal settlement offer, which included an immediate transfer the domain names and an omnibus financial settlement of Matthias' severance claims [Ex. 16].[1]  Herbert did not bother to respond.

Instead, he amended the complaint on April 12, 2012, to assert two additional claims seeking the return or destruction of a computer and CRM software. The amended complaint contained no allegation that the CRM software contained trade secrets [Ex. 1].

On June 15, 2012, Matthias, through his lawyers, made another settlement proposal, offering to transfer the Domain Names in return for reimbursement of $10,453 in itemized expenses incurred in establishing and maintaining them [Ex. 17].

On June 18, 2012, Herbert rejected the offer, stating "The idea that the companies should pay your client for maintaining domains that he had improperly made his personal property is beyond the pale." Herbert offered no reimbursement and demanded that Matthias pay Plaintiffs' legal fees and expenses [Ex. 18].

On July 19, 2012, Matthias, through his attorneys, made a Rule 68 Offer of Judgment offering to turn over the domain names, laptop and CRM software to the Plaintiffs, without asking for any reimbursement.  Herbert did not respond to this offer, as well [Ex. 19].

---

[1] The settlement offers are being used not with regards to the issues of liability or damages, but to refute any suggestion that Matthias wanted to hold on to the Domain Names or use them for his benefit.

## LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006). For a fact to be material, it must have the ability to affect the outcome of the case under governing law. *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006).

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). The Court's function is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a party moving for summary judgment has made a properly-supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must come forward with evidence that would be sufficient to support a verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). Here, Defendant unquestionably establishes prima facie entitlement to judgment as a matter of law in its moving papers. Summary judgment is therefore warranted.

## ARGUMENT

### A. Summary Judgment Dismissing Plaintiffs' Cybersquatting Claim Should be Granted

The ACPA was enacted to protect consumers and holders of distinctive trademarks from "cybersquatting," which has been explained as "the registration as domain names of well-known

trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000). To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark. *Id.*

Although "bad faith" is an element considered in other causes of action, it has a highly specific meaning in the context of the ACPA. "The Second Circuit has 'expressly note[d] that bad faith intent to profit' are terms of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts." *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 672 (S.D.N.Y. 2018) (citing *Sporty's Farm*). "Proving 'bad faith' is not enough. A defendant is liable only where a plaintiff can establish that the defendant had a 'bad faith intent to profit.'" *Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d. 1235, 1246 (11th Cir. 2009). Where there is a lack of evidence that the defendant had a bad faith intent to profit from the plaintiff's specific trademarks, summary judgment should be granted. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648,654-655 (U.S.D.C. N.D. Tex 2001). *See also Row, Inc. v. Highgate Hotels, L.P.*, 2018 U.S. Dist. LEXIS 123608 (S.D.N.Y. 2018).

In our case, Plaintiffs allege not a single fact to support the contention that Matthias had a "bad faith intent to profit." Instead of alleging facts, they speculate that he must have had a "bad faith intent to profit" because he did not turn over the domain names [*See* Ex. 1, ¶¶ 22, 23]. But Plaintiffs and Herbert knew that this allegation was not true. They knew that Matthias had, at every opportunity, stated his willingness to transfer them. All he was asking for was reimbursement of his expenses [Ex. 3 at 111-112], which he was justly entitled to. Plaintiffs also knew the

circumstances under which the domain names wound up in Matthias' account and they knew he did not acquire them for any purpose other than to protect their interests. They knew he had no intention to "cybersquat" and that he had never acted with "bad faith," let alone a "bad faith intent to profit."

During their depositions, none of the Plaintiffs' representatives could articulate any basis for the assertion that Matthias had acted with a "bad faith intent to profit" or any other kind of "bad faith" [Ex. 5 at 49-50 and 86; Ex. 12 at 41-42 and 100]. Herbert testified that he personally knew nothing about the domain name issues [Ex 2 at 312]. When asked about the complaint allegations that Matthias had acted in bad faith, he stated "at the beginning of his work, I was really very confident that he -- he works correctly, and there was no control. In the meantime, when I see what he did, I'm not as sure anymore." [*Id* at 313]. Not being sure anymore is an insufficient factual basis to allege a "bad faith intent to profit." When asked further about what made him think Matthias was acting in bad faith, he said he didn't know. [*Id*.]. He said he didn't know whether he had ever used the domain names for anything other than the companies' benefit or for his own benefit. [*Id.* at 315]. Thus, the allegation in the complaint that Matthias had a "bad faith intent to profit" is without any factual basis.

Baretz, who became the President of Lipoid LLC, said during his deposition on April 5, 2016, that he was not even told about the lawsuit when it was filed and only found out about it later [Ex. 5 at 44]. He was not President of the Company for purposes of the lawsuit; Herbert was [Ex. 5 at 41]. When Baretz was asked about the domain names, he said that he had no direct or indirect knowledge of this issue. Further, he admitted that he was unaware of any facts that could be construed as Matthias acting in bad faith or with a bad faith intent to profit or wrongfully in registering the domain names [Ex. 5 at 48-50; 86]. He testified that he was not aware that Matthias

11

used the lipoidllc.com account for anything other than Lipoid LLC business [Ex. 5 at 84]. He acknowledged that Plaintiffs' assertion that Matthias diverted traffic from Plaintiffs' websites, "thereby disrupting the accurate valuation of their websites" [Ex. 1, ¶ 25], was, at least insofar as Lipoid LLC was concerned, untrue because Lipoid LLC had no traffic data [Ex. 5 at 90-91].

Zigmont, the President of ALC, testified that he wasn't sure that he had seen the amended complaint in this action prior to his deposition in 2016, and that he had not authorized the complaint to be filed on behalf of ALC [Ex. 12 at 11-12].   He was unaware of any use by Matthias of the domain name americanlecithin.com for his personal use or benefit. [Ex. 12 at 41-42]. He testified that ALC had registered, but never used the domain names "Alcolec," "Phospholipon," "Phosal," "Cerasome," "Nanosolve," "Phytosolve," and "Cochleates." [Ex. 12 at 242-44]. He testified that he was not aware of any use by Matthias of these domain names [Ex. 12 at 100].[2]

Thus, all of them admitted that Plaintiffs filed their complaint without any factual basis for asserting that Matthias had a "bad faith intent to profit." Given this fact, it can only be concluded that the complaint was filed for any improper purpose - to punish Matthias.   Herbert's and Plaintiffs' improper motives are shown by the fact that Baretz and Zigmont were not involved in the lawsuit at all, even though it was being alleged that their companies were suffering "irreparable harm." It is shown by the fact that they had no concern when Zigmont did the same thing that they had accused Matthias of. When Zigmont registered the americanlecithin.us domain name, Zigmont personally was listed as the registrant [Ex. 11].   Herbert and Plaintiffs apparently had no problem with this even though they had sued Matthias for the same thing.

---

[2] There can be no claim ACPA claim with regard to "Nanosolve" for another reason.  The domain names was filed by Matthias even before the trademark. He purchased the domain name because he thought it might be of future use to the Group. It was never used. [Ex. 3 at 70].

Herbert's and Plaintiffs' improper motives are also demonstrated by the fact that the Business President of Lipoid LLC, Baretz, was not even told about the litigation, by the Litigation President, Herbert [Ex. 5 at 44]. It is inconceivable that if the business of Lipoid LLC was being harmed by Matthias' acts, the Business President would not know about this or be involved in the litigation brought to address this alleged harm. Clearly, the Litigation President allegation of "irreparable harm" was disingenuous.

It is also telling that Herbert could have obtained the Lipoid cell phone numbers and accounts without paying Matthias anything, but he opted to cause the company potential harm by disrupting its cell phone service and making its employees, customers and vendors deal with a whole new set of phone numbers. It is impossible to know what business was lost as a result of the switch. Similarly, Herbert could have permitted Lipoid LLC's and ALC's employees, customers and vendors to use their existing email addresses. They continued to work. Instead, he elected to change all of the Lipoid LLC and ALC email addresses and the ALC domain name. It could not have been in the companies' best interests to disrupt their email service and create a new website for ALC. But Herbert's desire to cause Matthias harm obviously took precedence over the companies' best interests. Even when Matthias offered to transfer the email addresses without reimbursement, this was not good enough for Herbert to call off this litigation. He now demanded that Matthias pay his legal fees for bringing this baseless litigation [Ex. 18].

Plaintiffs' ACPA claim must fail for another reason. They did not even bother to allege that the trademarks they were seeking to protect were "distinctive" or "famous." This is a precondition to a claim under the ACPA and its omission is a fatal defect. Further, it is unclear that any of the marks could meet the ACPA's requirement that they be distinctive or famous. Most had not even been used [Ex. 12 at 43-44].

**B. Summary Judgment Dismissing Plaintiffs' Breach of Fiduciary Duties Claims relating to the Domain Names Claims Should be Granted**

Plaintiffs' breach of fiduciary duties claims regarding the domain names must fail for several reasons. First, Lipoid LLC's operating agreement contained a provision that eliminated fiduciary duties for the LLC's Manager [Ex. 20; ¶ 4.11]. Matthias was listed in the agreement as Assistant Manager, and Herbert had delegated the Manager function to Matthias [Ex. 3 at 22-24], especially when it came to IT issues [Ex. 5 at 31-33]. Matthias was also listed as Manager in the Certificate of Authority of Lipoid LLC [Ex. 21].

Second, even without this provision, Matthias would still not have violated his fiduciary duties. There is no evidence that he did not act in the companies' best interests, or that he put his personal interests ahead of the company's. When his employment was terminated, he was the one who raised the need to transfer the domain names and hosting. It was Herbert's refusal to reimburse him for his personal expenses incurred for the benefit of the companies that caused this transfer not to occur.

Third, Matthias did not violate his fiduciary duties by seeking repayment of his expenses before turning over the domain names. A company cannot demand that an employee turnover an item without paying the employee's costs associated with obtaining and maintaining it. This, as shown below, is also barred by the doctrine of unclean hands.

Fourth, damages are an essential element of a breach of fiduciary duties claim. "[T]he claim is not enforceable until damages are sustained. Accordingly, to succeed on his breach of fiduciary duty claim, a plaintiff has to prove damages regardless of the relief ultimately sought." (*Sea Trade Mar. Corp. v. Stelios Coutsodontis*, 744 Fed. Appx. 721, 723 (2d Cir. 2018). In our case, Plaintiffs have suffered no damages (or at least, none that were not self-inflicted).

14

Finally, Matthias' fiduciary duties to Plaintiffs ended when he was terminated. Herbert could not expect him to perpetually continue to forward emails and maintain the Lipoid LLC and ALC websites. He could not expect him to perpetually continue to pay the expenses of maintaining the domain names.

### C. Summary Judgment Dismissing Plaintiffs' Conversion of Domain Names Claims Should be Granted

Plaintiffs' conversion claim also fails as a matter of law. A domain name cannot be the subject of a conversion claim since it is not personal property. It is the product of a contract for services between the registrar of the name and the registrant. *NextEngine Ventures, LLC v Network Solutions, LLC*, 2017 N.Y. Misc. LEXIS 3913, *12-13 (Sup. Ct. N.Y. Cty 2017) *citing Wornow v Register. Coco, Inc.*, 8 AD3d 59, 59-60 (1st Dept 2004). This conclusion is consistent with the general rule that a cause of action for conversion of intangible property does not lie under New York or New Jersey law. *Sporn v. MCA Records*, 58 N.Y.2d 482 (1983). The same rule applies under New Jersey law. *Premio Foods, Inc. v. Purdue Farms, Inc.*, 2012 U.S. Dist. LEXIS 107421, *17-18 (U.S.D.C. N.J. 2012).

Even if, hypothetically, a conversion claim would lie for a domain name, Plaintiffs' claim would still fail because the elements of a conversion claim have not been met. A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession. Two key elements of conversion are (1) the plaintiff's possessory right or interest in the property and (2) the defendant's dominion over the property or interference with it, in derogation of the plaintiff's rights. *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 46 (2006).

In our case, Matthias did not intentionally and without authority, assume or exercise control over the domain names and interfere with the Lipoid Group's right of possession. In fact, he

15

obtained the domain names for the benefit of Lipoid Group and he faithfully used them for its benefit. When he was terminated, he offered immediately to turn them over, subject to the Lipoid Group reimbursing him for the expenses he had incurred in registering and maintaining the domains. The Lipoid Group did not have a "possessory right" in the domain names without paying for them, and they could not demand their turnover without simultaneously reimbursing Matthias for these expenses. *See Winslow, Cohu & Stetson, Inc. v. Skowronek*, 136 N.J. Super. 97, 103-104 (Law Div. 1975) (a securities firm brought a conversion claim against a customer to whom it had erroneously delivered a certificate of preferred stock, rather than common; the firm sought the net of the value of the preferred over the value of the common. The court ruled that a conversion claim did not lie because the customer did not have knowledge of the error, but it granted the relief requested under the doctrine of unjust enrichment – the net difference between the value of the preferred and the common. The Court stated that "the concepts of undue enrichment and restitution are applicable to the factual situation presented by this case. It is a general rule that a payment of money under a mistake of fact may be recovered, provided that such recovery will not prejudice the payee. This rule is grounded upon considerations of equity and fair dealing." *Id.*).

In our case, Lipoid Group demanded the return of the domain names, but refused to pay the expenses associated with them. They cannot claim that they had a right to these domain names without paying these expenses. In essence, the domain names were a contract right for services and one cannot claim a "possessory right" to the services without paying for them (or reimbursing one who did).

### D. Summary Judgment Dismissing Plaintiffs' Breach of Fiduciary Duties Claims relating to the CRM Software and Laptop Should be Granted

At the instruction of his father, Matthias paid the company for the laptop and the data that was on it, including the CRM software [Ex. 3 at 143]. He placed a copy of the check used for the

payment in the file [Ex. 22]. He purchased the laptop and the data on it to comply with his father's directive that company computers not be used for personal business. Since Matthias could not travel with two computers – one personal and the other professional – he paid the company for the computer he was using, including whatever was on it. His father was aware of this [Ex. 3 79-81]. The CRM software did not contain any specific customer information, but was just an address book containing information that was not proprietary to Lipoid LLC or ALC. It did not contain a customer list, but a contact list [Ex. 3 at 81-83, 125 and 128]. It was part of the Microsoft Outlook program on Matthias' computer [Ex. 3 at 126]. Notably, the Amended Complaint does not allege that the CRM program contained trade secrets.

### E. Summary Judgment Dismissing Plaintiffs' Conversion Claim relating to the CRM Software and Laptop Should be Granted

Since Plaintiffs do not have any possessory right in the laptop and CRM software on it, Plaintiffs' conversion claim must fail. Further, the CRM software was intangible personal property and as previously demonstrated, conversion does not lie for intangible property. Finally, Matthias did not deprive the Lipoid Group of use of the software and data since all of it remained on the company server [Ex. 5 at 103-104]. *See Cameco, Inc. v. Gedicke*, 299 N.J. Super. 203, 217 (Sup. Ct. App. Div. 1997).

### F. The Doctrine of Unclean Hands Bars the Relief Plaintiff is Seeking

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). It is based "on the principle that since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff." *Id.* (citation

omitted). Misconduct that is "unrelated to the claim to which it is asserted as a defense," however, "does not constitute unclean hands." *Id.* (citations omitted). *Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC*, 149 F.3d 85, 90 (2d Cir. 1998).

Unclean hands may be asserted as an affirmative defense to equitable claims in an action under Lanham Act § 43(a). *See Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983). *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2016 U.S. Dist. LEXIS 24850, *36 (S.D.N.Y. Feb. 29, 2016, No. 08cv0442(DLC)) . It may be asserted as a defense to breach of fiduciary duties claims (*TransPerfect Global, Inc. v. Elting* (*In re Shawe & Elting LLC*), 2015 Del. Ch. LEXIS 211, at 119 (Ch Aug. 13, 2015, Nos. 9661-CB, 9686-CB, 9700-CB, 10449-CB)), and conversion claims. *McDonald v Elkholy*, 2017 WL 3503385, at *4 (E.D.N.Y. July 27, 2017).

In our case, there can be no doubt that Plaintiffs came into court with unclean hands. They sought to compel Matthias into turning over the domain names, notebook and software without paying the costs directly incurred by Matthias in maintaining them for Plaintiffs' benefit. Plaintiffs also misrepresented to the Court that Matthias was refusing to turn over the domain names and that they were suffering "irreparable harm" when in fact, Matthias had repeatedly offered to turn them over and they were suffering no harm or the harm was self-inflicted.

### G. The Doctrine of Laches Bars Plaintiffs' Claims

"Where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer or junior user, . . . a court of equity has the discretionary power, after weighing the respective interests of the parties, to deny injunctive relief or an accounting." *Cuban Cigar Brands N.V v. Upmann Int'l Inc.*, 457 F. Supp. 1090, 1096 (U.S.D.C. S.D.N.Y. 1978) (citation omitted). The same should be true for claims of wrongful appropriation of domain names.

Plaintiffs filed their complaint in February 2012, alleging "irreparable injury" as a result of Matthias' retention and use of the domain names, CRM software and laptop computer [Ex. 1 at ¶¶ 28, 34]. They did not move for a preliminary injunction, as one invariably would if they were faced with irreparable harm.  They did not pursue the relief they were requesting for the next seven years. This is fundamentally inconsistent with an allegation of irreparable harm.

Their irreparable harm assertions are belied by the fact that they felt no compulsion to remedy this harm over many years.  They preferred to have their lawsuit against Matthias pending to alleviating or preventing the irreparable harm they were claiming.  Their irreparable harm allegations (or allegations of any harm) are also belied by the fact that within days after Matthias was fired, and months before they had brought this litigation, they had established successful workarounds for whatever damages they would later claim they were suffering in the lawsuit.  It is belied by the fact that it was more important to them not to reimburse Matthias his expenses than to stop the alleged harm they were suffering.

All in all, Plaintiffs' arguments are patently disingenuous and frivolous. This lawsuit represents an improper use of the United States courts by Herbert. Appropriate sanctions are in order.

Dated: March 11, 2019
New York, New York

SAMUEL GOLDMAN & ASSOCIATES

By: _____
Samuel Goldman
200 Park Avenue, Suite 1700
New York NY, 10166
Tel. (212) 725-1400
Fax. (212) 725-0805
Email: sg@sgalaw.com

19

*Attorneys for Defendant and Third-Party
Plaintiff*

## CERTIFICATE OF SERVICE

I, Samuel Goldman, am an attorney at Samuel Goldman & Associates and am counsel for the Defendant and Third-Party Plaintiff, in the above-captioned proceeding. I hereby certify that on March 11, 2019, I caused the foregoing Memorandum Law in Support of Partial Summary Judgment to be served electronically via the United States District Court, Southern District of New York Court's ECF system upon those parties entitled to receive electronic notice.

Samuel Goldman