UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN LECITHIN COMPANY, LIPOID GmbH, LIPOID, LLC, and PHOSPHOLIPID GmbH,<br><br>      Plaintiffs,<br>v.<br><br>CARSTEN MATTHIAS REBMANN,<br><br>      Defendant and Third-Party Plaintiff,<br>v.<br><br>HERBERT REBMANN, LIPOID STIFTUNG, LIPOID BETEILIGUNGS GmbH, LIPOID VERWALTUNGS AG, LIPOID GRUNDSTUECKS GmbH, and PHOSPHOLIPID FORSCHUNGSZENTRUM e.V.,<br><br>      Third-Party Defendants. | Case No. 12-cv-00929-VSB<br><br>Document Electronically Filed<br><br>**RESPONSE OF PLAINTIFFS AND THIRD-PARTY DEFENDANT TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

      Plaintiffs and Third-Party Defendant Herbert Rebmann respond to the Local Rule 56.1 Statement of Defendant Carsten Matthias Rebmann ("Defendant") as follows (note that Exs. 2, 3, 5, and 12 are the deposition transcripts of Third-Party Defendant Dr. Herbert Rebmann, Defendant, Dr. Baretz of Plaintiff Lipoid LLC, and Mr. Zigmont of Plaintiff American Lecithin Company, respectively):

      1.      Matthias, while he was head of Lipoid LLC and ALC, set up hosting and email services for them, using domain names americanlecithin.com and lipoidllc.com; at the request of, and with full knowledge and participation, of employees of the Lipoid Group [Ex. *5* at 31, 37-38; Ex. 3 at 52-55, 92; Ex. 6; Ex. 7]. **RESPONSE:** Denied; the cited testimony of Dr. Baretz does not support the statement; while he does state that Defendant set up one of his email addresses, he also testified that he did not know for sure whether Defendant was responsible for the company's intellectual property or where the domain

names were hosted, or have any knowledge about the use or original registration of the domain names.  *See also* Ex. 5 at 48-49.  The cited testimony by Defendant also does not support the statement; he testified only that an internet consultant of American Lecithin Company was aware that the host server was changed, not that anyone else knew about anything else Defendant did with respect to email or domain hosting.  Exhibits 6 and 7 are documents unauthenticated by a witness with knowledge and therefore cannot support the statement for summary judgment purposes.  Furthermore, even if admissible:  Exhibit 6 simply says that an administrative contact for lipoidllc.com received a request for transfer of registrar, without indicating why or whether it was approved or happened; and Exhibit 7 simply says that there was a change of provider for the domain name nanosolve.com.

2.  He did this to resolve major difficulties Lipoid LLC and ALC were having with their email and internet services [Ex. 5 at 31, 37-38; Ex. 3 at 52-55, 92; Ex. 6; Ex. 7].

**RESPONSE:**  Denied; the cited testimony by Dr. Baretz does not support the statement; Dr. Baretz testified only that there were problems with VPN and spam but he does not know how they were addressed.  See also Ex. 5 at 39.  The cited testimony by Defendant does not support the statement; see response *supra* to ¶ 1.  Exhibits 6 and 7 are documents unauthenticated by a witness with knowledge and therefore cannot support the statement for summary judgment purposes. Furthermore, even if admissible:  Exhibit 6 simply says that an administrative contact for lipoidllc.com received a request for transfer of registrar, without indicating why or whether it was approved or happened; and Exhibit 7 simply says that there was a change of provider for the domain name nanosolve.com.

3.  Matthias had obtained the additional domain names alcolec.com; cerasome.com; nanosolve.com; phosal.com; phospholipon.com; and phytosolve.com at his own initiative to protect the Lipoid Group in case they might want to use them in the

future [Ex. 3 at 70]. **RESPONSE:** Denied; the cited testimony of Defendant supports the statement only as to Nanosolve.com, not as to any of the other domain names. Mr. Zigmont testified that he was the one who originally obtained the domain names alcolec.com, americanlecithin.com, phosal.com and phospholipon.com. (Goldman Ex. 12 at 32-33 & 42-43.) Defendant admitted that he transferred alcolec.com and americanlecithin.com from the company to himself. (Goldman Ex. 3 at 50-52.)

3.  Matthias had used his personal account to set up these services and these domain names were registered in his account, but, in all respects, they were used, if at all, only for Lipoid Group purposes. [Ex. 12 at 41-42, 100; Ex. 5 at 84]. **RESPONSE:** Denied; the cited testimony by Mr. Zigmont does not support the statement; he testified only that he did not know whether Defendant had ever used the domain or website americanlecithin.com for anything other than business; the cited testimony by Dr. Baretz does not support the statement; he testified only that he did not know of any use other than for Lipoid, LLC business. At his deposition, Defendant admitted that he has at least once referred to them as "my domain names", that he was aware that he was in control of the domain names and retained that control after he was terminated, and that he could transfer them to anyone he wanted. (Goldman Ex. 3 at 100-102, 103-105 & 114-115.) Dr. Baretz's view is that Defendant's intentional retention of the domain names could have only been deliberate, was a use of the companies' trademarks, and was both wrongful and improper. (Goldman Ex. 5 at 49-50, 87-88, 92-93 & 94-95.) After he was terminated, Defendant he admits that he received a demand to return the domain names to the companies that owned the trademarks incorporated in those names and that he made a decision not to do so. (Goldman Ex. 3 at 109-110 & 120.)

4. Matthias had been billed for and was personally paying all of the costs associated with these services [Ex. 3 at 59-60, 72].  **RESPONSE:**  Denied: Defendant testified only that he paid the maintenance costs, and he also testified that he could have sought reimbursement from the company, was never told not to, and is not sure whether he did.  Ex. 3 at 72-73 & 114.

5. All of this was done with the full knowledge of Lipoid Group personnel, including Herbert Rebmann, Matthias [*sic*] father and head of the Lipoid Group of companies based in Germany and Switzerland [Ex. 2 at 313-316, Exs. 6 and 7].  **RESPONSE:**  Denied; the cited testimony by Dr. Rebmann does not support the statement; Exhibits 6 and 7 are documents unauthenticated by anyone with knowledge and therefore cannot support the statement for summary judgment purposes.  Furthermore, even if admissible: Exhibit 6 simply says that an administrative contact for lipoidllc.com received a request for transfer of registrar, without indicating why or whether it was approved or happened; and Exhibit 7 simply says that there was a change of provider for the domain name nanosolve.com.  At his deposition Defendant testified that he did not know whether his father was aware of this. (Goldman Ex. 3 at 67:11-20).

6. The domain names "Alcolec," "Phospholipon," "Phosal," "Cerasome," "Nanosolve," and "Phytosolve," had never been used [Ex. 3 at 70].  **RESPONSE:**  Denied as to Cerasome, Nanosolve and Phytosolve; the cited testimony by Defendant supports the statement only as to Alcolec.com, Phospholipon.com and Phosal.com.

7. When Matthias was fired by his father as head of Lipoid LLC and ALC, he indicated a willingness to transfer of the domain names and asked that he reimbursed for the expenses he had incurred in establishing and maintaining services on them [Ex. 8].

**RESPONSE:** Denied; Exhibit 8 is a document unauthenticated by anyone with knowledge and therefore cannot support the statement for summary judgment purposes and furthermore, even if admissible, does not support the statement.  Plaintiffs dispute that any such offer was made and dispute that the evidence Defendant proffers on this point supports his claim.  Furthermore, at his deposition, he testified that could have reimbursed himself and he doesn't know if he ever sought reimbursement, and that he was holding the domain names until there was an agreement on all open issues, in other words, not just reimbursement of domain name costs expenses.  (Goldman Ex. 3 at 72:17-73:6, 112:7-114:9, & 139:14-143:8.)

8. Herbert ignored Matthias' offer and instead caused Lipoid and ALC personnel to set up new email accounts for all of Lipoid LLC and ALC employees and a new domain name for ALC [Ex. 11; Ex. 12; Ex 5 at 81, 132].  **RESPONSE:**  Denied; Exhibit 11 is unauthenticated by anyone with knowledge and is therefore inadmissible for summary judgment purposes; even if admissible, Exhibit 11 simply shows a domain registration and does not support the rest of the statement; Defendant cites to the deposition of Mr. Zigmont without indicating a page or pages, which precludes any response; the cited testimony by Dr. Baretz does not fully support the statement; he testified simply that a new email address was set up.

9. When Randall Zigmont, who replaced Matthias as President of ALC, registered the americanlecithin.us domain name, he personally was listed as the registrant just as Matthias had been when he set up his domain names) [Ex. 11]. **RESPONSE:** Denied; Exhibit 11 is a document unauthenticated by anyone with knowledge and therefore cannot support the statement for summary judgment purposes and furthermore, even if

admissible, does not support the statement; the document does not show what Matthias did, and also lists America Lecithin Company as the Registrar Organization.

10. Herbert commenced this action alleging that Matthias had acquired the domain names to personally profit from them, and that Matthias was "cybersquatting," acting with a "bad faith intent to profit" under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and was causing Plaintiffs "irreparable harm." [Ex. 1]. **RESPONSE:** Denied; Herbert did not commence this action or make any allegations in the Complaint or Amended Complaint; the Plaintiffs did, and the Amended Complaint, the only cited support, does not show otherwise.

11. In the Amended Complaint, Plaintiffs' did not allege that any of the trademarks they were seeking to protect in this lawsuit - "Lipoid," "American Lecithin," "Alcolec," "Phospholipon," "Phosal," "Cerasome," "Nanosolve," and "Phytosolve," - were "distinctive" or "famous." [Ex. 1 ¶ 9]. **RESPONSE:** Admitted that there was no such allegation, but Plaintiffs do consider the marks distinctive on their face and can prove that except for the two incorporating the American Plaintiffs' names the rest are registered trademarks. Hauser Aff. Exs. B-I.

12. In the Amended Complaint, Plaintiffs did not allege a single fact to support their contention that Matthias had a "bad faith intent to profit" from the domain names [*See* Ex. 1 ¶ 22]. **RESPONSE:** Denied; see Ex. 1 ¶¶ 21-23 & 47.

13. In the Amended Complaint, Plaintiffs speculate that he must have had a "bad faith intent to profit" because he did not turn over the domain names [*See* Ex. 1 ¶ 23]. **RESPONSE:** Denied; it was an allegation, not speculation.

14. Plaintiffs knew that the allegation that Matthias didn't turn over the domain names meant he had a bad faith intent to profit was not true [Ex. 6, Ex. 7]. **RESPONSE:**

Denied; Exhibits 6 and 7 are documents unauthenticated by anyone with knowledge. Furthermore, even if admissible: Exhibit 6 simply says that an administrative contact for lipoidllc.com received a request for transfer of registrar, without indicating why or whether it was approved or happened; and Exhibit 7 simply says that there was a change of provider for the domain name nanosolve.com.

15. Matthias had been willing to turn them over, but wanted reimbursement the [*sic*] expenses he had incurred in obtaining and maintaining them. [Ex. 8, Ex 3 at 111-112]. **RESPONSE:** Denied; Exhibit 8 is a document unauthenticated by anyone with knowledge and therefore cannot support the statement for summary judgment purposes and furthermore, even if admissible, does not support the statement; the cited testimony by Defendant indicates he wanted reimbursement but does not state a willingness to turn the domain names over to Plaintiffs. See also response *supra* to ¶ 7.

16. Plaintiffs also knew that Matthias had not acquired them for any purpose other than to protect their interests [see Pars. 3, 5 and 14 above]. **RESPONSE:** Denied; see responses *supra* to the listed paragraphs and to ¶ 7.

17. During their depositions, Plaintiffs' witnesses, Herbert [Ex. 3 [*sic*; should be 2] at 313-316], Bruce Baretz [Ex. 5 at 49-50, 86] and Randall Zigmont [Ex. 12 at 41-42, 100] identified no facts supporting Plaintiffs' allegation that Matthias had a "bad faith intent to profit." **RESPONSE:** Denied; the cited testimony by Dr. Baretz includes statements that Defendant's personal possession of domain names related to his former employers' business was improper and therefore wrongful and in bad faith and that Dr. Baretz believed Defendant had attempted to divert business to himself from Lipoid, LLC, and he also testified that Defendant was interacting with his former employers' customers, receiving

emails from customers on the retained domain names and not forwarding them, and that Defendant's actions could have only been deliberate and interfered with his former employers' business.  Ex. 5 at 49-50, 82-93.  The cited testimony by Mr. Zigmont also does not support the statement; he was not asked about bad faith or intent to profit. After he was terminated, Defendant's control of the domain names meant that the two American plaintiffs no longer received certain emails sent by customers or prospective customers and eventually received complaints from some of them about the lack of rseponse.  (Goldman Ex. 5 at 80:13-81:2: Ex. 12 at 52:25-55:10, 57:9-16.)  In addition, the Plaintiffs had to set up new domains and new e-mail addresses and inform their customers.  (Goldman Ex. 5 at 81:15-25, 83:11-21, 91:11-22; Ex. 12 at 34:11-25, 40:3-9, 49:12-50:9.)  Defendant did not respond to efforts by Mr. Zigmont to ask that the e-mails Defendant was receiving were redirected to Plaintiffs.  (Goldman Ex. 12 at 40:13-41:12.)  He admitted at his deposition that he was receiving emails from Plaintiffs' customers and that he stopped forwarding them.  (Goldman Ex. 3 at 130:14-132:9.)

18. During his deposition, Herbert testified that he did not know if Matthias was acting in bad faith [Ex 2 at 313-314]. He said he didn't know whether Matthias had ever used the domain names for anything other than the companies' benefit or for his own benefit. [*Id* at 315]. **RESPONSE:**  Denied; Dr. Rebmann did not testify whether he knew one way or the other if Defendant was acting in bad faith; Dr. Rebmann was only asked whether he believed Defendant was acting in bad faith, and there was never an answer.

19. Baretz, who replaced Matthias as President of Lipoid LLC, admitted that he was unaware of any facts that could be construed as Matthias acting in bad faith or with a bad faith intent to profit or wrongfully in registering the domain names [Ex. 5 at 48-50; 86].

He testified that he was not aware that Matthias used the lipoidllc.com account for anything other than Lipoid LLC business [Ex. 5 at 84]. He said that he was not even told about the lawsuit when it was filed and only found out about it later [Ex. 5 at 44]. He was not President of the Company for purposes of the lawsuit; Herbert was [Ex. 5 at 41]. **RESPONSE:** Denied; the cited testimony does not support the first sentence; see response *supra* to ¶ 17.

20. Baretz acknowledged that Plaintiff's [*sic*] assertion that Matthias diverted traffic from Plaintiffs' websites, "thereby disrupting the accurate valuation of their websites [Ex. 1, ¶ 25], was, at least insofar as Lipoid LLC was concerned, untrue because Lipoid LLC had no traffic data [Ex. 5 at 90-91]. **RESPONSE:** Denied; the fact that Lipoid, LLC, had no traffic data does not disprove that the valuation of the website, operated by Lipoid GmbH, was disrupted; Lipoid GmbH could have that data. See also Ex. 5 at 89-90.

21. Zigmont, who replaced Matthias as President of ALC, testified that he was unaware of any use by Matthias of the domain name americanlecithin.com for his personal use or benefit [Ex. 12 at 41-42]. He testified that ALC had registered, but never used the domain names "Alcolec," "Phospholipon," "Phosal," "Cerasome," "Nanosolve," "Phytosolve," and "Cochleates." [Ex. 12 at 242-44], and that he was not aware of any use by Matthias of these domain names [Ex. 12 at 100]. **RESPONSE:** Denied; the cited testimony by Mr. Zigmont at 41-42 was that he did not know one way or the other whether Defendant had used the domain name americanlecithin.com for anything other than business; Mr. Zigmont's deposition transcript ends at page 102, so there are no pages 242-33 and there is therefore no support for that portion of the statement; at page 100, Mr. Zigmont testified only that he knew of no use by Defendant of americanlecithin.com or alcolec.

22. He stated that he wasn't sure that he had seen the amended complaint in this action prior to his deposition in 2016, and that he had not authorized the complaint to be filed on behalf of ALC [Ex. 12 at 11-12]. **RESPONSE:** Denied; Mr. Zigmont testified that he wasn't sure whether he had seen the Amended Complaint before his deposition.

23. Matthias had testified that [*sic*] domain name for "Nanosolve" had been filed by him even before the trademark. He purchased the domain name because he thought it might be of future use to the Group. It was never used. [Ex. 3 at 70]. **RESPONSE:** Denied; the cited testimony does not include any statement that the domain name was never used.

24. Even when Matthias offered to transfer the email addresses without reimbursement, this was not good enough for Herbert to call off this litigation. He now demanded that Matthias pay his legal fees for bringing this baseless litigation [Ex. 18]. **RESPONSE:** Denied; Exhibit 18 is inadmissible pursuant to Fed. R. Evid. 408 and even if admissible shows no demand on behalf of Dr. Herbert Rebmann.

25. Lipoid LLC's operating agreement contained a provision that eliminated fiduciary duties for the LLC's Manager [Ex. 20; ¶ 4.11]. **RESPONSE:** Admitted.

26. Matthias was listed in the agreement as Assistant Manager [Ex. 20; ¶ 1.11], and Herbert had delegated the Manager function to Matthias [Ex. 3 at 22-24], especially when it came to IT issues [Ex. 5 at 31-33]. **RESPONSE:** Admitted that the agreement listed Defendant as the "initial assistant manager"; otherwise denied because the cited testimony by Defendant and Dr. Baretz does not support the statement.

27. Matthias was also listed as Manager in the Certificate of Authority of Lipoid LLC [Ex. 21]. **RESPONSE:** Denied; Exhibit 21 is unauthenticated by anyone with

knowledge and is therefore inadmissible for summary judgment purposes. Furthermore, even if admissible, Exhibit 21 shows only that Defendant was listed as Manager as of July 20, 2004.

28. Plaintiffs have suffered no damages (or at least, none that were not self-inflicted) as a result of what they allege Matthias did [Ex. 12 at 81-82, Ex. 2 at 321, Ex. 5 at 114]. **RESPONSE:** Denied; the cited testimony of Dr. Rebmann said only that he was unaware of any damages, the cited testimony by Mr. Zigmont said only that he was unaware of any damage to anyone other than American Lecithin Company, and the cited testimony by Dr. Baretz does not support the statement; he testified only that he was unaware of damages suffered by the plaintiffs other than Lipoid LLC; he also testified to the problems with customers that Defendant's actions caused Lipoid LLC, see also *supra* response to ¶ 17.

29. At the instruction of his father, Matthias paid the company for the laptop he was using and the data that was on it, including the "CRM software" [Ex. 3 at 143]. **RESPONSE:** Denied; the cited testimony by Defendant does not support the statement; he testified that one of the companies purchased the software (Ex. 3 at 83).

30. Matthias purchased the laptop and the data on it to comply with his father's directive that company computers not be used for personal business. Since Matthias could not travel with two computers - one personal and the other professional - he paid the company for the computer he was using, including whatever was on it. His father was aware of this [Ex. 3 79- 81]. **RESPONSE:** Denied; the cited testimony says only that Defendant purchased a used laptop, not that the purchase included whatever was on it, or that his father was aware of the purchase.

31. He placed a copy of the check used for the payment in the file [Ex. 22].

**RESPONSE:** Admitted, although Exhibit 22 is unauthenticated by anyone with knowledge and is therefore inadmissible and, even if admissible, shows only the purchase of computers, not software.

32. Plaintiffs filed their amended complaint on April 10, 2012, seeking to compel Matthias to turn over or destroy the computer and CRM software and alleging "irreparable injury" as a result of Matthias' retention of them [Ex. 1 at ¶¶ 28, 34].

**RESPONSE:** Admitted.

33. The laptop and "CRM software," belonged to Matthias [Ex. 3 at 79-81, 143; Ex. 22]. **RESPONSE:** Denied as to the CRM software; neither the cited testimony nor Exhibit 22 supports the statement as to the CRM software; he testified that one of the companies purchased the software (Ex. 3 at 83).

34. The so-called "CRM software" on Matthias' laptop was nothing more than a contact manager and contained no trade secrets or proprietary information [Ex. 3 at 81-83, 125- 126 and 128]. **RESPONSE:** Denied; it is clear from Defendant's cited testimony that the CRM software included customer names and contact information, which can be a trade secret and proprietary information.

35. The CRM software did not contain any specific customer information, but was just an address book containing information that was not proprietary to Lipoid LLC or ALC. It did not contain a customer list, but a contact list [Ex. 3 at 81-83, 125 and 128]. It was part of the Microsoft Outlook program on Matthias' computer [Ex. 3 at 126]. **RESPONSE:** Denied; see response *supra* to ¶ 34; also, as Dr. Baretz and Mr. Zigmont testified, it contained both customer contact information and records of interactions with the

customers, such as emails and visits, along with records of their purchases.  (Ex. 5 at 82-83 & 101-03; Ex. 12 at 59-61.)

36. The Amended Complaint does not allege that the CRM program contained trade secrets [Ex. 1].  **RESPONSE:**  Denied; plaintiffs have alleged that it owned the information in the CRM data base and that it provided a competitive advantage.  (Ex. 1 at ¶¶ 29, 59 & 60-62.)

37. Matthias did not deprive the Lipoid Group of use of the software and data since all of it remained on the company server [Ex. 5 at 103-104].  **RESPONSE:**  Admitted.

38. To end the litigation, Matthias offered to "return" the laptop and "CRM software," even though they belonged to him [Ex. 19].  **RESPONSE:**  Denied; the CRM software did not belong to him, and Defendant's Offer of Judgment (Ex. 19) does not support his claim to ownership; furthermore, an Offer of Judgment is irrelevant and inadmissible as evidence for summary judgment purposes.

39. Herbert, rejected taking them in favor of continuing the lawsuit. [Ex. 1] **RESPONSE:**  Denied; plaintiffs did not accept Defendant's Offer of Judgment; the Amended Complaint pre-dates the Offer of Judgment and therefore is no evidence of any response or reaction to the Offer of Judgment.

40. Plaintiffs sought to compel Matthias into turning over the domain names, notebook and software without paying the costs directly incurred by Matthias in maintaining the trade names for Plaintiffs' benefit or reimbursing Matthias for his duly incurred business expenses [Ex. 1, Ex. 8].  **RESPONSE:**  Denied; Exhibit 8 is unauthenticated by anyone with knowledge and is therefore inadmissible for summary judgment purposes; Defendant has not asserted a claim for such costs or expenses and Plaintiffs have taken no position on

the issue, and neither the Amended Complaint nor, if admissible, Exhibit 8 shows otherwise.

41. Plaintiffs misrepresented to the Court that Matthias was refusing to turn over the domain names and that they were suffering "irreparable harm." [see Pars. 15, 24 and 38 above]. **RESPONSE:** Denied; see responses *supra* to the indicated paragraphs and to paragraphs 3 & 7 *supra*.

42. Within days after Matthias was fired, and months before they had brought this litigation, Herbert and Plaintiffs had established successful workarounds for whatever possible damages they could possibly suffer as a result of Matthias' retention of the domain names. [Ex 12 at 59, Ex. 5 at 132] **RESPONSE:** Denied; the cited testimony by Mr. Zigmont does not support the statement; the cited testimony by Dr. Baretz does not support the statement; also, he testified that there was a continuing problem with customers sending emails to the former domain taken by Defendant and complaining about not getting a reply from Lipoid LLC, see *supra* response to ¶ 17.

43. Notwithstanding their claims of "irreparable harm," Plaintiffs did not move for a preliminary injunction [Dkt. 1, Ex. 1]. **RESPONSE:** Admitted.

44. Plaintiffs did not pursue the relief they were requesting from the alleged "irreparable harm" they were suffering for the next seven years [Ex. l]. **RESPONSE:** Denied; Plaintiffs are pursuing damages as relief.

Date: March 29, 2019
New York, NY

Respectfully submitted,

_____
Gregory F. Hauser
**WUERSCH & GERING LLP**
100 Wall Street, 10th Floor
New York, New York 10005
Tel: (212) 509-5050
Fax: (212) 509-9559
Attorneys for Plaintiffs and for Third-Party Defendant Herbert Rebmann

To: Samuel Goldman, Esq.
Samuel Goldman & Associates
200 Park Avenue, Suite 1700
New York, NY 10017
Tel: (212) 725-1400
Fax: (212) 725-0805
Attorneys for Defendant and Third-Party Plaintiff

**CERTIFICATE OF SERVICE**

    I am an attorney at Wuersch & Gering LLP, counsel for Plaintiffs and Third-Party Defendants, in the above-captioned proceeding. I hereby certify that on March 29, 2019, I caused the foregoing to be served electronically via the United States District Court, Southern District of New York Court's ECF system upon those parties entitled to receive electronic notice.

                                          Gregory F. Hauser