```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  7/24/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
AMERICAN LECITHIN COMPANY,                                :
LIPOID GmbH, LIPOID LLC, and                              :
PHOSPHOLIPID GmbH,                                        :
                                                          :          12-CV-929 (VSB)
                                    Plaintiffs,           :
                                                          :          **OPINION & ORDER**
                  - against -                             :
                                                          :
CARSTEN MATTHIAS REBMANN,                                 :
                                                          :
                                    Defendant and         :
                                    Third-Party           :
                                    Plaintiff,            :
                                                          :
                  - against –                             :
                                                          :
HERBERT REBMANN, LIPOID STIFTUNG, :
LIPOID BETEILGUNGS GmbH, LIPOID                           :
VERWALTUNGS AG, LIPOID                                    :
GRUNDSTUECKS GmbH, and                                    :
PHOSPHOLIPID FORSCHUNGSZENTRUM :
e.V.,                                                     :
                                                          :
                                    Third-Party           :
                                    Defendants.           :
----------------------------------------------------------X

Appearances:

Gregory F. Hauser
Sherica R. Bryan
Wuersch & Gering LLP
New York, New York
*Counsel for Plaintiffs and Third-Party Defendants*

Samuel Goldman
Samuel Goldman & Associates
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

American Lecithin Company ("ALC"), Lipoid GmbH, Lipoid, LLC, and Phospholipid GmbH (together with ALC, Lipoid GmbH, and Lipoid LLC, "Plaintiffs"), bring this action against Defendant Carsten Matthias Rebmann ("Defendant" or "Matthias") asserting various common law claims in connection with Matthias' registration of certain domain names (the "Domain Names"), and his retention of those domain names, a laptop (the "Laptop"), and a customer management software (the "CRM Software") following the termination of his employment with Plaintiffs ALC and Lipoid, LLC in August 2011.  In turn, Defendant asserted various claims against Third-Party Defendants ALC, Lipoid GmbH, Lipoid LLC, Phospholipid GmbH, Dr. Herbert Rebmann ("Dr. Rebmann"), Lipoid Verwaltungs AG, and Lipoid Grundstuecks GmbH, Lipoid Stiftung, Lipoid Beteiligungs GmbH, and Phospholipid Forschungszentrum e.V.  Now before me are (1) Third-Party Defendant Dr. Rebmann's motion for summary judgment dismissing Defendant's conversion claim against him, and (2) Defendant Matthias's motion dismissing all of Plaintiffs' claims against him.

Because there is a triable issue of fact as to whether Dr. Rebmann personally participated in the alleged conversion of Defendant's shares, Dr. Rebmann's motion is DENIED.

Defendant's motions are GRANTED IN PART and DENIED IN PART.  Because there are issues of fact relating to Plaintiffs' cybersquatting claim and Plaintiffs' conversion and breach of fiduciary claims related to the domain names, Defendant's motion for summary judgment dismissing these claims is DENIED.  Because there are disputes of fact as to Defendant's affirmative defenses of laches and unclean hands, his motion for summary judgment dismissing Plaintiffs' claims for injunctive relief is DENIED.  The remainder of Defendant's motions are GRANTED.  Specifically, because it is undisputed Defendant purchased the Laptop from Plaintiffs and because his retention of the Laptop and CRM Software did not interfere with

Plaintiffs' rights, Defendant's motion for summary judgment on Plaintiffs' claim of conversion

is GRANTED.  Because Plaintiffs have pointed to no evidence in the record demonstrating

damages, Defendant's motion for summary judgment on Plaintiffs' claims for breach of

fiduciary duty relating to the Laptop and the CRM Software is GRANTED.

## I.  __Factual Background__[1]

### A.  *The Parties*

Plaintiffs are four corporate entities, Defendant is an individual, and Third-Party

Defendant Dr. Rebmann is an individual.  (*See* Am. Compl. ¶¶ 1–5; SAA ¶¶ 71–81.)[2]  According

to Defendant, Plaintiffs are interrelated entities that are dominated and controlled by Dr.

Rebmann.  (SAA ¶¶ 71–81.)  Plaintiff ALC is a Delaware corporation with its principal place of

business in Connecticut.  (Am. Compl. ¶ 1; SAA ¶ 72.)  Plaintiff Lipoid LLC is a New Jersey

limited liability company with its principal place of business in New Jersey.  (Am. Compl. ¶ 3;

SAA ¶ 73.)  Plaintiffs Lipoid GmbH and Phospholipid GmbH are German limited liability

companies with principal places of business in Germany.  (Am. Compl. ¶¶ 2, 4; SAA ¶¶ 74–75.)

Third-Party Defendant Dr. Rebmann is a German citizen and domiciliary, and Defendant's

father.  (SAA ¶¶ 76, 83; Pls.' Ans. 1–2.)[3]

---

[1] Because the parties purport to dispute nearly all the material facts, this section summarizes the allegations of Plaintiffs and Defendant that are relevant to the motions before me.  It is not intended to be and should not be construed as a finding of the undisputed material facts, nor is it a comprehensive recitation of all the allegations in this case.

[2] "Am. Compl." refers to the Amended Complaint, filed on April 10, 2012, (Doc. 12), and re-filed on March 1, 2019, as Exhibit 1 to the Affirmation of Samuel Goldman in support of Defendant's Motion for Summary Judgment, ("Goldman Aff.," Doc. 275).

[3] "Pls.' Ans." refers to Plaintiffs' and Third-Party Defendant's Answer to First Counterclaim and Ninth and Eleventh Third-Party Claims in the Second Amended Answer, filed on May 25, 2018.  (Doc. 261.)

### B. *Defendant's Allegations*

In or about 1978, Dr. Rebmann began a business organized as Lipoid KG to manufacture, sell, and distribute lecithin and phospholipid products for use in the pharmaceutical, cosmetic, and dietetic industries. (*Id.* ¶ 82.) The initial shareholders of Lipoid KG were Dr. Rebmann (with 70%), his sister Rosabert (with 20%), and Birgit Wortberg, Dr. Rebmann's student (with 10%). (*Id.*) In or about 1989, Lipoid KG was reorganized, and Defendant received a 10% ownership interest in Lipoid KG. (*Id.* ¶ 85.) Dr. Rebmann divorced Defendant's mother in 1985 and later married Birgit Wortberg, his former student. (*Id.* ¶ 83.) In or about 1989, the share ownership in Lipoid KG was reorganized, so that Dr. Rebmann had 40%, Birgit Wortberg had 30%, Rosabert had 10%, Defendant had 10%, and Defendant's two half-brothers, Helge and Balder, had 5% each. (*Id.* ¶¶ 84–85.) In approximately 1996, Dr. Rebmann changed the name of Lipoid KG to Lipoid Grundstueks GmbH (*i.e.*, Lipoid G), and established the other corporate Plaintiffs and Third-Party Defendants (together, the "Lipoid Group") to continue the business of Lipoid KG. (*Id.* ¶ 87.) Lipoid G's only asset is certain real estate used by the Lipoid Group. (*Id.* ¶ 88.) Following the reorganization of Lipoid KG's assets among and between the Lipoid Group, Defendant no longer had a 10% interest in the entire Lipoid Group, but was given a 10% interest in Lipoid G as successor to Lipoid KG. (*Id.*) Dr. Rebmann told Defendant that the reason for the name change and the creation of the corporate Plaintiffs and Third-Party Defendants was to "promote operating efficiencies and address liability issues, and not to take away his interest in the Lipoid business." (*Id.* ¶ 89.)

At Dr. Rebmann's request, Defendant filed a Certificate of Formation for Lipoid LLC in New Jersey on or about March 12, 2004. (*Id.* ¶ 99.) In or about late 2005, Dr. Rebmann offered Defendant the opportunity to assume full management responsibility of the Lipoid Group's U.S.

operations.  (*Id.* ¶ 101.)  In 2007, Defendant engineered the acquisition of ALC by the Lipoid Group and became its President and CEO.  (*Id.* ¶ 115.)  Defendant's duties at ALC were the same duties he had with respect to Lipoid LLC.  (*Id.*).

In 2010, Dr. Rebmann requested that Defendant file certain United States tax returns on behalf of Lipoid LLC.  (*Id.* ¶ 123.)  Defendant believed—based upon the advice of the company's accountant—that filing such returns would likely violate United States tax laws, and refused to file them.  (*Id.* ¶ 123–24.)  In August 2011, Dr. Rebmann terminated Defendant's employment with Lipoid LLC and ALC "for cause," because Defendant purportedly was "unwilling[] to work with the parent company and others within our group."  (*Id.* ¶¶ 130.)  However, employees of the Lipoid Group in Europe were told that Defendant was terminated "because he did not prepare reports."  (*Id.* ¶ 131.)

In January 2013, during the pendency of this lawsuit, Dr. Rebmann allegedly caused the adoption of resolutions by Lipoid G that took away Defendant's 10% interest in that company and allowed Dr. Rebmann to determine how much Defendant would be paid for his 10% interest.  (*Id.* ¶ 149.)  The resolutions indicated Defendant's 10% interest was taken away "for cause," because Defendant "(a) had taken certain domain names that belonged to other members of the Lipoid Group, (b) had failed to file tax returns on behalf of Lipid LLC and ALC, and (c) had not repaid a loan from" Lipoid V, another member of the Lipoid Group.  (*Id.*)  Defendant alleges that his interest in Lipoid G was taken in retaliation for Defendant seeking sanctions against Dr. Rebmann for his failure to appear for his deposition in this case.[4]  (*Id.* ¶¶ 151–52.)

---

[4] After finding that Dr. Rebmann was deliberately avoiding sitting for his deposition, (Doc. 140), I ordered Dr. Rebmann's deposition to take place by a date certain, (Doc. 155), and granted Defendant's motion for fees and expenses in connection with his efforts to depose and the costs associated with deposing Dr. Rebmann in Frankfurt, Germany, (Doc. 243).

C. *Plaintiffs' Allegations*

Plaintiffs allege that while Defendant was an officer of ALC and LLC, he "registered under his own name, or transferred to his own name" the following eight domain names: alcolec.com; americanlecithin.com; cerasome.com; lipoidllc.com; nanosolve.com; phosal.com; phospholipon.com; and phytosolve.com. (Am. Compl. ¶ 11.) The substance of each Domain Name—in other words, the text preceding ".com"—was identical to a trademark that had been previously registered by Plaintiffs. (*Id.* ¶ 9.) According to Plaintiffs, the registration or transfer of these names was done "in bad faith." (*Id.* ¶ 3.) Plaintiffs allege that after Defendant's employment with ALC and Lipoid, LLC was terminated in August 2011, they directed him to turn over all property of both companies. (*Id.* ¶ 17.) Defendant did not transfer the Domain Names, even after multiple demands. (*Id.* ¶¶ 17–21.)

In addition, Plaintiffs allege that after Defendant's employment was terminated, he improperly retained and used the Laptop, the CRM Software that was installed on the Laptop, and the data saved in the CRM Software, all of which they contend belonged to them. (*Id.* ¶¶ 29–33.)

II. **Procedural History**[5]

Plaintiffs commenced this lawsuit by filing the Complaint on February 6, 2012. (Doc. 1.) Defendant filed the Amended Answer, Counterclaims, and Third-Party Claims, (Doc. 82), which Plaintiffs moved to dismiss. After I granted that motion in part and denied it in part, (Doc. 141), Defendant filed a Second Amended Answer. (Doc. 157.) Plaintiffs and the Third-Party Defendants moved to dismiss that pleading as well, (Doc. 170), which I granted in part and

---

[5] I provide only the procedural background relevant to the pending motions, and otherwise assume familiarity with the extensive procedural background of this action, set forth in my four prior decisions in this case. (Docs. 140, 141, 243, 249.)

denied in part by Memorandum & Opinion dated September 30, 2017.  (Doc. 249.)  Plaintiffs

and the remaining Third-Party Defendant, Dr. Rebmann, filed their Answer to Defendant's

counterclaims and third-party claims on May 25, 2018.  (Doc. 261.)

While the second motion to dismiss was pending the parties were engaging in discovery[6];

therefore, in order to assess the status of the case, in the September 2017 Memorandum &

Opinion the parties were asked to provide an update on the status of discovery.  (*See id.*)  On

November 10, 2017, the parties informed me by joint letter that discovery was largely complete

on Plaintiffs' original claims but that Plaintiffs sought additional discovery on the status of the

domain names as Defendant's deposition was initially taken in 2012, and that Defendant opposed

the taking of a second deposition.  (Doc. 251.)  The parties also represented that they needed

ninety (90) days for document discovery on the remaining counterclaims and third-party claims,

plus an additional ninety (90) days for depositions.  (*Id.*)  I held a conference on November 17,

2017 and directed the parties to meet and confer on a scheduling order for the balance of

discovery.

On October 22, 2018, the parties provided an update on this case that indicated that

discovery was at the same stage it had been as of the November 2017 conference.  (Doc. 263.)  I

entered an order of reference for general pretrial to Magistrate Judge Kevin Nathaniel Fox, (Doc.

265), who held a telephone conference on January 3, 2019.  At the conference, the parties

---

[6] Discovery on Plaintiffs' original claims technically closed on August 27, 2012.  At a conference on December 4, 2015, I asked the parties to update me on any additional discovery they might need on those claims.  I rejected their first proposal for lack of specificity and ordered Plaintiff to submit a revised proposal identifying all outstanding discovery, including depositions.  (Doc. 242).  On January 5, 2016, Defendant submitted a letter proposing a revised schedule, describing his first deposition of Dr. Rebmann as unfruitful—but not requesting leave to depose him again—and proposing four additional potential deponents.  (Doc. 244.)  I granted Defendant's application and so-ordered a schedule that set a deadline of April 20, 2016 for all discovery on Plaintiffs' claims.  (Doc. 245.)  On February 26 and 29, 2016, the parties submitted letters describing a dispute over three additional depositions that Defendant had noticed.  (Docs. 246–47.)  Because Defendant had not identified those depositions in his January 5, 2016 letter, and did not set forth in his February letter why the deposition testimony would be relevant, I denied his application to take the additional depositions.  (Doc. 248.)

represented that they intended to file potentially dispositive motions, whose outcome would determine whether and what additional discovery was needed.  Accordingly, Magistrate Judge Fox deferred consideration of any disputes over outstanding discovery, and entered a briefing schedule for the parties' proposed cross-motions for summary judgment.  (*See* Doc. 267.)

On March 1, 2019, Dr. Rebmann filed a motion for summary judgment, (Doc. 270), along with a memorandum of law, declaration, and a Local Rule 56.1 statement, (Docs. 271–73). On March 29, 2019, Defendant filed his memorandum of law in opposition and his Local Rule 56.1 response statement.  (Docs. 288–89.)  Dr. Rebmann filed his reply memorandum on April 5, 2019.  (Doc. 291.)

On March 1, 2019, Defendant filed his motion for summary judgment, (Doc. 274), along with a memorandum of law, declaration with exhibits, and Local Rule 56.1 Statement, (Docs. 275–77).  With my permission, on March 11, 2019, Defendant filed an amended memorandum of law, (Doc. 282), and Local Rule 56.1 statement, (Doc. 283).  On March 29, 2019, Plaintiffs filed their memorandum of law in opposition, declaration with exhibits, and Local Rule 56.1 response statement.  (Docs. 285–87.)  On April 5, 2019, Defendant filed his reply memorandum. (Doc. 292.)

### III.   Legal Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual

disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256 (citation omitted), and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party,"

summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d

Cir. 2002).  Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a

motion for summary judgment."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

IV.   **Discussion**[7]

A.   ***Third-Party Defendant Dr. Rebmann's Motion for Summary Judgment***

Defendant alleges that Dr. Rebmann is liable for conversion of Defendant's shares in

Lipoid G because he "wrongfully exercised dominion" over and "converted such shares to his

own use."  (SAA ¶ 261.)  Dr. Rebmann seeks summary judgment dismissing Defendant's

conversion claim because "it was the company that took the shares," by a vote of the other

shareholders, and not Dr. Rebmann.  (Dr. Rebmann Mem. 2.)[8]  I disagree, reject this argument,

and deny summary judgment because there are genuine issues of material fact, including

concerning whether Dr. Rebmann personally participated in and/or directed the taking of the

shares.

---

[7] In determining the undisputed facts that are material to the claims at issue in the instant motion, I do not take the parties' 56.1 statements at face value but rather have disregarded allegations that were "not accompanied by citation to admissible evidence" as well as allegations where "the cited evidence [did] not support the allegation."  *See F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 302 (S.D.N.Y. 2008).  Indeed, Defendant's 56.1 statement contained numerous assertions that were either conclusory or accompanied by misleading citations in improper attempts to establish that certain facts were undisputed.  I note that the unreliability of Defendant's statement imposed upon this Court the undue burden of conducting an independent review of the record, in direct contravention of the purpose of Local Civil Rule 56.1, which is "to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  *See also Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence.").  Counsel is cautioned against making future submissions that misrepresent the record and violate the letter and spirit of the Rule.

[8] "Dr. Rebmann Mem." refers to the Memorandum of Law in Support of Third-Party Defendant's Motion for Partial Summary Judgment, filed on March 1, 2019.  (Doc. 271.)

1.   Applicable Law

Under New York law,[9] "conversion is the unauthorized assumption and exercise of the

right of ownership over goods belonging to another to the exclusion of the owner's rights."

*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (quoting *Vigilant Ins.*

*Co. of Am. v. Hous. Auth.*, 660 N.E.2d 1121, 1126 (1995)).  "[T]o establish a claim for

conversion, a plaintiff must show that:  (1) the property subject to conversion is a specific

identifiable thing; (2) plaintiff had ownership, possession or control over the property before

its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question,

to the alteration of its condition or to the exclusion of the plaintiff's rights."  *AD Rendon*

*Commc'ns, Inc. v. Lumina Ams., Inc.*, No. 04-CV-8832 (KMK), 2007 WL 2962591, at *4

(S.D.N.Y. Oct. 10, 2007) (internal quotation marks omitted).

2.   Application

As Dr. Rebmann contends, on January 9, 2013, the shareholders of Lipoid G voted to

pass a resolution mandating that Defendant forfeit his 10 percent interest in the company "for

cause," and that Defendant's shares reverted to the possession of Lipoid G.  (Dr. Rebmann 56.1 ¶

6; Def.'s Resp. 56.1 ¶ 6; SAA ¶¶ 149–15; Def.'s Oct. 18, 2013 Aff. ¶ 15.)[10]  It is also true that as

a general matter, "corporations [have] an existence separate and distinct from that of

---

[9] The parties cite exclusively to New York law in their discussion of the conversion claim.  "[W]here the parties
have agreed to the application of the forum law, their consent concludes the choice of law inquiry."  *Am. Fuel Corp.*
*v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).  Such consent may be implied by the parties' reliance on
New York law in their briefs.  *Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton*, 888
F.2d 239, 242 (2d Cir. 1989).  Accordingly, I apply New York law to Defendant's claim for conversion against Dr.
Rebmann.
[10] "Dr. Rebmann 56.1" refers to Third Party Defendant Herbert Rebmann's Local Rule 56.1 Statement in Support of
Motion for Partial Summary Judgment, filed on March 1, 2019.  (Doc. 273.)  "Def.'s Resp. 56.1" refers to
Defendant's Response Pursuant to Local Rule 56.1 to Third Party Defendant's Statement of Purported Undisputed
Facts, filed on March 29, 2019.  (Doc. 289.)  "Def.'s Oct. 18, 2013 Aff." refers to the October 18, 2013 Affidavit of
Carsten Matthias Rebmann, filed on October 28, 2013, (Doc. 78), and cited by Dr. Rebmann in his 56.1 Statement.
(Dr. Rebmann 56.1 ¶ 6.)

their shareholders and consequently, [courts] will not impose liability upon shareholders for the acts of the corporation." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 170–71 (2d Cir. 2012) (quoting *Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152 (1980)).  However, a shareholder is individually liable for torts of the corporation in which he personally participates. *Aeroglide Corp. v. Zeh*, 301 F.2d 420, 422 (2d Cir. 1962) (finding shareholder directors who voted for and signed mortgage on equipment personally liable for converting property of manufacturer who retained property's title); *Doe v. Bloomberg, L.P.*, 109 N.Y.S.3d 254, 259 (1st Dep't 2019) ("[A] corporate owner or officer may be held individually liable for a tort committed by the corporation . . . if [he] participates in the commission of [the] tort" (internal quotation marks omitted)); *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 522 (S.D.N.Y. 2016) (owner of closely held corporation could be held liable for corporation's fraudulent conduct because she was alleged to have personally participated in it); *cf. We're Assocs. Co. v. Cohen, Stracher & Bloom, P.C.*, 478 N.Y.S.2d 670, 674 (2d Dep't 1984) (stating that the "common law rule [is] that a shareholder is liable for those torts of the corporation in which he is a participant" (citing *Chess Enterprises v. Beldon Assoc.*, 148 N.Y.S.2d 804 (2d Dep't 1956)), *aff'd*, 65 N.Y.2d 148 (1985))).

Here, the evidence in the record demonstrates that there is a dispute of fact as to whether Dr. Rebmann personally participated in the forfeiture of Defendant's shares.  The translated minutes of the January 9, 2013 shareholder meeting[11] indicate that Lipoid G had five

---

[11] Defendant initially provided a copy of these minutes in their original German along with an uncertified English translation prepared by him as an exhibit to his October 18, 2013 Affidavit.  (*See* Def.'s Oct. 18, 2013 Aff. Ex. D.) In his affidavit in support of his motion for summary judgment, Dr. Rebmann implicitly approves those minutes by citing to their substance:  "5.  By a meeting of the shareholders of Lipoid Grundstücks GmbH on 9 January 2013, the shareholders other than the Defendant voted for the Company's withdrawal of the Defendant's ownership shares.  6. I understand that the Court has before it a copy of the minutes of that shareholders meeting.  7.  As those minutes state, it was the Company that took the shares from the Defendant."  (Doc. 272.)  Then, in his 56.1 statement, Dr. Rebmann cites to these minutes to support his assertion that it is undisputed that Defendant "provided a translated copy of the minutes of that meeting showing that the company mandated he forfeit his shares and itself took possession of the shares."  (Dr. Rebmann 56.1 ¶ 6.)  Dr. Rebmann does not object to the translation or the

shareholders at the start of the meeting:  Dr. Rebmann, who possessed 40 percent of the shares and was also the managing director; Birgit Rebmann, Dr. Rebmann's wife and holder of 40 percent of the shares; and Defendant, Helge Rebmann, and Balder Rebmann, each of whom held 10 percent of the shares.  (Def.'s Oct. 18, 2013 Aff. Ex. D.)  According to the minutes, Dr. Rebmann and Birgit Rebmann were the only persons present at the meeting and voted to revoke Matthias' shares; Dr. Rebmann voted on behalf of himself and Balder Rebmann, and Birgit Rebmann voted on behalf of herself and Helge Rebmann.  (*Id.*)  The translated minutes do not specifically indicate whether or how Balder and Helge Rebmann authorized Dr. Rebmann and Birgit Rebmann to vote on their behalf.  (*See id.*)  The minutes also contain a lengthy statement of the reasons why the shareholders decided to revoke the shares and are signed by Dr. Rebmann.  (*Id.*)  Defendant has also stated by affidavit that Dr. Rebmann personally called the shareholder meeting and held it in his own home.  (*Id.* ¶¶ 12, 15 & Exs. A, D.)  A reasonable jury could conclude from these facts that Dr. Rebmann did personally participate in the revocation of the shares, by calling the shareholders' meeting, holding it in his home, proposing the resolution, and voting for the resolution.[12]

---

admissibility or authenticity of the minutes.  (*See generally id.*; Dr. Rebmann Mem.)  Defendant similarly relies on the minutes.  (*See* Def.'s Resp. 56.1 ¶ 6.)  Accordingly, despite the fact that neither party has demonstrated the admissibility of the shareholder meeting minutes and the translation of those minutes, which might otherwise be hearsay, I take their silence on the point as "waive[r] of [their] objection to the admissibility of [the] document" for purposes of summary judgment.  *Kovalchik v. City of New York*, No. 09-CV-4546 RA, 2014 WL 4652478, at *6 (S.D.N.Y. Sept. 18, 2014); *see also Capobianco v. City of New York,* 422 F.3d 47, 55–56 (2d Cir. 2005) (concluding that the district court erred by *sua sponte* excluding a document as inadmissible hearsay, where both parties had relied on the document in their summary judgment briefing and neither had challenged its admissibility).

[12] Dr. Rebmann attempts to distinguish Defendant's claim on the ground that unlike corporate officers and directors, "shareholders are not agents of a corporation."  (Dr. Rebmann Reply 4 (citing *Rensselaer & S.R. Co. v. Irwin*, 239 F. 739, 746 (N.D.N.Y. 1917), *aff'd,* 249 F. 726 (2d Cir. 1918); *Van Heusen v. Van Heusen Charles Co.*, 131 N.Y.S. 401, 406 (Supr. Ct. Albany Cty. 1911).  Dr. Rebmann provides no further reasoning or any authority explaining how this principle would be relevant where, as here, a corporate owner is alleged to have personally participated in the tort at issue.  *Cf. Minnie Rose LLC v. Yu*, 169 F. Supp. 3d at 522.  More generally, even if piercing the veil were required to hold Dr. Rebmann liable for the conversion—and it is not, *see id.*—the relevant inquiry would be whether the corporation was the agent or instrumentality of Dr. Rebmann, not the other way around.  *See Indus. Water Sols., LLC v. Ravyn & Robyn Constr., LLC*, 789 F. App'x 920, 921 (2d Cir. 2020) ("In order to pierce the

Dr. Rebmann's argument that the conversion claim must fail because he did not ever personally take possession or control of the shares is also unavailing.  (*See* Dr. Rebmann Reply 3.)[13]  As an initial matter, there is no requirement that a defendant take possession of the property at issue to constitute conversion.  *See Hillcrest Homes, LLC v. Albion Mobile Homes, Inc.*, 984 N.Y.S.2d 755, 757 (4th Dept. 2014) ("A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession"); *Gen. Elec. Co. v. Am. Exp. Isbrandtsen Lines, Inc.*, 327 N.Y.S.2d 93 (2d Dep't 1971).  Moreover, while it may have been Lipoid G that technically "exercise[d] control" over the shares, *see id.*, as discussed above Dr. Rebmann, as a shareholder and officer, could be individually liable for that conversion if he personally participated in it.[14]  In this regard, *LoPresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997) is instructive.  In that case, a closely held corporation had wrongfully used money withheld from employee paychecks for union dues to pay off some of its debts.  *Id.* at 37.  The Second Circuit found that the shareholder and president of the corporation could be held liable for conversion because he had "participate[d] in [the] tort," even though he did so "in the course of his duties on behalf of the corporation."  *Id.* at 42; s*ee also PDK Labs, Inc. v. G.M.G. Trans W. Corp.*, 101

---

corporate veil under New York law, a plaintiff must establish that '(1) [the owner] ha[s] exercised such control that the [corporation] has become a mere instrumentality of the [owner], which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff.'" (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc*., 933 F.2d 131, 138 (2d Cir. 1991))).  I also note that the record evidence suggests that Dr. Rebmann was an officer and a shareholder of Lipoid G.  (*See* Def.'s Oct. 18, 2013 Aff. Ex. D.)

[13] "Dr. Rebmann Reply" refers to the Reply Memorandum of Law in Further Support of Third-Party Defendant's Motion for Partial Summary Judgment, filed on April 5, 2019.  (Doc. 291.)

[14] I note that is not clear whether the actions taken at the shareholders meeting were sufficient to divest Defendant of his shares.  For example, Plaintiffs do not cite to any provisions of the company's formation documents permitting the company to take the shares away from a shareholder.  In addition, there is no evidence concerning whether Dr. Rebmann and Brigit Rebmann were duly authorized to vote on behalf of Balder and Helge Rebmann.

A.D.3d 970, 974, 957 N.Y.S.2d 191 (2d Dep't 2012) (complaint stated a claim for conversion where it alleged that individual corporate principals "personally participated in the [corporation's] allegedly wrongful withholding of the pharmaceuticals").

Dr. Rebmann argues in a footnote in his reply brief that the conversion claim must ultimately fail because the shares at issue were intangible property, and Defendant has not shown that a physical stock certificate or other tangible paper document was converted by Dr. Rebmann.  (Dr. Rebmann Reply 2 n.1.)  Because this argument is not properly or timely raised,[15] and Defendant has not had the opportunity to respond, I will not decide the instant motion on that ground.  However, New York law is clear that "shares of stock are intangible property" that may only be the subject of a conversion action if they have "merge[d]" with a tangible document that was itself converted.  *See Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir.), *certified question accepted,* 7 N.Y.3d 837, 857 N.E.2d 528 (2006), and *certified question answered,* 8 N.Y.3d 283, 864 N.E.2d 1272 (2007); *see also Jin Yung Chung v. Sano*, No. 10-CV-2301 DLI CLP, 2011 WL 1298891, at *9 (E.D.N.Y. Mar. 31, 2011) (dismissing conversion claim because plaintiff claimed only that defendant "converted stock *interests*, not physical property or physical representations of intangible property").  I have not been able to locate in the record evidence suggesting that Dr. Rebmann converted any stock certificates or other documents representing the shares at issue, nor is there any allegation in the Second Amended Answer to that effect, although it appears from the parties' prior communications that discovery

---

[15] Arguments raised for the first time on reply or in a footnote are not properly raised and need not be considered by the district court.  *See Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 441 (S.D.N.Y. 2015); *Laidlaw & Co. (UK) Ltd. v. Marinaccio*, No. 19-CV-5246 (RA), 2020 WL 1151323, at *6 n.10 (S.D.N.Y. Mar. 10, 2020); *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) (citing *United States v. Restrepo,* 986 F.2d 1462, 1463 (2d Cir. 1993)), *aff'd,* 626 F. App'x 20 (2d Cir. 2015)).  Dr. Rebmann did cite to *Thyroff*, 460 F.3d at 403–04, as his source for the basic rules on conversion, but did not cite to the page of the opinion that mentions that shares of stock are typically intangible property, *see id.* at 405, and did not otherwise mention this issue.

on Defendant's third-party claims is not yet complete.  (*See* Doc. 263.)  If in fact there is no evidence that a tangible representation of Defendant's shares was converted, his claim will likely fail at trial.

### B.   *Defendant Matthias Rebmann's Motion for Summary Judgment*

Defendant moves for summary judgment dismissing all the claims against him, namely: (1) cybersquatting under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); (2) breach of fiduciary duties relating to the domain names; (3) conversion relating to the domain names; (4) breach of fiduciary duties relating to the CRM software and the laptop; and (5) conversion relating to the CRM software and the laptop.  (Def.'s Mem. i, 3.)[16]  Defendant also seeks summary judgment dismissing Plaintiffs' claims for injunctive relief based on his affirmative defenses of laches and unclean hands.  (*Id.* at i.)

### 1.  Cybersquatting

#### a.  Applicable Law

The ACPA was passed in 1999 as an addition to the Lanham Act in order "to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as 'cybersquatting.'"  *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 668 (S.D.N.Y. 2018) (quoting S. Rep. No. 106–140, at 4); *see also* 15 U.S.C. § 1125.  More specifically, "[c]ybersquatting involves the registration of domain names of well-known trademarks by non-trademark holders who then try to sell the names back

---

[16] "Def.'s Mem." refers to Defendant and Third-Party Plaintiff Carsten Matthias Rebmann's Motion for Summary Judgment Dismissing Plaintiffs' Amended Complaint, filed on March 11, 2019.  (Doc. 282.)

to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493

(2d Cir. 2000)).  "This practice 'is considered wrong because a person can reap windfall profits

by laying claim to a domain name that he has no legitimate interest in or relationship to.'"

*Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 431 (S.D.N.Y. 2013) (quoting

*Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 238 (4th Cir. 2002)).

Accordingly, the ACPA imposes liability on any person who "registers, traffics in, or

uses a domain name that . . . is identical or confusingly similar to" a trademark.  15 U.S.C. §

1125(d)(1)(A).  To establish a violation of the ACPA, a plaintiff must prove that "(1) its marks

were distinctive at the time the domain name was registered; (2) the infringing domain names

complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has

a bad faith intent to profit from that mark." *Gioconda Law Grp.*, 941 F. Supp. 2d at 430 (quoting

*Webadviso v. Bank of Am. Corp.*, 448 Fed. App'x 95, 97 (2d Cir. 2011)).  The phrase "bad faith

intent to profit" is a "term[] of art in the ACPA and hence should not necessarily be equated with

'bad faith' in other contexts." *NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328,

339 (S.D.N.Y. 2014) (quoting *Sporty's Farm*, 202 F.3d at 499 n.13).  The ACPA sets forth a list

of factors courts may consider in assessing bad faith intent to profit,[17] but both the statute and the

---

[17] The factors are:  (I) the trademark or other intellectual property rights of the person [who registered the domain name], if any, in the domain name ("Factor I"); (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person ("Factor II"); (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services ("Factor III"); (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name ("Factor IV"); (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site ("Factor V"); (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct ("Factor VI"); (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct ("Factor VII"); (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or

Second Circuit have made clear that these factors are non-exhaustive and permissive rather than

mandatory.  *See* § 1125(d)(1)(B)(i) (stating that a court "may consider factors such as, but not

limited to . . .").  Courts "need not . . . march through the nine factors seriatim because

the ACPA itself notes that use of the listed criteria is permissive." *Gioconda Law Grp.*, 941 F.

Supp. 2d at 432 (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th

Cir. 2001)); *see also McAllister Olivarius*, 298 F. Supp. 3d at 673 ("[C]ourts 'are not limited to

considering just the listed factors.'" (quoting *Sporty's Farm*, 202 F.3d at 499)).  Rather, "[a]ny

'unique circumstances . . . , which do not fit neatly into the specific factors enumerated' [by

Congress] may . . . be considered." *McAllister Olivarius*, 298 F. Supp. 3d at 673 (quoting

*Sporty's Farm*, 202 F.3d at 499 (finding that those "unique circumstances" provided "[t]he most

important grounds for [] holding that Sporty's Farm acted with a bad faith intent")).

b.  <u>Application</u>

Defendant moves for summary judgment dismissing this claim on the grounds that (1) as

a matter of law, Plaintiffs have not demonstrated that the underlying trademarks are

"distinctive"; and (2) there is no evidence sufficient to demonstrate that he acted with a bad faith

intent to profit.  (Def.'s Mem. 9–13.)  I find that both of these arguments are controverted by the

record, and summary judgment on this claim must be denied.

---

confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties ("Factor VIII"); and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous.  ("Factor IX").  15 U.S.C. § 1125(d)(1)(B)(i). "A leading treatise on the law of trademarks notes that "[t]he first four factors suggest circumstances tending to indicate an absence of bad faith intent to profit from the goodwill of the mark, the next four tend to indicate that such bad faith does exist and the last factor points in either direction, depending on the degree of distinctiveness and fame of the mark." *Gioconda Law Grp.*, 941 F. Supp. 2d at 432 (quoting 4 McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed.)).

i. *Distinctiveness*

A registered trademark is presumed to be distinctive. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986); *Alpha Recycling, Inc. v. Crosby*, No. 14-CV-5015 (JPO), 2016 WL 1178774, at *3 (S.D.N.Y. Mar. 23, 2016).  Although Defendant contends that Plaintiffs did not allege its marks were "distinctive," (Def.'s Mem. 13), Plaintiff offers trademark registrations, of which I take judicial notice, showing that the Domain Names are URL versions of trademarks registered by Plaintiffs.[18]  (*See* Pls.' Opp. 3–4; Hauser Decl. Exs. B–I.)[19]  Accordingly, in the absence of any substantive argument for why the presumption of distinctiveness should be rebutted with respect to the Domain Names,[20] there is a dispute of material fact on the first cybersquatting factor.

---

[18] The Second Circuit has held that district courts may take judicial notice of copyright registrations published in the federal Copyright Registry. *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).  The same principle has been applied to trademark registrations registered with the United States Patent & Trademark Office [the "USPTO"]."  *See Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 CV 6403, 2008 WL 2884761, at *2 n.2 (E.D.N.Y. July 23, 2008).  Defendant's counsel has supplied copies of the relevant registrations and sworn they are true copies of the registrations as displayed on the website of the USPTO. (*See* Hauser Decl. ¶ 4 & Exs. B–I.)  I have also independently confirmed on the USPTO website that each of the relevant trademarks is registered by one Plaintiff.  *See* United States Patent and Tradmeark Office, Trademark Electronic Search System, http://tmsearch.uspto.gov/bin/gate.exe?f=tess&state=4802:66xm6i.1.1 (follow "Basic Word Mark Search (New User)" hyperlink, then search, with quotation marks, "Alcolec," "American Lecithin," "Cerasome," "Lipoid," "Nanosolve," "Phosal," "Phospholipon," and "Phytosolve").  Accordingly, judicial notice of Plaintiffs' trademark registrations is proper.

[19] "Pls.' Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendant and Third-Party Plaintiff Carsten Matthias Rebmann's Motion for Summary Judgment Dismissing Plaintiffs' Amended Complaint, filed on March 29, 2019.  (Doc. 286.)  "Hauser Decl." refers to the Declaration of Gregory F. Hauser in Opposition to Defendant's Motion for Summary Judgment ("Hauser Declaration"), filed on March 29, 2019.  (Doc. 287.)

[20] In a footnote in his reply, Defendant states that Plaintiffs' ACPA claim must fail because "the testimony [Plaintiffs] cite shows that at least six of the marks were generic, rather than distinctive."  (Def.'s Reply 8 (citing Pls.' Mem. 9–10).)  The cited portion of Plaintiffs' brief, however, does not cite to any testimony, and Defendant does not further elaborate on why those six marks should be deemed "generic" rather than distinctive.  Therefore, I do not credit this argument.  "Def.'s Reply" refers to the Reply Memorandum of Law of Defendant and Third-Party Plaintiff Carsten Matthias Rebmann on his Motion for Summary Judgment, filed on April 5, 2019.  (Doc. 292.)

ii. *Bad Faith Intent to Profit*

Defendant has also failed to establish as a matter of law that he did not have a bad faith intent to profit. Defendant's arguments to the contrary mischaracterize the evidence in the record and impermissibly rely on the drawing of inferences against Plaintiffs.

It is undisputed that americanlecithin.com and lipoidllc.com were initially registered by the Lipoid Group and that Defendant transferred the registration for those Domain Names to his own name. (*See* Def.'s 56.1 ¶ 1; Pls.' Resp. 56.1 ¶ 1; Pls.' Opp. 4–5; Def.'s Resp. to Pls.' 1st Interrogs. No. 2.)[21] It is also undisputed that Defendant registered phytosolve.com, cerasome.com and nanosolve.com in his own name in the first instance. (Def.'s 56.1 ¶ 3; Pls.' Resp. 56.1 ¶ 3; Pls.' Opp. 4–5.) The facts relating to how the remaining Domain Names became registered to Defendant are, on their face, disputed: Defendant now asserts in his 56.1 Statement that he registered alcolec.com, phosal.com, and phospholipon.com in his name in the first instance, (Def.'s 56.1 ¶ 3), but this assertion is unsupported by the accompanying citation, and the president of ALC, Randall E. Zigmont, testified that he was the one who originally registered those names. (Zigmont Dep. Tr. 32:24–33:10, 42:17-43:22.)[22] Indeed, Defendant himself previously stated in his deposition that he had transferred alcolec.com to his own name from ALC's, (Def.'s Dep. Tr. 50:18–52:12)[23], and stated in interrogatory answers that alcolec.com,

---

[21] "Pls.' Resp. 56.1" refers to the Response of Plaintiffs and Third-Party Defendant to Defendant's Local Rule 56.1 Statement in Support of Motion for Summary Judgment, filed on March 29, 2019. (Doc. 285.) "Def.'s Resp. to Pls.' 1st Interrogs." refers to Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories, originally dated May 21, 2012, and filed on the docket on March 29, 2019 as Exhibit A to the Hauser Declaration. (Doc. 287-1.)

[22] "Zigmont Dep. Tr." refers to the transcript of the March 30, 2016 Deposition of Plaintiff American Lecithin Company, by Randall E. Zigmont, filed on March 1, 2019 as Exhibit 12 to the Affirmation of Samuel Goldman in Support of Defendant's Motion for Summary Judgment ("Goldman Affirmation" or "Goldman Aff."), filed on March 1, 2019. (Doc. 275-11.)

[23] "Def.'s Dep. Tr." refers to the transcript of the July 19, 2012 deposition of Defendant Carsten Matthias Rebmann, filed on March 1, 2019 as Exhibit 3 to the Goldman Affirmation. (Doc. 275-2.)

phosal.com, and phospholipon.com, were initially registered in September 2003 and were transferred to his account in May or June 2008, (Def.'s Resp. to Pls.' 1st Interrogs No. 2).

Defendant contends that he transferred americanlecithin.com and lipoidllc.com to his own name in order to "resolve major difficulties Lipoid LLC and ALC were having with their email and internet services," (*id.* ¶ 2), and registered the other Domain Names in order to protect the Lipoid Group in case they might want to use them in the future, (*id.* ¶ 3).

Shortly after his employment was terminated, Defendant sent an e-mail in English to Dr. Rebmann.  (Goldman Aff. Ex. 8.)  Defendant characterizes this email as "a list of open items that needed to be addressed in connection with the transition . . . includ[ing] transfer of internet domain names and reimbursement of his expenses for maintaining them."  (Def.'s Mem. 5; *see also* Def.'s 56.1 ¶ 8.)  This characterization does not accurately describe the actual text of the e-mail.  In fact, Defendant's email states that he "would transfer the daily affairs and other aspects of the company to you only if a fair separation is signed," then notes that he is still in possession of certain corporate documents and the "the corporate internet domain names."  (Goldman Aff. Ex. 8.)  In the final paragraph, Defendant stated:  "I will be traveling now and could possibly be available for a transfer meeting on August 26, 2011 if you should still offer a fair settlement until then.  My mother's bequest has still not been credited to my bank account.  Please consider such payment a precondition for any settlement conversation."  (*Id.*)  The e-mail contains no request for reimbursement, (*see id.*), nor does anything else in the record, although Defendant did state at his deposition that he refused to return the Domain Names after Plaintiffs' demand because "what was missing here was the offer of reimbursement, because I paid for those things." (Def.'s Dep. Tr. 111:18–119:5.)

On November 7, 2011 and December 16, 2011, Plaintiffs' attorneys sent Defendant a

letter demanding he transfer the domain names.  (Goldman Aff. Exs. 14, 15.)  Defendant did not

do so.  At his deposition, Defendant described an e-mail he sent to Dr. Rebmann on or about

November 30, 2011—which is notably not included as an exhibit here—in which he wrote, in

German:  "I have paid for the domain names.  They are my property, and I could transfer them to

anyone."  (Def.'s Dep. Tr. 115:9-15.)  Defendant's subsequent testimony suggested that he

included this sentence in the e-mail in order to obtain a favorable settlement:

> Q:  So your feeling was that you could give them away.  You could just
> sell them, correct?
>
> A:  Maybe I thought this at that point.  Maybe I didn't think it.  Maybe I
> just thought this was a good bargaining chip.
>
> Q:  But that's what you wrote, correct?
>
> A:  In the attempt to settling.

(Def.'s Dep. Tr. 115:17-23.)  Plaintiffs commenced this lawsuit on February 6, 2012.  On March

21, 2012, Defendant offered to return the domain names in exchange for an omnibus financial

settlement of all his claims. (Ex. 16.)  On June 15, 2012, Defendant made another offer to return

the domain names, this time in exchange for $10,453 in "unreimbursed costs incurred by Mr.

[Matthias] Rebmann to host the domain names on Plaintiffs' behalf for the past several years."

(Goldman Aff. Ex. 17.)  Although the settlement offer letter references an attached breakdown of

fees, the version provided by Defendant does not include this breakdown.  (*Id.*)[24]  Plaintiffs

declined the offer.  (Goldman Aff. Ex. 18.)  On July 19, 2012, Defendant made a Rule 68 Offer

of Judgment offering to turn over the domain names (as well as the laptop and CRM software),

---

[24] I note that in another exhibit supplied by Defendant, the annual fee for nanosolve.com charged by the original host was $60.00, suggesting that $10,453 might be out of proportion to the actual cost of the hosting fees for seven domain names over the course of several years.

not conditioned on any payment of a monetary settlement, (Ex. 19), which Plaintiffs did not accept.[25]

Based on the direct and circumstantial evidence described above, a reasonable juror could find that Defendant has retained the Domain Names with a bad faith intent to profit. While the majority of the ACPA factors do not apply here,[26] the eighth and sixth factors provide guidance. *See* 15 U.S.C. 1125(d)(B)(i)(VII, VI). With respect to the eighth factor, Defendant did "regist[er] . . . multiple domain names which [he] kn[ew] [we]re identical . . . to marks" belonging to Plaintiffs. *Id.* § 1125(d)(B)(i)(VIII). Defendant contends his registration of americanlecithin.com and lipoidllc.com was made in good faith in order to resolve issues with ALC and Lipoid's e-mail services, but there are issues of fact as to his motivation for registering those two Domain Names in his personal name in order to resolve those issues. He also contends he registered the remaining Domain Names in his name in order to protect Plaintiffs' business interests, but there are issues of fact as to whether he registered all of those Domain Names in the first instance or transferred them from Plaintiffs, and why he made those registrations in his own

---

[25] Rule 408 of the Federal Rules of Evidence bars use of statements made during settlement negotiations for the purposes of proving or disproving the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction, but permits a court to admit such evidence for "another purpose." Fed. R. Evid. 408. Defendant contends the Offer of Judgment is not inadmissible because he offers it "not with regards to the issues of liability or damages, but to refute any suggestion that [he] wanted to hold on to the Domain Names or use them for his benefit." (Def.'s Mem. 8 n.1.) Plaintiffs do not object to consideration of the Offer of Judgment. (*See generally* Pls.' Mem.) A trial court has "broad discretion as to whether to admit evidence of settlement . . . offered for 'another purpose.'" *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999). "In applying the 'another purpose' exception to Rule 408, the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Id.* I agree that Defendant's attempt to use the Offer of Judgment to demonstrate that he did not have a bad faith intent to profit constitutes "another purpose" within the meaning of Rule 408. Further, because Defendant seeks to introduce his own settlement offer, and because neither party objects to its consideration, admitting the Offer of Judgment would not discourage future settlement and I find it appropriate to consider it at this stage.

[26] Factors one through five, seven, and nine are inapplicable: Defendant does not contend that he has any rights in the Domain Names, (Factors I and II); did not in any way use the Domain Names to divert visitors, operate his own website or to offer goods and services, (Factors II, IV, and V); and did not provide false or inaccurate contact information in the course of registering and maintaining the Domain Names, (Factor VII). There is no evidence in the record to overcome the presumption that Plaintiffs' marks are distinctive, (Factor IX); indeed Defendant does not acknowledge or address the ninth factor.

name rather than in the name of one of the Plaintiffs. The sixth factor tips significantly in favor

of bad faith. Defendant did "offer to transfer . . . the domain name[s] to [Plaintiffs] . . . for

financial gain without having used, or having an intent to use, the domain name in the bona fide

offering of any goods or services." *Id.* § 1125(d)(B)(i)(VI). *See also DSPT Int'l, Inc. v. Nahum*,

624 F.3d 1213, 1219–20 (9th Cir. 2010), 624 F.3d at 1221 ("Factor VI may fairly be read to

mean that it is bad faith to hold a domain name for ransom, where the holder uses it to get money

from the owner of the trademark rather than to sell goods." (footnote omitted)).

Courts have found bad faith intent to profit under circumstances analogous to those

presented here. The Ninth Circuit has held that: "As for whether use to get leverage in a

business dispute can establish a violation, the statutory factors for 'bad faith intent' establish that

it can." *DSPT Int'l*, 624 F.3d at 1221. In *DSPT International*, a former employee of the plaintiff

withheld the access information and domain name for the plaintiff's website in order to gain

leverage for his claim for $14,936.86 in unpaid commissions. *Id.* at 1219–21. The defendant

testified that he only intended to transfer the domain names after he and the plaintiff "were able

to resolve the monetary issues regarding [his] commissions." *Id.* at 1221. The Ninth Circuit

found that the defendant had a bad faith intent to profit, explaining that:

> Though there was no direct evidence of an explicit offer to sell the domain to DSPT
> for a specified amount, the jury could infer the intent to give back the site to DSPT
> only if DSPT paid Nahum the disputed commissions.
>
> The "intent to profit," as factor VI shows, means simply the intent to get money or
> other valuable consideration. "Profit" does not require that Nahum receive more
> than he is owed on his disputed claim. Rather, "[p]rofit includes an attempt to
> procure an advantageous gain or return." . . . [Defendant] could not hold the domain
> name for ransom even if he had been owed commissions.

*Id.* (quoting *Coca–Cola Co. v. Purdy*, 382 F.3d 774, 786 (8th Cir. 2004)).

Here, too, Defendant "could not hold the [D]omain [N]ame[s] for ransom" in order to gain leverage for severance or even for "reimbursement." *Id.* District courts in this circuit have come to similar conclusions. In *Mintz v. Mktg. Cohorts, LLC*, the court found a bad faith intent to profit where the defendant, who had been hired by plaintiff to upgrade her website, "hijacked the TepOrganics website and social media account and used them as digital cudgels to extract payment" from plaintiff on her allegedly overdue bill for defendant's services. No. 18-CV-4159 (ERK) (SIL), 2019 WL 3337896, at *5 (E.D.N.Y. July 25, 2019). In *Vogster Entm't, L.L.C. v. Mostovoy*, defendant was a co-owner of plaintiff, a corporation, and initially registered the websites at issue in his own name. No. 09-CV-1036 RRM/RER, 2009 WL 691215, at *4 (E.D.N.Y. Mar. 16, 2009). After he resigned following allegations of misconduct, he agreed to return the domain names but did not do so despite repeated demands. *Id.* On the plaintiff's motion for a temporary restraining order, the court found a likelihood of success on the merits on plaintiff's cybersquatting claim, "observing that '[u]nder the circumstances here, it is unlikely that Defendants can advance any legitimate purpose for their current ownership or control of [the] websites and domain names." *Id*.

Defendant contends that he could not have been seeking financial gain because he was merely seeking "reimbursement" of his expenses rather than making an "extortionate demand." (*See* Def.'s Mem. 10.) According to Defendant, "[t]he ACPA does not prohibit requests for reimbursement or requests for omnibus settlement amounts so long as they are not "unreasonable, exorbitant and extortionate." (Def.'s Reply 7 (quoting *New World Sol'ns*, 150 F. Supp. 3d at 313.) These contentions must be rejected.

As an initial matter, as detailed above, there are issues of disputed fact concerning whether Defendant in fact only sought reimbursement, and it is by no means clear from the

record that the vague "fair" settlement Defendant sought was not extortionate.  Moreover,

Defendant misrepresents the law.  It is true that courts consider "purchas[ing] a domain name

very similar to the trademark and then offer[ing] to sell the name to the trademark owner at an

extortionate price" to be a "quintessential example" of bad faith.  *Gioconda Law Grp.*, 941 F.

Supp. 2d at 432 (quoting *Utah Lighthouse Ministry v. Found. for Apologetic Info. &*

*Research,* 527 F.3d 1045, 1058 (10th Cir. 2008)); *see also New World Sol'ns*, 150 F. Supp. 3d at

325 ("[A] court must analyze each case based on its unique circumstances to determine how

close a defendant's conduct falls to the ACPA's heartland—the clearest example of which is the

situation where a defendant registers an established entity's domain name in bad faith and offers

to sell it to the entity for an exorbitant price." (internal quotation marks omitted)).  But nothing in

the statute or the case law suggests that an "extortionate" or "exorbitant" price is *required* to give

rise to bad faith.  To the contrary, "holding domains hostage to extract ransoms from lawful mark

owners was one of the evils targeted by the ACPA."  *Mintz*, 2019 WL 3337896, at *5 (citing

*Sporty's Farm*, 202 F.3d at 493.)

        Defendant cites *Pro-Concepts, LLC v. Resh*, No. 2:12CV573, 2013 WL 5741542 (E.D.

Va. Oct. 22, 2013), for the proposition that "seeking reimbursement for expenses of registering

and maintaining a website is not an 'intent to profit' and therefore not a violation of the ACPA."

(Def.'s Reply 3.)  *Pro-Concepts* is both non-binding and distinguishable.  There, the defendant

had been employed by a software company and registered a domain name that incorporated

plaintiff's trademark in order to protect the product.  *Id.* at *1.  He asked his employer for

reimbursement for the registration of the website, but his request was denied because the

company did not wish to use that domain name.  *Id.*  The defendant later began working at a

company that sold his prior employer's software, and set up a website at the previously

purchased domain name to redirect users to his new employer's official website.  *Id.*  He cancelled that redirect function after his own employment was terminated.  *Id.*  The court denied the plaintiff's request for a preliminary injunction in part because the sixth factor weighed against a finding of bad faith "as there [was] evidence [defendant asked for payment] not for financial gain, but for reimbursement . . . the evidence indicates that [defendant] attempted to transfer the site to the markholder for an amount equal to the cost of acquiring and maintaining the domain."  *Id.* at *15.  The defendant's single request for reimbursement in *Pro-Concepts*, however, is very different from the situation in the instant case, where the evidence suggests that Defendant repeatedly attempted to use the Domain Names as leverage for a global severance settlement.  Further, *Pro-Concepts* was decided prior to the commencement of discovery, and the court noted that "further factual development" would "likely dictate the final resolution" on the merits.  *Id.* at *23.  *Academy of Motion Picture Arts & Sciences. v. GoDaddy.com, Inc.*, No. CV 10-03738 AB (CWX), 2015 WL 5311085 (C.D. Cal. Sept. 10, 2015) is also non-binding and inapplicable.  Defendant cites that case for the proposition that "a 'mere offer to sell a domain name is not itself evidence of bad faith intent in the absence of evidence' of the offer being exorbitant."  (Def.'s Reply 4 (quoting *id.* at *45).)  There, however, the defendant was a domain name registrar that was in the business of selling millions of domain names, including the one at issue—a very different situation than the one at bar, particularly given that, as I have stated, it is not clear that Defendant's price was not exorbitant.

Defendant's contention that he initially registered or transferred the Domain Names in good faith, (*see* Def.'s Mem. 4–5; Def.'s Reply 3), is not relevant to this analysis.  Even if, *arguendo*, Defendant initially registered or transferred the Domain Names to his own name in good faith—and it is by no means clear from the cited evidence that he did—that does not bear

on whether he was acting in good faith when he retained the Domain Names after his employment was terminated.  "Congress intended the cybersquatting statute to make rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration."  *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 385 (2d Cir. 2003).  In assessing a cybersquatting claim, therefore, "courts look to a defendant's whole course of conduct, including conduct during ACPA litigation."  *Gioconda Law Grp.*, 941 F. Supp. 2d at 433.  Here, it is Defendant's "ongoing conduct" after his employment was terminated that gives rise to the dispute of fact, and conduct at the time he registered or transferred the Domain Names does not change that analysis.[27]

Defendant points to additional evidence he claims supports his contention that it is undisputed that he did not act in bad faith.  He contends that he did not change anything about the websites located at lipoidllc.com and americanlecithin.com, (Def.'s Mem. 6–7; Def.'s Dep. Tr. 129–133), that the other Domain Names had never been used (Zigmont Dep. Tr. 43–44), that for a time after his employment was terminated he either forwarded relevant e-mails to persons

---

[27] There are also disputed issues of fact related to whether Defendant did initially register or transfer the Domain Names in good faith.  Defendant contends that he registered the Domain Names in his own name as part of a habit of incurring expenses personally even though they were for the benefit of the company, (Def.'s Dep. Tr. 58–60), and that he did this "with the full knowledge and participation, of employees of the Lipoid Group."  (Def.'s 56.1 ¶¶ 1, 5.) But the cited exhibits do not actually demonstrate that any employee of the Lipoid Group, much less a person in a management role, was aware of the fact that the Domain Names were in Defendant's personal name.  Defendant testified that he discussed the general decision to transfer hosting of americanlecithin.com with "the person who [he] retained as the Internet consultant for" ALC, (*id.* 53:20-22), and that he was not sure whether Dr. Rebmann was aware that the domains were registered in his personal name, (*id.* 67:11-20 ("Q:  Mr. Rebmann, was your father aware that all these domain names were being handled through your personal hosting account? . . . A:  You have to ask him . . . . I don't know whether he knew the specifics.  I know that he generally was aware of the way I did those things, yeah.").)  Bruce Baretz, the president of Lipoid LLC, testified that he recalled issues with the e-mail systems, but did not address whether he knew the Domain Names were registered in Defendant's name.  (Baretz Dep. Tr. at 37–38.)  Similarly, Dr. Rebmann explicitly testified that he did not understand the domain name issue.  (Dr. Rebmann Dep. Tr. 315:13-20, 316:15-17) ("This domain, this whole story, I don't understand.  He has specialists on this, and they have to—to care for this . . .  I tell you, I have no idea about the whole project concerning these home pages and domains as well.  I was never involved with it.").  "Dr. Rebmann Dep. Tr." refers to the transcript of the April 29, 2015 deposition of Dr. Herbert Rebmann, filed on October 9, 2015, as Exhibit 1 to the Affirmation of Samuel Goldman in Opposition to the Motion by Plaintiffs and Third-Party Defendants to Dismiss Counterclaims and Third-Party Claims.  (Doc. 207-1.)  In his affirmation in support of Defendants' instant motion, Goldman also lists this transcript as Exhibit 2, but does not actually attach it.

at Lipoid LLC and ALC or told the sender to contact the company, (Def.'s Dep. Tr. 131–32),

until his attorney advised him to stop doing so, (*id.* at 132–33.)  He also cites to testimony by Dr.

Rebmann, Baretz, and Zigmont, in which they stated they did not know of any additional facts

demonstrating bad faith on the part of Defendant.  (Def.'s Mem. 11–12.)  None of these pieces of

evidence establish beyond dispute that Defendant lacked a bad faith intent to profit.  At best, they

create a dispute of fact as to Defendant's intentions that I cannot adjudicate at this stage.

### 2.  Breach of Fiduciary Duty

Under New York law, the elements of a breach of fiduciary duty claim are: "(1) the

existence of fiduciary relationship, (2) misconduct by the defendant, and (3) "damages directly

caused by [the defendant's] misconduct."  *Sea Trade Mar. Corp. v. Coutsodontis*, 744 F. App'x

721, 725 (2d Cir. 2018) (quoting *Pokoik v. Pokoik*, 982 N.Y.S.2d 67, 70 (1st Dep't 2014)).[28]

Plaintiff alleges that Defendant breached his fiduciary duties of loyalty and care by

---

[28] "A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state." *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006).  Generally, in New York, "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation."  S*cottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996) (citations omitted).  A claim for breach of fiduciary duty brought against a corporate officer or director raises issues relating to the internal affairs of a corporation and therefore should be governed by the law of the state of incorporation of the relevant corporation.  *In re Hydrogen LLC*, 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010) (citing *Walton v. Morgan Stanley & Co., Inc.,* 623 F.2d 796, 798 n. 3 (2d Cir. 1980) (noting that the choice-of-law rules of New York dictate "that the law of the state of incorporation govern[] an allegation of breach of fiduciary duty owed to a corporation")).  Here, the parties do not squarely address the question of which law should be applied to this claim.  Defendant does not address the issue at all and cites only three cases, two applying New York law and one applying Colorado law.  (Def.'s Mem. 13–14, 16–17; Def.'s Reply 8–13.)  Plaintiffs set forth the elements of a breach of fiduciary claim under New York law, describe the internal affairs doctrine, state that New Jersey law and Delaware law both impose fiduciary duties on corporate officers, and contend generally that Defendant breached his duties with respect to both ALC and Lipoid LLC.  (Pls.' Opp. 13–18.)  Plaintiffs then cite a mix of federal cases from different districts, including three from this district.  Neither party points to any conflict between the law on breach of fiduciary duty in New York and the corresponding law of Delaware or New Jersey.  "[A]s the [p]arties have not alerted [me] to an actual conflict" and cite principally to cases applying New York law, and as I have not independently identified such a conflict, I apply New York law to this claim.  *See 2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 220 (S.D.N.Y. 2015); *Interstate Foods, Inc. v. Lehmann*, No. 06 CIV. 13469(JGK), 2008 WL 4443850, at *3 (S.D.N.Y. Sept. 30, 2008) (applying New York law to breach of fiduciary duty claim because "parties [had] not submitted any evidence that there [was] actually a conflict of law.")

registering the Domain Names in his name and using them as a bargaining chip, and by retaining

and using the Laptop and the CRM Software after his employment was terminated.  (Am.

Compl. ¶¶ 7–8.)  Defendant seeks dismissal of both claims; I address each in turn.

### a.   Breach of Fiduciary Duty as to the Domain Names

Defendant seeks dismissal of the breach of fiduciary claim as to the Domain Names on

the grounds that (1) he did not breach any fiduciary duties, (2) Plaintiffs have not demonstrated

damages, and (3) his fiduciary duties ended when his employment was terminated.[29]  (Def.'s

Mem. 13–15.)  These arguments are not persuasive, and must be rejected.

First, Defendant states in a conclusory fashion that "[t]here is no evidence that he did not

---

[29] Although "[i]t is black letter law that the directors and corporate officers of a corporation owe a fiduciary duty to that corporation," *Smith on behalf of 50 E. 69th St. Corp. v. Smith*, No. 17 CIV. 6648 (PAE), 2019 WL 1755517, at *10 (S.D.N.Y. Apr. 19, 2019) (citing *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 165 (2d Cir. 2003)), Defendant argues in his opening brief that he did not owe a fiduciary duty to Lipoid LLC because the operating agreement contained a provision that waived any fiduciary duties owed by the company's "Manager."  According to Defendant, although he was listed in the operating agreement as the "Assistant Manager," Dr. Rebmann delegated the "Manager" function to him and he is listed as the "Manager" in Lipoid LLC's certificate of authority.  (Def.'s Mem. 14 (citing Goldman Aff. Ex. 20 ¶ 4.11; Def.'s Dep. Tr. 22–24; Baretz Dep. Tr. 31–33; Ex. 21).)  Despite Plaintiffs' arguments in opposition, (Pls.' Opp. 15 n.6), Defendant's reply does not provide further support on this point, (Def.'s Reply 8–12).  Accordingly, I deem this argument abandoned.  Even if I did not deem it abandoned, the cited evidence does not show that Defendant undisputedly occupied the role of "Manager."  Defendant testified that he began as a "managing director" of Lipoid LLC, (Matthias Dep. Tr. 21:3-8), and that he ran much but not all of the company's business:

> Q: As a practical matter, was it you who was running Lipoid, LLC, here in the United States?
>
> A: Not everything.  I mean, like, everything that was addressed to Lipoid, all like legally and otherwise were addressed to me, and I was doing all of this, yeah.

(Matthias Dep. Tr. 22:18-23.)  The certificate of authority lists Defendant as one of two "Managers," alongside Dr. Rebmann.  (Ex. 21.)  Defendant's testimony also suggested that he did not formally take on the title of president, the title which the Operating Agreement designates as equivalent to "Manager."  (Ex. 20 ¶ 4.5.)

> A: . . . [W]e acquired American Lecithin Company at some point.  I think this was 2007.  And in the past, like he wanted be president of other companies that he acquired.  But at that point he said, no, he doesn't want to do this anymore.  And I think sometime after this, he also said that he would want to have signing power for Lipoid, LLC, but wouldn't want to remain president of Lipoid, LLC.  And this is when I am, like, formally – however, like, I didn't – like, I didn't change my business card.  So basically I assumed the title of president.

(*Id.* 23:24-24:10.)  Accordingly, there remains a dispute of fact as to whether Defendant owed fiduciary duties to Lipoid, LLC, and the Plaintiffs' claims cannot be dismissed on this ground.

act in the companies' best interests, or that he put his personal interests ahead of the company's."
(Def.'s Mem. 14.)  Rather, he contends, he merely sought repayment of his expenses, which Dr.
Rebmann refused to pay, causing "th[e] transfer [of the Domain Names] not to occur."  (*Id.*)  As
discussed at length above, there is no evidence in the record to support—much less establish that
no material factual issue exists—that Defendant was only seeking reimbursement of his expenses
or that Dr. Rebmann or Plaintiffs were actually "aware of what he was doing."  (Def.'s Reply 8.)
To the contrary, drawing inferences in favor of Plaintiffs, the evidence could lead a jury to
conclude that Defendant was withholding the Domain Names as leverage to obtain a favorable
severance settlement.  Defendant's contention that "Plaintiffs produce no evidentiary facts
showing that Matthias registered the names for any reason other than Plaintiffs' benefit" ignores
the fact that a reasonable juror could find that Defendant acted in bad faith when he registered
the Domain Names—which amounted to company intellectual property—in his own name, based
solely on Defendant's actions and their context, as set forth in the record.  (*See* supra, Part
III(B)(1)(b)(ii)); *see also C.D.S., Inc. v. Zetler*, 298 F. Supp. 3d 727, 759 (S.D.N.Y. 2018)
(granting summary judgment against defendant on breach of fiduciary duty claim where
defendant transferred registration of three domain names originally owned and registered by
plaintiff to his own LLC, where defendant "point[ed] to no evidence that he informed [plaintiff's
officer] of this transfer or otherwise received approval for his decision" to do so), *appeal
withdrawn,* No. 18-1318, 2018 WL 3689978 (2d Cir. June 1, 2018); *Vogster*, 2009 WL 691215,
at *5 (applying New Jersey law and granting motion for preliminary injunction based on former
officer's registration of corporate domain name in his own name because "any bad-faith action in
unlawfully registering Vogster's intellectual property to himself . . . would likely give rise to
successful claims for breach of fiduciary duty.").

Further, under certain circumstances, an employee's "fiduciary duty may continue after termination of the employment relationship." *Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 KMK, 2015 WL 5730339, at *20 (S.D.N.Y. Sept. 30, 2015) (citing *Am. Fed. Grp., Ltd. v. Rothenberg,* 136 F.3d 897, 914 (2d Cir.1998)).  Such continuing duties may include "the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227–28 (S.D.N.Y. 2013) (quoting *Am. Fed. Grp.*, 136 F.3d at 897).  Judge J. Paul Oetken offers the following helpful illustration of the kinds of duties that may continue after employment has ended:

> For example, by virtue of a prior employment relationship, a former employee may have access to an employer's property—perhaps he retained his employer's key after his employment ended.  Because the employee originally obtained the key to serve the ends of the fiduciary relationship with his employer, he is arguably duty-bound not to appropriate the key, or the property to which the key grants access, for his own use.

*Nicholsen v. Feeding Tree Style, Inc.*, No. 12 CIV. 6236 JPO, 2014 WL 476355, at *4 (S.D.N.Y. Feb. 6, 2014) (citing *United States v. Chestman,* 947 F.2d 551, 569 (2d Cir.1991) (*en banc* ) ("In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another.  Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use.")).

While the Domain Names are not perfectly analogous to keys, they were based on Plaintiffs' intellectual property, which Defendant was obligated to protect in order "to serve the ends of the fiduciary relationship with his employer." *Id.*  Thus, there is an issue of fact as to whether, after his employment was terminated, he was "duty-bound not to appropriate [the Domain Names] . . . for his own use." *Id.*

Finally, although the record is sparse, I find that Plaintiffs have adduced just enough evidence that they were damaged to survive summary judgment.  First, Plaintiffs state that because Defendant controlled the Domain Names, they were forced to use other domain names for their e-mail services and website.  As a result, they assert, some customers attempted to reach them at their prior addresses and when they received no response, complained.[30]  I agree with Defendant that these generalized assertions of harm to Plaintiffs' customer relationships based on "complaints," are, on their own, too speculative.  *See Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 907 (2d Cir. 1998) (noting that to recover damages for lost earnings or profits resulting from breach of fiduciary duty, a plaintiff ultimately "must prove with reasonable certainty . . . the amount of the loss" (citation omitted)).  Plaintiffs do not, for example, state that they experienced a loss of customer goodwill, that they experienced a reduction in purchases from the customers who complained, or that any other consequences flowed from the "complaints."  However, I find that a reasonable jury could find that Plaintiffs were damaged based on (1) the facts that americanlecithin.com and lipoidllc.com were assets that belonged to Plaintiffs in the first instance, and which they are now deprived of, and (2) Plaintiffs' evidence about the efforts they undertook to develop new web presences after Defendant refused to transfer the Domain Names.  Baretz testified that Lipoid, LLC, switched to using lipoid.com, which was already being used by Lipoid GmbH, once it became clear that they "were no longer receiving e-mails," (Baretz Dep. 81:17-25.), changed their business cards and stationery to reflect that change, and then notified their customers of the changes.  (*Id.* at 91:14-20.)  Zigmont testified that ALC changed its

---

[30] Baretz testified:  "Over the years I've received e-mails either directly from Mr. Rebmann, Mr.Matthias Rebmann, or customers who said that they sent e-mails inquiring this or that, and either I was not responsive or they contacted Mr. Matthias Rebmann directly and he referred them to me.  And on many occasions in the past I recall receiving these [forwarded] e-mails from Mr. Matthias Rebmann himself."  (Baretz Dep. Tr. 18–81:2.)  Zigmont testified that "people got frustrated and called us because of lack of response," (Zigmont Dep. Tr. 53:14-16), and that "[i]n phone calls that I received, customers told me where they've sent emails to an employee who normally handled a certain product that got no response," (*id.* 57:13-16).

domain name to americanlecithin.us, created an entirely new website to be hosted at that new

domain name, which "took awhile," (Zigmont Dep. Tr. 34:11-25, 40:3-9), and verbally informed

customers of the change, (*id.* 49:21-50:2).  Based on this testimony, there is a dispute of fact as

to whether "damages [were] sustained."[31]  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12

N.Y.3d 132, 140 (2009); *cf. Ruso v. Morrison*, 695 F. Supp. 2d 33, 51 (S.D.N.Y. 2010) (denying

defendant's motion for summary judgment on breach of fiduciary duty claim in part because

"[d]isputed issues of fact [] remain[ed] with respect to . . . the amount of damages that

[Plaintiffs] suffered as a result of [Defendant's] alleged misconduct.").

        b.  Breach of Fiduciary Duty as to the Laptop and the CRM Software

Defendant argues that Plaintiffs' claim of breach of fiduciary duty as to his retention of

the Laptop and CRM Software must be dismissed because (1) Defendant properly purchased the

Laptop and the CRM Software from Lipoid LLC, and (2) the CRM software contained an

electronic address book but did not contain any proprietary information, and there is no evidence

Defendant used any of that information after his employment was terminated.  (Def.'s Mem. 16–

17, Def.'s Reply 13.)  Plaintiffs respond only that "the material facts concerning Plaintiffs'

claims with regard to the CRM software, including whether he purchased it, whether his father

knew of any such purchase, and to what information the software gave him access, are in definite

---

[31] Plaintiffs contend that "discovery is not yet complete, and there is no telling what additional damages [they] will uncover prior to trial." (Pls.' Opp. 16.)  This is unpersuasive.  A "plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover . . . an opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion" for summary judgment." *Halebian v. Berv*, 869 F. Supp. 2d 420, 438–39 (S.D.N.Y. 2012) (quoting *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981)), *aff'd*, 548 F. App'x 641 (2d Cir. 2013).  This is particularly true here, given that Plaintiffs' damages are a matter within their own knowledge, and are not likely to be further illuminated with additional discovery.  Moreover, the deadline for all discovery on Plaintiffs' claims was April 20, 2016; while the parties have repeatedly represented that there is outstanding discovery—in letters to me and in their January 3, 2019 conference with Magistrate Judge Fox—they have not yet requested or received any extension of that deadline.

dispute." (Pls.' Opp. 18.)

First, Plaintiffs do not address their claim as to the Laptop in their memorandum of law. They also do not dispute or even address Defendant's statement, supported by his testimony and uncontradicted by any other evidence in the record, that he purchased the laptop from Lipoid, LLC, thereby conceding it. (*See* Def.'s Mem. 16–17; Pls.' Opp. 7 -8, 18; Def.'s 56.1 ¶ 33 ("The laptop and 'CRM' software," belonged to Matthias" (citing Def.'s Dep. Tr. 79–81; Goldman Aff. Ex. 22)); Pls.' 56.1 Resp. ¶ 33 ("RESPONSE: Denied as to the CRM software . . . .").  Because Plaintiffs have "fail[ed] to controvert" this material fact, it is "deemed admitted." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).  If the Laptop belonged to Defendant, his retention of it after his employment ended could not have caused Plaintiffs any injury, nor do Plaintiffs identify any evidence showing that it did.  (*See* Pls.' Mem. 7.)  The branch of the claim relating to the laptop must therefore be dismissed.

As to the CRM software, Plaintiffs do offer evidence creating disputes of fact as to whether the contact information "was either technically confidential or that was available to the fiduciary only because of the employment," and whether Defendant was "exploit[ing] [that information] to [Plaintiffs'] detriment," *Poller*, 974 F. Supp. 2d at 227–28 (quoting *Am. Fed. Grp.*, 136 F.3d at 897).  *See also Don Buchwald & Assocs., Inc. v. Marber-Rich*, 782 N.Y.S.2d 725, 727 (1st Dep't 2004) (affirming denial of defendants' motion for summary judgment "to dismiss that part of the breach-of-fiduciary-duty cause of action alleging the individual defendants had copied plaintiff's confidential files during the period they were forming Atlas, because there are factual questions as to what information had been taken and whether that information was improperly used by Atlas"); *cf. Island Sports Physical Therapy v. Kane*, 923 N.Y.S.2d 158, 160 (2d Dep't 2011) ("[S]olicitation of an entity's customers by a former

employee . . . is not actionable unless the customer list could be considered a trade secret, or there was wrongful conduct by the employee or independent contractor, such as physically taking or copying files or using confidential information." (collecting cases)).

However, Plaintiffs do not offer even a scintilla of evidence or argument demonstrating that they suffered any damage as a result of Defendant's actions related to the CRM software, and the record makes clear that they did not.  For example, Baretz testified that he "believe[d] [Defendant] ha[d] attempted to divert business to himself directly from Lipoid, LLC," based on the fact that "[o]n several occasions, [he] ha[d] been told by customers that [Defendant] approached them saying that he was formerly the president of Lipoid, LLC, and he sampled them with materials that compete with materials that we sell."  (Baretz Dep. Tr. 86:19–87:4; *see also id.* 140:2-7.)  Baretz also testified that Defendant approached a handful of other companies, but that all three approached companies have remained customers of Lipoid, LLC.  (*Id.* 140:16–141:23.)  Similarly, Zigmont testified that he was "aware of at least . . . two incidences" of Defendant contacting ALC's customers, (Zigmont Dep. Tr. 71:23–72:2), and that the only way Defendant would have been able to do so was if had "he had prior information that was part of American Lecithin's . . . customer database," (*id.* 73:14-24; *see also id.* 72:9-11).  According to Zigmont, one of the two companies contacted by Defendant entered bankruptcy, though he testified he was not sure if they ever bought anything from Defendant, and the other continued as a customer of ALC.  (*Id.* 75:8-23.)

Accordingly, because Plaintiffs have failed to offer any evidence that would satisfy the damages element of a breach of fiduciary duty claim based on Defendant's retention of the Laptop and CRM Software, Defendant's motion for summary judgment dismissing that claim must be granted.

### 3.  Conversion[32]

Plaintiffs allege conversion based on Defendant's transferring the Domain Names to his own name and continuing to retain them,[33] and based on and his retention of the Laptop and CRM Software after his employment was terminated.  Defendant seeks dismissal of both claims. I find that there are issues of fact as to the claim based on the Domain Names, but that the claim based on the Laptop and CRM software fails as a matter of law.

#### a.  Domain Names

Defendant argues that Plaintiffs' conversion claim must fail because (1) the Domain Names are intangible property that cannot be converted under New York law, and (2) the Lipoid Group does not have a possessory right in the Domain Names.  Neither argument is compelling.

The long-standing general rule in New York was that intangible property could not be the subject of a conversion claim.  In 2006, however, the New York Court of Appeals held, in answer to a certified question from the Second Circuit, that "electronic records that were stored on a computer and were indistinguishable from printed documents" were "subject to a claim of conversion."  *Thyroff v. Nationwide Mut. Ins.* Co., 8 N.Y.3d 283, 289 (2007).  Although the Court of Appeals noted that the Ninth Circuit had found that domain names could be the subject of a conversion claim, *id.* at 290 (citing *Kremen v. Cohen*, 337 F.3d 1024, 1033–1034 (9th Cir.

---

[32] Defendant asserts that a claim for conversion is the same under New York law and New Jersey law, and throughout his briefs cites a mix of cases applying New York and New Jersey law.  (Def.'s Mem. 15–17; Def.'s Reply 12–13.)  Plaintiff cite only cases applying New York law.  (Pls.' Opp. 17–18.)  Accordingly, because the parties have pointed to no relevant conflict of laws, and implicitly consent to the application of New York law, I apply New York law to the conversion claims.

[33] As an initial matter, I note that although the Amended Complaint claims that Defendant converted all the Domain Names and alleges that "[b]y virtue of their Trademarks and/or the appointment of Defendant as an officer and/or employee, Plaintiffs had a right to possession of the Domain Names," (Am. Compl. ¶¶ 45–51), Plaintiffs' opposition argues only that Defendant converted those domain names that were registered in the first instance by someone other than Defendant: lipoidll.com, alcolec.com, americanlecithin.com, phosal.com, and phospholipon.com.  (Pls.' Opp. 17.)  The opposition does not address the Domain Names that were registered by Defendant in his own name in the first instance.  Accordingly, I deem that portion of the claim abandoned.

2003)), it explicitly "d[id] not consider whether any of the myriad other forms of virtual information should be protected by the tort," *id.* at 292–93.  In subsequent years, the Court of Appeals has not revisited the question of whether domain names may be converted under New York law.  *See Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16 CIV. 2555 (KMW), 2017 WL 239379, at *4 (S.D.N.Y. Jan. 18, 2017).  However, numerous district and state trial courts that have considered the question have concluded that domain names may indeed be the subject of a conversion claim.  *See id.* (collecting cases); *Ardis Health, LLC v. Nankivell*, No. 11 Civ. 5013, 2011 WL 4965172, at *3 (S.D.N.Y. Oct. 19, 2011) ("It is uncontested that plaintiffs own the rights to the Access Information.  Defendant's unauthorized retention of the information may therefore form the basis of a claim of conversion."); *Cf. C.D.S., Inc.*, 298 F. Supp. 3d at 749 (finding, after bench trial, that when defendant changed the registration of various domain names belonging to plaintiff to his own LLC, he "interfered with [plaintiff's] possessory interest" in the property, and was liable for conversion); *Triboro Quilt Mfg. Corp. v. Luve LLC*, No. 10 Civ. 3604, 2014 WL 1508606, at *9 (S.D.N.Y. Mar. 18, 2014) ("New York courts recognize exceptions [to the normal rule that only physical property can be converted] when the rightful owner of intangible property is prevented from creating or enjoying a 'legally recognizable and protectable property interest in his idea' such as by being prevented from registering the domain name for a website or being denied access to a database he created."  (quoting *Trustforte Corp. v. Eisen*, 10 Misc. 3d 1064(A), 814 N.Y.S.2d 565 (Table), 2005 N.Y. Slip Op. 52116(U), at *2 (N.Y. Cty. Sup. Ct. 2005)).  Defendant has cited no case in which a court applying New York law has explicitly found that domain names may not be subject to a conversion claim.

Therefore, I conclude that New York law does permit a plaintiff to sue for conversion based on interference with a domain name.  This conclusion is bolstered by the fact that the

Court of Appeals' decision in *Thyroff* was motivated by the need for "the common law to respond . . . to the demands of commonsense justice in an evolving society."  8 N.Y.3d at 291.

According to the Court of Appeals:

> [S]ociety's reliance on computers and electronic data is substantial, if not essential. Computers and digital information are ubiquitous and pervade all aspects of business, financial and personal communication activities . . . . We cannot conceive of any reason in law or logic why [the] process of virtual creation should be treated any differently from production by pen on paper or quill on parchment.  A document stored on a computer hard drive has the same value as a paper document kept in a file cabinet.

*Thyroff*, 8 N.Y.3d at 292.  Domain names also have inherent value, particularly where they implement an intellectual property right like a trademark.[34]

Next, Defendant argues that the Lipoid Group did not have a possessory right in the Domain Names because it refused to pay for them.  According to Defendant, because he offered to return the Domain Names in exchange for reimbursement, he did not "intentionally and without authority, assume or exercise control over the domain names and interfere with the Lipoid Group's right of possession."  (Def.'s Mem. 15.)  Further, Defendant contends, no conversion could have occurred because his original possession was authorized and Plaintiffs' demand was not accompanied by an offer to pay the expenses.  (Def.'s Reply 12 (citing *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993)).  As I have already discussed, the evidence does not establish that there are no material issues of fact concerning whether

---

[34] I note that although the Amended Complaint claims that Defendant converted all the Domain Names and alleges that "[b]y virtue of their Trademarks and/or the appointment of Defendant as an officer and/or employee, Plaintiffs had a right to possession of the Domain Names," (Am. Compl. ¶¶ 45–51), Plaintiffs' opposition argues only that Defendant converted those domain names that were registered in the first instance by someone other than Defendant —*i.e.*, lipoidll.com, alcolec.com, americanlecithin.com, phosal.com, and phospholipon.com.  (Pls.' Opp. 17.) Defendant's arguments do not differentiate between the Domain Names he transferred into his own name and the Domain Names he registered in his own name in the first instance.  Accordingly, because the parties have not raised it, I need not and do not decide the question of whether it is conversion to create a new domain name that exploits another person's trademark.

Defendant's initial possession of the Domain Names was authorized by Plaintiffs or that Defendant ever requested reimbursement.  Accordingly, this line of argument fails too, and Defendant's motion for summary judgment dismissing Plaintiffs' conversion claim as to the Domain Names is denied.

### b.  Laptop and CRM Software

Plaintiffs' claim of conversion relating to Defendant's retention of the Laptop and CRM Software after his employment was terminated must fail.  First, as discussed, it is undisputed that Defendant purchased the Laptop, and any conversion claim relating to it must fail because he undisputedly had the right of possession.

Second, New York law "requires that the defendant exclude the owner from exercising her rights over the goods."  *Thyroff*, 460 F.3d at 403–04 (quoting *New York v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 259 (2002)).  Plaintiffs explicitly admit that Defendant's possession of the CRM Software and its data did not interfere with their ability to use either.  (Pls.' Resp. 56.1 ¶ 37; *see also* Baretz Dep. Tr. 103:15-105:23 (testifying that Defendant had an offline copy of the software).)  Therefore, because Defendant did not "exclude [Plaintiffs] from exercising [their] rights over the goods," no claim for conversion can lie.  *Thyroff*, 460 F.3d at 403–04 (quoting *Vigilant Ins. Co.*, 87 N.Y.2d at 44).  *See also Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 414–16 (S.D.N.Y. 2018) (dismissing conversion counterclaim based on pure copying of electronic files because copying did not "result[] in any 'alteration' of the files" or "'exclude[]' [counterclaimant] from using the original files in any way [it] saw fit" (quoting *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 284 (S.D.N.Y. 2016)); *Reis, Inc. v. Spring11 LLC*, 2016 WL 5390896, at *1–2 (S.D.N.Y. Sept. 26, 2016) (finding that unauthorized downloading of files did not constitute conversion because the plaintiff was never deprived of

access, and observing that "[w]hile New York courts have recognized that conversion can be predicated on the loss of intangible electronic data, that case law has not altered the traditional rule requiring the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor"); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011) (defendant who downloaded business documents onto a thumb drive was not liable for conversion because defendant "possessed only a copy of the client list and did not, in any way, limit or otherwise deprive [plaintiff] of possession or use of that list").

### 4.  Affirmative Defenses

Finally, Defendant argues that Plaintiff's claims for equitable relief against him are barred by the doctrines of unclean hands and laches.  Factual disputes preclude summary judgment as to both defenses.

#### a.  Unclean Hands

"The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.'"  *Genger v. Genger*, 76 F. Supp. 3d 488, 502 (S.D.N.Y.2015) (quoting *Kopsidas v. Krokos*, 742 N.Y.S.2d 342, 344 (2002)).

Defendant argues that Plaintiffs have unclean hands because they sought to compel return of the Domain Names without reimbursement,[35] and because they falsely represented to the Court that they were suffering irreparable harm when in fact Matthias had offered to turn them over.  (Def.'s Mem. 18.)  I have already found that there are disputed issues of fact as to whether

---

[35] Defendant also makes the same argument with regard to the Laptop and CRM Software.  However, because I have already determined that all of Plaintiffs' causes of action relating to the Laptop and CRM Software must be dismissed in their entirety on the merits, I do not address the applicability of Defendant's affirmative defenses as to those claims.

Defendant's initial possession of the Domain Names was authorized and whether he actually sought and was entitled to reimbursement.  These same factual issues are integral to Defendant's unclean hands defense, and so summary judgment is not appropriate.[36]

### b.  Laches[37]

Ordinarily, laches is available as a defense against trademark infringement claims brought under the Lanham Act, because it "expressly incorporates the principles of equity." *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 420 (S.D.N.Y. 2012), *opinion clarified* (Feb. 21, 2012); *see also Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, No. 06-3508-CV, 2007 WL 2914452, at *1 (2d Cir. Oct. 5, 2007) (summary order). "Laches will apply where (1) plaintiff had knowledge of defendant's use of its marks, (2) plaintiff inexcusably delayed in taking action with respect to defendant's use, and (3) defendant suffered prejudice as a result.  *Id.* (citing *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir. 1980)).  However, "[i]t is well established that 'laches is not a defense against injunctive relief in a trademark infringement action when the defendant intended trademark infringement,'" *Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371 (S.D.N.Y. 2015) (quoting *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000)), because "he who comes into equity must come with clean hands," *Hermes Int'l*, 210 F.3d at 107 (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814 (1945)).  Thus, "intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense . . . ."  *Id.*

---

[36] I note, however, my discussion here is not intended and should not be construed as a finding that if the facts asserted by Defendant are proved at trial, they would necessarily establish that Plaintiffs had unclean hands.

[37] Defendant only argues that Plaintiffs' claims for equitable relief for trademark infringement are barred by laches, and does not address Plaintiffs' requests for equitable relief as a remedy for their breach of fiduciary duty claim.

Unlike an ordinary trademark infringement cause of action, the ACPA necessarily requires bad faith intent to profit, suggesting that a laches defense cannot be asserted against a factually supported claim of cybersquatting.  In the instant case, as I have already held, there is a genuine issue of fact as to Defendant's intent in registering and retaining the Domain Names, and so I cannot adjudicate his laches defense against Plaintiffs' cybersquatting claim at this stage.

Accordingly, Defendant's motion for summary judgment on his affirmative defenses of unclean hands and laches must be denied.

### V.   <u>Conclusion</u>

Because there is a triable issue of fact as to whether, among other things, Dr. Rebmann personally participated in the alleged conversion of Plaintiff's shares, Dr. Rebmann's motion for summary judgment is DENIED.

Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Because there is an issue of fact as to whether Defendant has retained the domain names at issue in bad faith, his motion for summary judgment dismissing Plaintiffs' cybersquatting claim is DENIED.  Because there are multiple issues of fact as to Plaintiffs' conversion and breach of fiduciary duty claims relating to the domain names, Defendant's motion for summary judgment dismissing those claims is DENIED.  Because there are disputes of fact as to Defendant's affirmative defenses of laches and unclean hands, his motion for summary judgment dismissing Plaintiffs' claims for injunctive relief is DENIED.  The remainder of the motion is GRANTED.  Because Defendant undisputedly purchased the Laptop from Plaintiffs and because his retention of the Laptop and CRM Software undisputedly did not interfere with Plaintiffs' rights, Defendant's motion for summary judgment as to Plaintiffs' claim of conversion is GRANTED and that claim is DISMISSED.  Because Plaintiffs have pointed to no evidence in

the record demonstrating damages, Defendant's motion for summary judgment as to Plaintiffs claims for breach of fiduciary duty relating to the Laptop and the CRM Software is GRANTED.

The parties are directed to appear for a telephonic post-discovery conference on August 27, 2020, at 2:30 p.m.  The parties shall enter the conference by dialing 1-888-363-4749 and entering access code 2682448.  The parties shall meet and confer and submit a joint letter on or before August 20, 2020, (1) stating whether they seek to conduct any additional discovery on Plaintiffs' claims and on Defendant's counterclaims and third-party claims, and if so setting forth what discovery they seek, and detailing any disputes as to the purportedly outstanding discovery; (2) if there are no issues as to discovery, (a) proposing trial dates[38] beginning in or after October 2020, (b) setting forth a proposed schedule for submission of a joint pretrial order and motions in limine, and (c)  indicating whether they intend to call any witnesses who reside abroad, and if so whether those witnesses will appear in person or by deposition; and (3) indicating whether they wish to be referred to a magistrate judge for settlement.

The Clerk of Court is respectfully directed to terminate the motions at Document 270 and 274.

SO ORDERED.

Dated: July 24, 2020
     New York, New York

Vernon S. Broderick
United States District Judge

---

[38] Such dates will be tentative given that jury trials have been suspended indefinitely in this District. *See In re: Coronavirus/COVID-19 Pandemic*, No. 20-mc-197, at ECF No. 1 (Apr. 20, 2020).